IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2007 APR 25 P 4: 28

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | | |
|---|---|---|
| CARROLL W. PUCKETT, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. |
| | ) | 2:06-cv-1148-ID |
| McPHILLIPS SHINBAUM, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

---

## PLAINTIFF'S CONSOLIDATED RESPONSE
## IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

*(i) STATEMENT IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT;*
*(ii) NARRATIVE SUMMARY OF FACTS;*
*(iii) MEMORANDUM BRIEF & CITATION OF AUTHORITIES;*
*(iv) OPPOSING AFFIDAVITS; AND*
*(v) NOTICE OF FILING OF EVIDENTIARY MATERIALS*

---

Submitted by:

GEORGE E. JONES, III
ATTORNEY AND COUNSELOR AT LAW
711 Alabama Avenue
P. O. Box 9
Selma, Alabama 36702-0009
(334) 874-6617

ALA. BAR I.D. ASB-9546-5826
ATTORNEY FOR PLAINTIFF

April 25, 2007

## *TABLE OF CONTENTS*

|  | Page(s) |
|---|---|
| Table of Contents.......................................... | i, ii, iii |
| Plaintiff's Statement in Opposition to Summary Judgment....... | 1 |
| Plaintiffs' Narrative Summary of Facts......................... | 3 |
| Standard of Review........................................ | 6 |
| Introduction to Argument................................... | 7 |

Argument:

| I. | THE COURT SHOULD DEFER RULING ON ANY MOTION FOR SUMMARY JUDGMENT UNTIL THE DISCOVERY PROCESS CAN BE COMPLETED.................. | 7 |
|---|---|---|
|  | A.  Unripeness for Summary Judgment......... | 7 |
|  | B.  Burdens and Presumptions.. .............. | 8 |
|  | C.  Plaintiff's Rule 56(f) Statement.. ............. | 11 |
|  | D.  Cosmetic Appearance of Motion............. | 12 |
|  |     1. Rule 12(b)(6) Standard.................. | 12 |
|  |     2. Rule 56 Standard...................... | 13 |
| II. | THE PLAINTIFF MAY OBTAIN RELIEF AGAINST INDIVIDUAL DEFENDANTS IF THEY ARE AGENTS OF THE EMPLOYER..................................... | 14 |

<u>*TABLE OF CONTENTS*</u>
*(continued)*

III.   *PLAINTIFF HAS ESTABLISHED A PRIMA
FACIE CASE OF DISCRIMINATION UNDER
TITLE VII AND HE HAS PRESENTED
SUBSTANTIAL EVIDENCE SO AS TO
PRECLUDE SUMMARY JUDGMENT
IN FAVOR OF THE DEFENDANTS.* . . . . . . . . . . . . . . . .   16

    A.   **Hostile Work Environment** . . . . . . . . . . . . . . . . .   16

    B.   **National Origin Discrimination.** . . . . . . . . . . . . .   17

    C.   **Gender Discrimination** . . . . . . . . . . . . . . . . . . . .   18

    D.   **Retaliation Discrimination** . . . . . . . . . . . . . . . . .   18

    E.   **Unmeritorious Defenses of
McPhillips-Shinbaum.** . . . . . . . . . . . . . . . . . . . .   20

IV.   *PLAINTIFF HAS ESTABLISHED A PRIMA
FACIE CASE OF DISCRIMINATION UNDER
THE A.D.A. AND HE HAS PRESENTED
SUBSTANTIAL EVIDENCE SO AS TO
PRECLUDE SUMMARY JUDGMENT IN
FAVOR OF THE DEFENDANTS.* . . . . . . . . . . . . . . . . . .   21

V.   *PLAINTIFF HAS ESTABLISHED A PRIMA
FACIE CASE OF DISCRIMINATION UNDER
THE A.D.E.A AND HE HAS PRESENTED
SUBSTANTIAL EVIDENCE SO AS TO
PRECLUDE SUMMARY JUDGMENT FOR
THE DEFENDANTS* . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

VI.   *PLAINTIFF HAS PRESENTED SUBSTANTIAL
EVIDENCE IN SUPPORT OF HIS CLAIM THAT
THE REASONS FOR HIS DISCHARGE WERE
PRETEXTUAL.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

VII.   *PLAINTIFF HAS COME FORWARD WITH
SUBSTANTIAL EVIDENCE WHICH WOULD
ENTITLE HIM TO PREVAIL ON HIS
DEFAMATION CLAIM.* . . . . . . . . . . . . . . . . . . . . . . . .   26

*ii.*

<u>*TABLE OF CONTENTS*</u>
*(Continued)*

*VIII.    PLAINTIFF'S FRAUD CLAIM* . . . . . . . . . . . . . . . . . . . . . . .    *27*

*Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *29*

*Certificate of Service* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *30*

*Index to Exhibits.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    *31*

*iii.*

## PLAINTIFF'S STATEMENT IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### 1.

The Motion is due to be denied because it is premature at this stage of the proceeding. PLAINTIFF should be afforded the opportunity to exhaust the discovery process, and in particular to take depositions, before the summary judgment process is initiated.

### 2.

The Supreme Court of the United States has held that summary judgment should not be granted until after the nonmoving party has had an "adequate time for discovery." *Celotex Corp. V. Catrett, infra.*

### 3.

This is an employment discrimination case involving peculiarly intensive state of mind questions and intent questions which can only be resolved through sworn deposition testimony.

### 4.

The truthfulness of the DEFENDANTS' affidavit testimony cannot be tested in the absence of some sort of cross-examination, i.e., the taking of depositions. Until depositions can be taken, there remain general issues of material fact to be resolved.

### 5.

In the alternative, PLAINTIFF respectfully submits that he has come forward with "substantial evidence," in the form of affidavits and exhibits which are attached

hereto, which present genuine issues of material fact so as to preclude the entry of

summary judgment in favor of the DEFENDANTS.

Respectfully submitted this the _25_ day of April, 2007.

GEORGE E. JONES, III
ALB. BAR I.D. ASB-9546-S82G
ATTORNEY FOR PLAINTIFF

ADDRESS OF COUNSEL:

GEORGE E. JONES, III
ATTORNEY AND COUNSELOR AT LAW
711 Alabama Avenue
P. O. Box 9
Selma, Alabama 36702-0009
(334) 874-6617

### PLAINTIFF'S NARRATIVE SUMMARY OF FACTS

1.      *PLAINTIFF CARROLL W. PUCKETT has been associated with DEFENDANT JULIAN McPHILLIPS for a period of some twenty-six (26) years without separation from employment. ( C. PUCKETT AFFID. ¶ 5 and ¶6). During this time PUCKETT never received a negative employee performance appraisal rating. (Id. at ¶11, ¶18, ¶22)   Beginning in 1999, and up until his termination, MR. PUCKETT was paid an annual salary and he was considered to be a full-time employee with all benefits including health insurance, vacation leave, and sick leave. (Id. at ¶8)    As a paralegal/legal assistant it was not unusual for MR. PUCKETT to be working on over one hundred (100) cases at a time. (Id.)*

2.      *PUCKETT'S job title was "paralegal" or "legal assistant." (C. PUCKETT AFFID. ¶5)    PUCKETT'S duties included interviewing prospective clients, the drafting of pleadings of all types, performing legal research, and accompanying MR. McPHILLIPS and other lawyers in the firm to court appearances. (C. PUCKETT AFFID. ¶9)    MR. PUCKETT always "pulled his own weight," so to speak, by generating substantially more income for the law firm than what was being paid out to him in salary and benefits. (Id. at ¶10)*

3.      *From 2002 up until his termination on April 28, 2006, MR. PUCKETT experienced some health problems.  He had a kidney surgically removed in 2002. (C. PUCKETT AFFID. ¶12)   MR. PUCKETT suffered a minor stroke in June of 2003. (Id. at ¶13) He was briefly hospitalized in September of 2003 for stomach bleeding. (Id. at ¶14)   In December of 2003 he was briefly hospitalized for a gastrointestinal*

-3-

blockage. (*Id*. at ¶15) In 2004 MR. PUCKETT underwent radiation treatments for prostate cancer. (*Id*. at ¶16)  After recovering from each illness MR. PUCKETT was at all times able to perform his job duties. (C. PUCKETT AFFID. ¶¶12 through 18).

4.      A hostile work environment against MR. PUCKETT then ensued. DEFENDANT McPHILLIPS was hostile and uncooperative when PUCKETT needed to take radiation treatments. (C. PUCKETT AFFID. ¶16)  MR. McPHILLIPS began to require MR. PUCKETT to go through an intermediary in order to communicate with him (McPHILLIPS). ( *Id*. at ¶35)    MR. PUCKETT'S nameplate was mysteriously removed from the door to his office. (B. PUCKETT AFFID. ¶10)   MR. PUCKETT was harassed about not complying with "phantom" law firm policies which did not exist. He was chastised for not organizing and keeping his case files in a certain manner. (B. PUCKETT AFFID. ¶8)   Cases which MR. PUCKETT was working on were taken from him and re-assigned without any explanation whatsoever. (C. PUCKETT AFFID. ¶¶21, 27, 28, and 36); (B. PUCKETT AFFID. ¶8) All of sudden the cases being assigned for Mr. PUCKETT were cases of poor quality and of little settlement or recovery value. (B. PUCKETT AFFID. ¶9); (C. PUCKETT AFFID. ¶22)  DEFENDANT McPHILLIPS constantly complained about MR. PUCKETT'S age. (C. PUCKETT AFFID. ¶ 25)  The firm's office manager, DEFENDANT AMY STRICKLAND, made statements which could be construed as a demand that MR. PUCKETT retire because of his age. (B. PUCKETT AFFID. ¶ )

5.      PUCKETT was terminated from his employment with the McPHILLIPS-SHINBAUM law firm on or about April 28, 2006. (Complaint, C. PUCKETT AFFID. ¶6)

The reasons given by the DEFENDANTS for said termination include,  *inter alia*, the following: (i) poor economic conditions and dwindling law firm revenue (DEFENDANT McPHILLIPS AFFID.; DEFENDANT SHINBAUM AFFID.); (ii) alleged concerns about the quality of MR. PUCKETT'S work performance (DEFENDANT McPHILLIPS AFFID.; DEFENDANT SHINBAUM AFFID.) and (iii) the unfounded claim that MR. PUCKETT was not capable of performing the duties of a general legal secretary in addition to his duties as a law clerk/paralegal.) (*Id.*)

6.     At the time MR. PUCKETT was terminated, a younger female law clerk/paralegal named ALLISON HIGHLEY was retained as an employee, notwithstanding the fact that she had only been with the firm for less than a year and was not as productive as MR. PUCKETT. (C. PUCKETT AFFID. ¶32)

### *STANDARD OF REVIEW*

*It is axiomatic that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law." Rile 56, <u>Fed. R. Civ. Pro.</u>; <u>Celotex Corp. V. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed. 265 (1986). The principle is illustrated by the decision of <u>Barber v. Dale County Mental Health Center</u>, 898 F. Supp. 832 (M.D. Ala. 1995):*

> *The party asking for summary judgment 'always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.' <u>Id</u>. At 323, 106 S.Ct. At 2552. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id</u>. At 322-23, 106 S.Ct. At 2552-53.*

> *"Once the moving party has met it burden, Rule 56(e) 'requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id</u>. At 324, 106 S.Ct. At 2553. To avoid summary judgment, the nonmoving party 'must do more than show that there is some metaphysical doubts as to the material facts.' <u>Matsushita Elec. Indus. Co. V. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1989). On the other hand, the evidence of the nonmovat must be*

> *believed and all justifiable inferences must be drawn in its favor. Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)."*

*898 F. Supp. at 835. Based upon PLAINTIFF'S response to the Motions for Summary Judgment, contained herein, we submit that there are indeed genuine issues of material fact to be determined by a jury and none of the DEFENDANTS are entitled to a judgment as a matter of law.*

## INTRODUCTION TO ARGUMENT

*Cases such as the one sub judice seldom lend themselves to summary disposition because questions of credibility will ordinarily abound. Thus, summary judgment should be used sparingly and should be seldom granted in cases involving intent, and in cases involving peculiarly intensive "state of mind" questions such as employment actions and discrimination claims. In the alternative, PLAINTIFF respectfully submits that he has come forward "substantial evidence" in response to DEFENDANTS' motion so as to preclude the entry of summary judgment.*

## ARGUMENT

I.     *THE COURT SHOULD DEFER RULING ON ANY MOTION FOR SUMMARY JUDGMENT UNTIL THE DISCOVERY PROCESS CAN BE COMPLETED.*

A.     *Unripeness For Summary Judgment.*

*PLAINTIFF respectfully submits that this case, under it's present factual*

-7-

posture and procedural posture, is not ripe for summary judgment at the present time. There is very little substantive evidence before the Court at the present time, i.e., affidavits and counter-affidavits, and the PLAINTIFF should be permitted to exhaust the discovery process. Depositions are particularly important in this case for the PLAINTIFF (as well as helpful to the trial court) in order for PLAINTIFF to meet his various burdens to establish a prima facie case and to rebut certain presumptions that may exist in favor of the DEFENDANTS. A summary judgment motion can be "premature" simply because it was filed before discovery is completed or even began. Celotex Corp v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed 2d 265 (1986). Thus, pre-discovery summary judgments should more appropriately be the exception, rather than the rule. Patton v. General Signal Corp., 984 F.Supp. 666, 670 (W.D.N.Y. 1997). See also, Information Handling Services, Inc. v. Defense Automated Printing Svcs., 338 F.3d 1024 (D.C. Cir 2003)(commenting that summary judgment is ordinarily proper only when plaintiff has had adequate time for discovery); Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292 (2d Cir. 2003)(pre-discovery summary judgment granted only in the rarest cases); and Vaughn v. United States Small Bus. Admin., 65 F.3d 1322, 1325 n.1 (6th Cir 1995)(defendant's summary judgment motion cannot ordinarily by considered until the plaintiff has had the opportunity to conduct discovery).

B.    Burdens and Presumptions.

Some of the burdens which are applicable in this case shift back and forth between the parties under the causes of action which have been presented. For

-8-

*example, to the extent that the "McDonnell Douglas" doctrine, a burden-shifting framework, applies in this case, the PLAINTIFF simply cannot respond adequately to any motion for summary judgment made by the DEFENDANTS without propounding interrogatories, requesting documents, and taking depositions:*

> *"In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court 'established an allocation of the burden of production and an order for the presentation of proof in title VII discriminatory-treatment cases.' St. Mary's honor Center v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). Under the McDonnell Douglas approach, an employee has the initial burden of establishing a prima facie case of unlawful gender discrimination by a preponderance of evidence. 411 U.S. at 802, 93 S.Ct. At 1824. A 'prima facie case requires 'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion.' International Brotherhood of Teamsters v. United States, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). An employee may establish a prima facie case of discrimination in lay off or demotion by . . .*

> *"If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee. This may be done by the employer articulating a legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that is was actually motivated by the reason advanced. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. At 1824; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-55, 258, 101*

*S.Ct. 1089, 1093-94, 1096, 67 L.Ed.2d 207 (1981). 'If the trier of fact finds that the elements of the prima facie case are supported by a preponderance of the evidence and the employer remains silent, the court must enter judgment for the Plaintiff.' O'Connor v. Consolidated Coin Caterers Corp., 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996).*

\*      \*      \*

*"Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden either directly by persuading the court that a discriminatory reason more than likely motivated the employer or indirectly by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of the evidence that she has been the victim of unlawful discrimination. Burdine, 450 U.S. at 256, 101 S.Ct. At 1095."*

*Hearn v. General Elec. Co., 927 F.Supp. 1486, 1494 (M.D. Ala. 1996). Thus, there must be at least a logical connection between each element of the prima facie case and the illegal discrimination. O'Connor v. Consolidated Coin Caterers Corp., 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). The foregoing language illustrates precisely why summary judgment is inappropriate in this case until the discovery process can be completed by all of the parties. Indeed, evaluating credibility, weighing evidence, and drawing factual inferences are all functions reserved for the jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed 2d 202 (1986). Therefore, cases involving motive, knowledge, intent, good faith or bad faith, malice, fraud,*

-10-

*conspiracy, or consent, will seldom lend themselves to a summary disposition because questions of credibility will ordinarily abound. Quinones v. Buick, 436 F.3d 284 (1st Cir. 2006); Hutchinson v. Proxmire, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed. 2d 411 (1979). Therefore, summary judgment is to be used sparingly and     seldom granted in cases involving particularly intensive state of mind questions such as employment actions, discrimination claims, and antitrust cases. Expert Masonry, Inc. v. Boone County, 440 F.3d 336, 341 (6th Cir. 2006)(emphasis supplied). Accord, Peterson v. Scott County, 406 F.3d 515 (8th Cir. 2005)(summary judgment "seldom" granted in employment discrimination cases); and Feingold v. New York, 366 F.3d 138 (2nd Cir. 2004)(summary judgment is to be used "sparingly" in discrimination cases).*

*C.    Rule 56(f) Statement.*

*PLAINTIFF  avers that it may be likely he cannot satisfy all of the above-described burdens and presumptions without the taking of depositions. Indeed, to prove discriminatory treatment in violation of Title VII, the plaintiff-employee must establish a prima facie case of discrimination and raise inference(s) that discriminatory intent motivated discharge of the employee.     O'Conner v. Fort Gordon Bus Co., 761 F.2d 1495 (11th Cir 1985). Again, we submit that this simply cannot be done without plaintiff having the opportunity to exhaust the discovery process. That the discovery process should be exhausted prior to consideration of summary judgment in actions such as this is illustrated by the decision in O'Connor, supra:*

-11-

> *"If an employer articulates at trial a clear and specific reason for discharging an employee, the purposes of the employer's burden of production have been met.   The employee is given a reasonable opportunity for rebuttal, for she is accorded the opportunity to show her competence according to the stated objective criteria.   See Miles, supra, at 871."*

*761 F.2d at 1499.  Moreover, it is for the jury to decide when [an] alleged hostile environment ceased to exist, if at all, prior to [Carroll's] discharge.   Saville v. Houston County Healthcare Authority, 852 F.Supp 1512, 1526-27 (M.D. Ala. 1994).*

D.    <u>Cosmetic Appearance of Defendant's Motion.</u>

1.    <u>Rule 12(b)(6) Standard.</u>

PLAINTIFF would respectfully submit that DEFENDANTS' pending Motion for a Rule 56 Summary Judgment is in actuality a Rule 12(b)(6) Motion to Dismiss, which has been cosmetically made to appear as a Rule 56 summary judgment motion by attaching three (3) vague affidavits, the contents and veracity of which are spurious.  We respectfully urge the Court, in ruling on this pending motion, to apply the standard of review applicable to motions filed under Rule 12(b)(6), <u>Fed. R. Civ. Pro.</u>:

> *"A claim may be dismissed either because it asserts a legal theory that is not cognizable as a matter of law or because it fails to allege sufficient facts to support a cognizable legal claim.  When a claim is challenged under this Rule, the court presumes that all well-pleaded allegations are true, resolves all doubts and inferences in the pleader's favor, and views the pleading in the light most favorable to the non-moving party.*

-12-

> *"In it's liberality, the Rule erects a powerful presumption against dismissing pleadings for failing to state a cognizable claim for relief. Such dismissals are disfavored and, in view of the rules' 'notice pleading' requirements, are not routinely granted. A claim will only be dismissed under Rule 12(b)(6) if it appears beyond doubt that the pleader can prove no set of facts in support of the claim that would entitle the pleader to relief. Thus, the pleader's stated legal theory and specific requests are not necessarily dispositive in ruling on a Rule 12(b)(6) motion."*

*Baicker-McKee, Janssen and Corr, <u>Federal Civil Rules Handbook</u>, at page 371 (2007 ed.); case citations omitted. Indeed, by way of example, in a racial discrimination employment case, the PLAINTIFF'S naked allegation that "I was turned down for a job because of my race," is all the complaint need say. <u>Bennett v. Schmidt</u>, 153 F.3d 516, 518 (7th Cir. 1998). In any event, the law is quite clear that dismissal and other summary procedures should be applied "sparingly" . . . "where motive and intent play leading roles." <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 212 (4th Cir. 2002). In the matter at bar, the PLAINTIFF'S entire case may turn on the deposition testimony of the DEFENDANTS' with respect to their motive and intent. By filing self-serving and vague affidavits, they are attempting to defeat PLAINTIFF'S right to test their truthfulness by cross-examination as to the contents of the affidavits.*

### 2.    <u>The Rule 56 Standard May Be Ignored</u>.

*PLAINTIFF respectfully submits that Your Honor has discretion deciding in which standard of review to apply in this matter. Even when extrinsic materials are improperly attached to a Rule 12(b)(6) motion to dismiss, a conversion to a*

*summary judgment proceeding does not occur automatically.        Scuedbery v.*

*Marotzke, 339 F.3d 1139 (9th Cir. 2003).  The Court does not have to consider the*

*matters outside the pleadings, i.e., the DEFENDANTS' affidavits, or if the materials*

*are otherwise irrelevant to the Court's resolution of the motion.  Pueschel v. United*

*States, 369 F.3d 345 (4th Cir. 2004); Casazza v. Kiser, 313 F.3d 414 (8th Cir. 2002).  By*

*attaching affidavits to their motion the DEFENDANTS are asking Your Honor to*

*weigh the credibility of witnesses and other vague evidence in ruling on the Motion*

*for Summary Judgment.  Evaluating credibility, weighing evidence, and drawing*

*factual inferences are all functions reserved for the jury. Anderson v. Liberty Lobby,*

*supra.*

*Applying either of the two (2) standards, we respectfully submit that*

*DEFENDANTS' motion is due to be overruled because, under the circumstances of*

*this case, PLAINTIFF'S claims should not be dismissed until further factual*

*development is accomplished.*

*II.      THE PLAINTIFF MAY OBTAIN RELIEF AGAINST THE*
*LAW FIRM BY NAMING INDIVIDUAL DEFENDANTS IF*
*THEY ARE AGENTS OF THE EMPLOYER.*

*The term "employer" in Title VII of The Civil Rights Act of 1964 is to be*

*interpreted liberally consistent with the purposes of Title VII. Virgo v. Riviera Beach*

*Associates, Ltd., 30 F.3d 1350 (11th Cir. 1994).  It has been explicitly held that an*

*employee has a disparate treatment cause of action against his or her employer by*

*naming either the employer or supervisory employees or agents of the employer.*

*Edwards v. Wallace Community College, 49 F.3d 1517 (11th Cir. 1995). Moreover, an*

-14-

employer can be held liable under Title VII for the discriminatory actions of it's employees under either of two theories: agency or respondeat superior.  *Sparks v. Pilot Freight Carriers, Inc.* 830 F.2d 1554 (11th Cir. 1987).  Indeed, "[Title VII] suits may be brought only against individuals in their official capacity and/or the employing entity.  *Yeldell v. Cooper Green Hospital, Inc.,* 956 F.2d 1056, 1060 (11th Cir. 1992).  *See also, Smith v. Capitol City Club of Montgomery,* 850 F.Supp. 976 (M.D. Ala. 1995)( the proper method for a plaintiff to recover under Title VII is by suing the employer, either by naming the supervisory employees as agents of the employer or by naming the employer directly).

PLAINTIFF would submit that DEFENDANTS SHINBAUM and STRICKLAND are due to remain DEFENDANTS in this action, in their "official capacities," so to speak, because PLAINTIFF seeks to hold the employer law firm vicariously liable for said DEFENDANTS' discriminatory conduct under theories of agency or respondeat superior.  The same applies with respect to DEFENDANT JULIAN MCPHILLIPS.  Moreover, DEFENDANTS have cited no authority which holds that this Court is precluded from directing declaratory and injunctive relief against individual agents of the law firm if PLAINTIFF prevails on the merits.  And, obviously, an offending individual employee may be held liable under causes of action other than Title VII, such as state-law tort claims for defamation and fraud.  *Sparks v. Pilot Freight, supra; Smith v. Capitol City Club, supra.*

-15-

III.    PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE
OF DISCRIMINATION UNDER TITLE VII AND HE HAS
PRESENTED SUBSTANTIAL EVIDENCE SO AS TO
PRECLUDE SUMMARY JUDGMENT IN FAVOR OF THE
DEFENDANTS.

A.    Hostile Work Environment.

Under Title VII, the term "abusive work environment" is interchangeable with

the term "hostile work environment". Bivins v. Jeffers Vet Supply, 873 F.Supp 1500

(M.D. Ala. 1994), affirmed, 58 F.3d 640 (11th Cir. 1995). It has been explicitly held that:

> "whether an environment is 'hostile' or
> 'abusive' can be determined only by looking at all
> the circumstances," including "the frequency of the
> discriminatory conduct; its severity; whether it is
> physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably
> interferes with an employee's work performance."
> Harris v. Forklift Systems, Inc. 114 S.Ct. 367, 371,
> 126 L.Ed2d 295 (1993)".

Saville, supra, 852 F.Supp. at 1526. Abusive conduct which creates a hostile

working environment need not be directed toward the plaintiff specifically to give

rise to a Title VII violation. Stingley v. State of Arizona, 796 F.Supp. 424 (D. Ariz.

1992). Indeed, in the "hostile environment context," there is no substantive

requirement that all conduct contributing to the violation be directed specifically or

exclusively at plaintiff; rather, the conduct is actionable when it effects conditions

of the PLAINTIFF'S employment. Anthony v. County of Sacramento, 898 F.Supp.

1435 (E.D. Cal. 1995). In the matter at bar affidavit testimony reflects that the

atmosphere at the law firm turned quite hostile towards him after his health

problems began. MR. PUCKETT'S nameplate was removed fromk his door. (B.

-16-

PUCKETT AFFID. ¶ 10)  Personnel at the law firm urged MR. PUCKETT to retire by continually suggesting that he do so. (B. PUCKETT AFFID. ¶ 5; C. PUCKETT AFFID. ¶ 21) Personnel at the law firm began to rummage through MR. PUCKETT'S case files in his private office whenever he was away. (C. PUCKETT AFFID. ¶¶ 21, 22, 23, and 36; B. PUCKETT AFFID. ¶ 8) Suddenly and without explanation cases which MR. PUCKETT were working on were taken from him and re-assigned without explanation. (C. PUCKETT AFFID. ¶ 27 and ¶36; B. PUCKETT AFFID. ¶ 9) DEFENDANT JULIAN McPHILLIPS refused to speak directly to MR. PUCKETT and forced him to communicate through an intermediary after PLAINTIFF PUCKETT had been working for McPHILLIPS for some twenty-six (26) years. (C. PUCKETT AFFID. ¶35)  MR. PUCKETT was accused of violating "phantom" firm policies which did not exist with respect to how he was maintaining his case files. (C. PUCKETT AFFID. ¶ 22 and ¶ 27; B. PUCKETT AFFID. ¶ 8 and 9)  All of this clearly constitutes abusive conduct which affected conditions of MR. PUCKETT'S employment.

    B.    <u>National Origin Discrimination.</u>

    Title VII forbids discrimination on the basis of sex, race, or national origin in a wide range of employment practices, including hiring, discharge, and promotion. <u>Mays v. U.S. Postal Service</u>, 928 F.Supp. 1552 (M.D. Ala. 1996). It is axiomatic that a plaintiff may maintain an employment discrimination claim under Title VII for discrimination solely on the basis of national origin.    <u>Bennun v. Rutgers State University</u>, 941 F.2d 154 (3rd cir. 1991). <u>Lam v. University of Hawaii</u>, 40 F.3d 1551(9th Cir. 1994).  MR. PUCKETT, a Christian, contends that he was fired in order that a

-17-

*young lady of Jewish descent, ELIZABETH BERN-SPEAR, could be hired to take his*

*place. (C. PUCKETT AFFID.    ¶ 30) MR. PUCKETT contends that DEFENDANT*

*KENNETH SHINBAUM, a person of the Jewish faith, orchestrated PUCKETT'S firing*

*in order to bring in a person of his own faith. (C. PUCKETT AFFID. ¶ 30)*

C.    *Gender Discrimination.*

*Under Title VII, employment discrimination based on gender is prohibited and*

*this principle applies equally to both men and women.  Martin v. Norfolk Southern*

*Ry. Co., 926 F.Supp. 1044 (N.D. Ala. 1996).  It is axiomatic that "[a]n employee may*

*establish an [unlawful case of] discrimination in lay off or demotion by showing (1)*

*membership in a protected group, (2) qualification for the position held, (3) layoff or*

*demotion, and (4) retention in the position of a less or equally qualified person*

*outside the protected group."  Hearn v. General Elec. Co. , 927 F.Supp 1486, 1494*

*(M.D. Ala. 1996).  Moreover, It has been firmly established that men are within a*

*protected class as defined by Title VII.  Grant v. Bullock County Bd. Of Educ., 895*

*F.Supp. 1506 (M.D. Ala. 1995).  MR. PUCKETT contends that he was replaced by*

*ALLISON HIGHLY, a law clerk/paralegal who is some forty (40) years younger than*

*Mr. PUCKETT and who has substantially less legal experience than MR. PUCKETT.*

*(C. PUCKETT AFFID. ¶ 30)  MR. PUCKETT is a male and the much yonger and less*

*qualified MS. HIGHLY is a female (Id.)*

D.    *Retaliation Discrimination.*

*DEFENDANTS' argument that there can be no retaliation claim at all, because,*

-18-

they say, CARROLL'S E.E.O.C. complaint was filed after his termination, is without

substance.  With respect to a retaliation claim made under the A.D.A., the law is

quite clear that:

> "The ADA provides that '[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA].' 42 U.S.C. § 12203(a). In order to establish a prima facie case of retaliation, [CARROLL] must show that: (1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression.' See <u>Farley v. National Mut. Ins. Co.</u>, 197 F.Ed 1322, 1336 (11th Cir. 1999)(other citation omitted.)"

<u>Lucas v. W.W. Grainger, Inc.</u>, 257 F.3d 1249, 1260 (11th Cir. 2001).  The basis of MR.

PUCKETT'S retaliation claim is the fact that a pattern and practice of harassment

ensued once he complained about the way he was being treated.  MR. PUCKETT

asked office manager AMY STRICKLAND, "are ya'll trying to run me off?" (C.

PUCKETT AFFID. ¶ 21)  It was after this form of expression, and after MR.

PUCKETT'S wife complained, that the harassment of Mr. PUCKETT reached a

crescendo. (B. PUCKETT AFFID. ¶ 9)  Prior to his termination the work environment

at McPHILLIPS-SHINBAUM was almost unbearable and clearly retaliatory.

PUCKETT'S office was searched, rummaged through and files were taken and

reassigned. (C. PUCKETT AFFID. ¶ 21 and ¶28)   JULIAN McPHILLIPS refused to

speak directly to MR. PUCKETT without going through an intermediary after being

associated together for a period of some twenty-six (26) years. (<u>Id.</u> at ¶ 35)

E.    *Defenses of McPhillips-Shinbaum.*

In addition to "reduction in force" (R.I.F.) and "business necessity, the DEFENDANTS appear to argue the defense of "bona fide occupational qualification." That is to say, PLAINTIFF (a male) was fired instead of any of the firm's female legal assistants because the females can all act as "secretaries" to the various lawyers in the firm.  As set forth in PLAINTIFF'S affidavit, he is very proficient in computer and word processing skills and he has been typing his own work since the early 80's. The gist of the matter is that DEFENDANTS don't want a male legal assistant to do secretarial work.   PLAINTIFF would   submit that gender is not a bona fide occupational qualification (B.F.O.Q.) for secretarial work.  The business necessity or bona fide occupational qualification defense requires something more than a showing of business convenience.  *Wynn v. Columbus Mun. Separate School District,* 692 F.Supp. 672 (N.D. Miss. 1988). Moreover, where the discrimination is on the basis or gender, the employer bears the burden of proving:

"1) that the job qualification or function justifying the discrimination is reasonably necessary to the essence of the defendant's particular business; and

2) that gender is a legitimate proxy for the qualification or function because

(a) there is a substantial basis for believing that all or nearly all employees of the affected gender lack the qualification or ability to perform that function, or

(b) it is impossible or highly impractical for the defendant to insure by individual testing that its employees will have the necessary qualifications for the job.

-20-

> *See E.E.O.C. v. Boeing Co., 843 F.2d 1213, 1214, (9th Cir.) cert. denied, 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988); Harris v. Pan American World Airways, Inc., 649 F.2d 670 (9th Cir. 1980)."*

*Carl v. Angelone, 883 F.Supp. 1433, 1438 (D. Nev. 1995).*

IV.    *PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION UNDER THE A.D.A. AND HE HAS PRESENTED SUBSTANTIAL EVIDENCE SO AS TO PRECLUDE SUMMARY JUDGMENT IN FAVOR OF THE DEFENDANTS.*

*It is axiomatic that Congress enacted the Americans with Disabilities Act (A.D.A.) to level the playing field for disabled people and thereby combat employment decisions based on unfounded stereotypes.    Pouncy v. Vulcan Materials Company, 920 F.Supp. 1566 (N.D. Ala. 1996).  The A.D.A. imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer.    Morisky v. Broward County, 80 F.3d 445 (11th Cir. 1996). In a case brought under the A.D.A., the plaintiff may prove a prima facie case by showing: (1) that he or she was in a protected class; (2) that he or she was discharged; (3) that at the time of discharge she was performing her job at a level that met her employer's expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.  Pouncy v. Vulcan Materials Company, supra.  See also, Gore v. GTE South, Inc., 917 F.Supp. 1564 (M.D. Ala. 1996).  The burden is thus on an A.D.A. plaintiff to inform his or employer that an accommodation is needed and to request a specific accommodation.    Cheatwood v. Roanoke Industries, 891*

-21-

F.Supp. 1528 (M.D. Ala. 1995). *While our position, which we hereby reserve, is that the defendant(s) were specifically informed, it has been explicitly held that a disability discrimination case can also be based upon the theory that there is a "perceived disability" on the part of the employer. That is, that the employer has the perception that the employee is disabled. We submit that Carroll has shown that his perceived impairment has limited his employment generally rather then just at his former position at McPhillips-Shinbaum.*

A.    *Plaintiff's Perceived Disability.*

*PLAINTIFF PUCKETT'S health problems have been recited with specificity. (C. PUCKETT AFFID. ¶¶ 12 through 18)    Because a hostile work environment, and ultimately termination, ensued subsequent to MR. PUCKETT'S illness, the conclusion is inescapable that McPHILLIPS-SHINBAUM perceived that he was disabled. See generally, C. PUCKETT AFFID.*

B.    *Qualified With or Without Reasonable Accommodation.*

*Although JULIAN McPHILLIPS complained and became hostile whenever Mr. PUCKETT needed to go to cancer treatments, the fact remains that MR. PUCKETT was at all times able to perform his essential job functions. ( C. PUCKETT AFFID. ¶¶ 12 through 18).*

-22-

C.    *Ability to Perform Essential Functions.*

*Again, MR. PUCKETT has testified under oath that at all times pertinent hereto he was able to do his job. (C. PUCKETT AFFID. ¶¶ 12 through 18)*

D.    *Termination Was Because of Disability.*

*Because a hostile work environment as well as termination did not occur prior to MR. PUCKETT'S illness, the conclusion is inescapable that his termination was due to his disability, whether actual or perceived.*

V.    *PLAINTIFF HAS ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION UNDER THE A.D.E.A AND HE HAS PRESENTED SUBSTANTIAL EVIDENCE SO AS TO PRECLUDE SUMMARY JUDGMENT FOR THE DEFENDANTS.*

*It is axiomatic that the A.D.E.A., Title VII of The Civil rights Act of 1964, and the Equal Pay Act all share a common purpose: the elimination of discrimination in the workplace. Wallace v. Dunn Const. Co., Inc., 62 F.3d 374 (11th Cir. 1995). As a threshold matter, it is singular to note that the Eleventh Circuit has adapted to issues of age discrimination under the A.E.D.A. those principles of law applicable to some of the very similar provisions of Title VII. Hairston v. Gainesville Sun Publishing Company, 9 F.3d 913 (11th Cir. 1993); rehearing and rehearing denied, 16 F.3d 1233 (11th Cir. 1994). The Age Discrimination in Employment Act (A.D.E.A.) protects older employees from discrimination on the basis of age, not just discrimination in favor of persons under the age of 40. Collier v. Budd Co., 66 F.3d 886 (7th Cir. 1995).*

*An employee creates an inference that age discrimination was the determining*

-23-

factor in an adverse employment decision by showing that: (1) he or she is a member of a statutorily protected age group (over 40 years old); (2) was qualified for the position; (3) was discharged from and/or rejected upon reapplication to the position; and (4) the position remained open and was subsequently filled by a younger person who does not fall within a statutorily protected class. *Hayman v. National Academy of Sciences*, 23 F.3d 535 (D.C. Cir. 1994). *Accord, Myrick v. Runyon*, 898 F.Supp. 827 (N.D. Ala. 1995); *Brook v. City of Montgomery*, 916 F.Supp. 1193 (M.D. Ala. 1996). In all cases arising under the A.D.E.A. the employee bears the initial burden of establishing a prima facie case of age discrimination. *Moody v. Dept. of Education of State of Alabama*, 883 F.Supp. 624 (M.D. Ala. 1995). Once a plaintiff establishes a prima facie case of age discrimination, the defendant must articulate legitimate nondiscriminatory reasons for it's actions. *Bibby v. Drummond Co., Inc.*, 818 F.Supp. 325 (N.D. Ala. 1993); *affirmed*, 20 F.3d 1174 (11th Cir. 1994). If the defendant carries it's burden, then the plaintiff must prove by a preponderance of the evidence that legitimate reason's offered by the defendant are pretext. *Id.* In other words, once the employer in an A.D.E.A. action articulates legitimate nondiscriminatory reasons for it's questioned actions, the presumption of discrimination drops from the case, and the employee must prove by a preponderance of the evidence that the employer's proffered non-discriminatory reasons is part of a pretextual scheme to conceal unlawful discrimination. *Myrick v. Runyon, supra.* In order to establish a violation of A.D.E.A., age must be the determinative factor in the employer's decision though it need not have been sole factor. *Brook v. City of Montgomery, supra.*

-24-

An employer acts unlawfully when, due to an employee's age, it manipulates the employee's work environment in an effort to induce a seemingly "voluntarily" termination of employment.  <u>Griswold v. Ala. Dept. Of Industrial Relations</u>, 903 F.Supp. 1492 (M.D. Ala. 1995).

An employer acts "wilfully" under A.D.E.A. if it either knew or showed reckless disregard for the matter of whether it's conduct was prohibited by the A.D.E.A. <u>Pierce v. Atchison, Topeka, and Santa Fe Ry. Co.</u>, 65 F.3d 562 (7th Cir. 1995), <u>affirmed after removal</u>, 110 F.3d 431 (7th Cir. 1998).

An employer's proffered reason for adverse employment action is a pretext for unlawful discrimination in violation of A.D.E.A. if it is shown both that the reason is false and discrimination is the real reason.  <u>Robertson v. Ala. Dept. Of Economic and Community Affairs</u>, 902 F.Supp. 1473 (M.D. Ala. 1995).

## VI. PLAINTIFF HAS PRESENTED SUBSTANTIAL EVIDENCE IN SUPPORT OF HIS CLAIM THAT THE <u>REASONS FOR HIS DISCHARGE WERE PRETEXTUAL.</u>

PLAINTIFF contends that many if not all of the reasons advanced to justify his termination are merely pretextual.  The allegations in the AFFIDAVIT OF DEFENDANT JULIAN McPHILLIPS, that one of the reasons for termination was declining revenue, is belied by the fact that two (2) new paralegals/law clerks were hired just prior to MR. PUCKETT'S termination. (C. PUCKETT AFFID. ¶ 25)  In their AFFIDAVITS both DEFENDANTS McPHILLIPS AND SHINBAUM complain that MR. PUCKETT'S work performance was below par.  In contrast, PLAINTIFF has testified

that his work was of superior quality and that he was often praised by McPHILLIPS.

(C. PUCKETT AFFID. ¶ 20)    It is singular to note that DEFENDANTS have offered no

written documents to support this claim, such as negative performance appraisals,

reprimands, or warnings.   In addition thereto, the assertion of DEFENDANTS that

MR. PUCKETT was incapable of performing the general duties of a legal secretary

are completely untrue.   MR. PUCKETT has testified that he has always performed

such duties with respect to his own cases, and that none of the lawyers in the firm

ever asked him to perform secretarial duties. (C. PUCKETT AFFID. ¶ 9 and ¶ 20)


VII.    PLAINTIFF HAS COME FORWARD WITH SUBSTANTIAL
        EVIDENCE WHICH WOULD ENTITLE HIM TO PREVAIL
        ON HIS DEFAMATION CLAIM.

Defamation is any false and malicious publication expressed orally, in writing,

or by other means, that tends (_inter alia_) to bring an individual into public hatred,

contempt, or ridicule, or charges an act odious and disgraceful in society. _McGraw_

_v. Thomason_, 265 Ala. 635, 93 So.2d 741 (1957).   Slander, or defamation which is

verbal in character, may be a publication in the form of irony-censure in the guise

of praise.  It may be abuse in the guise of a jest.  It may be maliciousness behind

friendly humor.  The Courts look behind the various disguises and take note of the

real imputation of such utterances.  _Berry v. City of New York Ins. Co._, 210 Ala. 369,

98 So. 290 (1923).

The essence of an action for defamation is the protection of an individual's

interest in his reputation and good name.  _United States Steel Corp. V. Darby_, 516

-26-

*F.2d 961 (5th Cir 1975). The necessary elements for both libel and slander are:*

> *"a publication (a communication with someone other than the plaintiff or his alter ego); the publication must be defamatory (a false statement understood by some third party as naturally and probably injurious to the plaintiff's reputation); it must have sufficient specificity for the person to whom publication is made to know that it relates to the plaintiff; and it must have been intentional or have occurred in such circumstances that the defendant should have anticipated it's occurrence."*

*Roberts and Cusimano, <u>Alabama Tort Law</u>, § 24.0 (3d ed. 2000). It is axiomatic that the law recognizes special protection for the interest of one's reputation relative to his business, profession, or employment. <u>Kelly v. Arrington</u>, 624 So. 2d 546 (Ala. 1993); <u>Ledbetter v. United Ins. Co. Of Am.</u>, 845 F.Supp. 844 (M.D. Ala. 1994). We contend that DEFENDANT McPHILLIPS defamed the PLAINTIFF when he instructed office personnel "not to assign any new cases to PUCKETT. (C. PUCKETT AFFID. ¶ 22; B. PUCKETT AFFID. ¶ 9) This implies that the PLAINTIFF is incompetent in his profession, trade or business.*

*VIII. <u>PLAINTIFF'S FRAUD CLAIM.</u>*

*The action of fraud basically lies where one party has wilfully led another into a false belief, and the other has acted accordingly to his hurt. <u>Gewin v. Shields</u>, 167 Ala. 593, 52 So. 887 (1910); <u>Earnest v. Pritchett-Moore, Inc.</u>, 401 So.2d 752 (Ala. 1981). The general law on the subject of fraud may be succinctly stated as follows:*

> *"Misrepresentations of a material fact made wilfully to deceive, or recklessly without knowledge, and*

-27-

> *acted on by the opposite party, constitute legal fraud."*

*§6-5-101, <u>Code of Alabama</u> 1975, as amended. Promissory fraud is based upon a promise or promises. The elements of this aspect of fraud are: (1) a misrepresentation; (2) of a material fact; (3) upon which the plaintiff justifiably relied; (4) which caused damage to the PLAINTIFF; and (5) the misrepresentation was based on a promise which when made by the defendant he did not intend to perform. <u>Coastal Concrete v. Patterson</u>, 503 So.2d 824 (1987).*

*An at-will employee may bring an action against his employer for promissory fraud. <u>Winn-Dixie Montgomery v. Henderson</u>, 353 So.2d 1380 (1977). Thus, an employer's representation to an employee that he would be taken care of as to a job, which is false, may be actionable as promissory fraud. <u>Shaddit v. United Ins. Co. of America</u>, 678 So.2d 1097 (1995). As set forth at paragraph no. 20 of the AFFIDAVIT OF PLAINTIFF CARROLL PUCKETT, there is a genuine question of material fact as to whether or not DEFENDANT McPHILLIPS made a fraudulent promise to MR. PUCKETT that PUCKETT would have a lifetime employment contract.*

-28-

<u>CONCLUSION</u>

The following language contained in the decision of <u>Portis v. Dillard Store</u>

<u>Services, Inc.</u>, 148 F.Supp 2d 1269 (M.D. Ala. 2001), illustrates precisely why any

motion for summary judgment in the matter at bar is premature in an

employment discrimination case:

> *"Neither the evidence supporting, nor offered in opposition to, summary judgment is particularly strong at this early point in the proceedings. Dillard is, of course free to offer additional evidence in support of a new motion at a later point, after more discovery has been conducted, should Dillard choose to do so. Portis, in turn, will be free to offer new evidence gleaned though discovery to oppose any such later-flied motion.    At this point in proceeding, however, the court must conclude that the Motion for Summary Judgment is due to be denied."*

*148 F.Supp. 2d at 1272.*

Respectfully submitted this the ___25___ day of April, 2007.

GEORGE E. JONES, III
ALB. BAR I.D. ASB-9546-S82G
ATTORNEY FOR PLAINTIFF

ADDRESS OF COUNSEL:

GEORGE E. JONES, III
ATTORNEY AND COUNSELOR AT LAW
711 Alabama Avenue
P. O. Box 9
Selma, Alabama 36702-0009
(334) 874-6617

-29-

## CERTIFICATE OF SERVICE

I hereby certify that I have this the _25_ day of ~~February~~ *April*, 2007, served a

copy of the foregoing by placing same in the United States Mail, postage prepaid

and addressed to:

Robert D. Segall, Esquire
COPELAND, FRANCO, SCREWS & GILL, PC
P. O. Box 347
Montgomery, Alabama 36101-0347

Shannon L. Holliday, Esquire
COPELAND, FRANCO, SCREWS & GILL, PC
P. O. Box 347
Montgomery, Alabama 36101-0347

OF COUNSEL

-30-

## _INDEX TO EXHIBITS_

**"A"    _Counter-Affidavit of PLAINTIFF CARROLL PUCKETT_**

**"B"    _Counter-Affidavit of BETTY PUCKETT_**

**"C"    _Memorandum to PLAINTIFF from DEFENDANT McPHILLIPS, dated February 12, 2006, requesting an update on PLAINTIFF'S pending cases_**

**"D"    _Memorandum to PLAINTIFF from DEFENDANT McPHILLIPS, dated February 14, 2006, thanking PLAINTIFF for his quick response in getting the report of cases to McPHILLIPS_**

**"E"    _Memorandum from DEFENDANT McPHILLIPS dated January 20, 1999, thanking PLAINTIFF for assisting Montgomery Police following a night-time burglary of the office, and arranging for repairs to be made_**

# EXHIBIT
# A

*STATE OF ALABAMA*                    )

*MONTGOMERY COUNTY*                   )

### *CONSOLIDATED COUNTER-AFFIDAVIT OF*
### *PLAINTIFF CARROLL W. PUCKETT*

1.      *My name is Carroll W. Puckett. I am presently seventy-two (72) years of age, I have personal knowledge of the facts set forth in this affidavit, and I am competent to testify as to the matters contained herein. I understand that this counter-affidavit is to be proffered by my attorney in opposition to the DEFENDANTS' Motion for Summary Judgment in the case of        PUCKETT vs. McPHILLIPS SHINBAUM, ET AL., Case No. 2:06 cv-1148-ID, which is presently pending in The United States District Court for the Middle District of Alabama, in which I am the PLAINTIFF.*

2.      *In my lawsuit I seek monetary damages and other relief against the DEFENDANTS, and each of them, for violations of Title VII of The Civil Rights Act of 1964, the 1991 amendments to Title VII of The Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and Alabama's Age Discrimination Act of 1997. I also assert claims under the pendent or supplemental jurisdiction of the Court for defamation and fraud.*

3.      *I have read the Motion for Summary Judgment filed by the DEFENDANTS in this case, and I have read the memorandum brief prepared by their attorneys. I have read the Affidavit of JULIAN McPHILLIPS and the Affidavit of KENNETH SHINBAUM, both of whom are DEFENDANTS in this case. Also, I have read the Affidavit of AMY STRICKLAND, who is also a DEFENDANT in this case.*

**EXHIBIT "A"**

4.      This consolidated counter-affidavit is intended to refute and challenge certain  untrue factual allegations made by each of the three (3) above-named DEFENDANTS in their respective affidavits submitted in support of their motion for Summary Judgment.

5.      I have been associated with DEFENDANT JULIAN McPHILLIPS since approximately the 1979.  As a real estate agent I purchased numerous tracts of land in behalf of MR. McPHILLIPS which he wanted to own for rental purposes.  In approximately 1980 I moved into MR. McPHILLIPS' law office building at 516 South Perry Street which still houses his law offices.  I mainly worked on real estate transactions and financial matters for MR. McPHILLIPS.  I attended the Thomas Goode Jones School of Law in Montgomery from 1967 to 1970 but I did not graduate. Based upon my legal education, I began doing work in behalf of MR. McPHILLIPS as a paralegal or legal assistant.

6.      I was even doing paralegal/legal assistant work for MR. McPHILLIPS before I moved into an office in his building at 516 South Perry Street.  Once I took an office in MR. McPHILLIPS' building, I was assigned substantial legal work by MR. McPHILLIPS and he began to pay me financial compensation on a case-by-case basis.  I worked for MR. McPHILLIPS and I did work for his law firm in this building from 1980 to approximately April 28, 2006, a period of some twenty-six (26) years, without interruption or separation from employment.

7.      In 1983, I re-enrolled in the Jones School of Law of Faulkner University. I continued to work as a paralegal/legal assistant for MR. McPHILLIPS and for his law firm during the day time and I attended classes at the law school at night.  I

*graduated from The Jones School of Law in 1985 with the degree of Juris Doctorate. Also during the year of 1983 I began receiving a regular income from MR. McPHILLIPS and his law firm for my work as a paralegal/legal assistant.*

8.      *Prior to the year of 1999 I was paid for my paralegal/legal assistant work on a case-by-case basis.  Beginning in 1999, I was paid an annual salary by MR. McPHILLIPS and his law firm which continued up until my termination from employment in April of 2006.  I was a full-time employee and received all of the benefits afforded other full-time employees such as health insurance and vacation leave. I also received regular bonuses on various occasions.  Prior to going on an annual salary I had a very heavy caseload.  It was not unusual for me to have hundreds of cases assigned to me at any given time.  Due to the number of cases I was working on which resulted in income for MR. McPHILLIPS and his law firm, the payments I was receiving for working on each case were quite substantial.  MR. McPHILLIPS then changed both my method of pay and my rate of pay to the annual salary system because some of the associate attorneys (and partners) in the law firm began to complain to MR. McPHILLIPS that I was making more money than they were and they did not like it because I was a paralegal/legal assistant.   MR. McPHILLIPS refused to disclose to me the names of the attorneys in his law firm who were complaining.*

9.      *From 1980 until my termination from employment on April 28, 2006, my duties as a paralegal/legal assistant were to assist MR. McPHILLIPS and other attorneys in the firm by drafting summons/complaints; interviewing prospective clients and interacting and communicating with those persons who ended up hiring*

MR. McPHILLIPS and who thus became clients; performing legal research in the law library as assigned by MR. McPHILLIPS; drafting discovery documents and preparing responses to discovery requests; accompanying MR. McPHILLIPS and other attorneys to court during the actual trial of cases; and researching and drafting memorandum briefs, trial briefs, and appellate briefs.

10.    My caseload has increased every year and beginning in or about the year 2002 my annual caseload always exceeded one hundred (100) cases. Since that time, those cases I have worked on exclusively in behalf of MR. McPHILLIPS, which have resulted in a settlement or favorable jury verdict, have generated on average approximately two-hundred fifty thousand dollars ($250,000.00) per annum to four-hundred thousand ($400,000.00) per annum for Mr. McPHILLIPS and his law firm. I have also worked on cases under the supervision of other partners and associates down through the years. Each year since I have been placed on an annual salary, the attorney's fees paid to MR. McPHILLIPS as a result of favorable outcomes on my assigned cases has always greatly exceeded the salary I was paid.

11.    During the twenty-six (26) year period I worked for MR. McPHILLIPS and his law firm I have never received an unfavorable performance evaluation. I have known MR. McPHILLIPS to put down in writing almost everything that comes up with respect to his employees. I have never seen a written document criticizing my work product or which stated that MR. McPHILLIPS had "concerns" about the quality of my work. I did not observe any such document(s) attached as exhibits to the DEFENDANTS' summary judgment materials. Moreover, MR. McPHILLIPS has never spoken to me face-to-face to express his alleged "concerns" about my work

performance or work product.

12.    In December of 2002 I underwent surgery for the removal of a kidney. I was in the hospital for two (2) days and, upon release from the hospital, I was back at work within 3 or 4 days.   I was able to perform my job at all times.

13.    In or about June of 2003 I suffered what my physicians called a "minor" stroke. I was hospitalized and otherwise absent from the law firm for approximately three (3) weeks. My wife, Betty Puckett, prepared a list of my active cases and came to see me at the hospital in order that I could relay a status report on each case.  All of the details about my cases were then given by BETTY PUCKETT to DEFENDANT AMY STRICKLAND, the office manager.  There were no problems with any of my cases and all of them remained assigned to me when I returned to work at the end of my three (3) week convalescent period.    I was able to perform my employment duties at all times.

14.    In September of 2003 I was admitted to the hospital for bleeding in my stomach.  The bleeding was a side-effect of my taking the prescription drug plavix and aspirin, both of which were intended to thin my blood. I was in the hospital only 3 or 4 days and I missed only about one (1) week of work.  Upon return to work I was able to do my job at all times.

15.    In December 2003 I went back into the hospital for gastrointestinal problems and was there for 3 or 4 days.  Again, I came right back to work as soon as I got out of the hospital.  Throughout these illness and hospitalizations I always maintained a caseload of approximately 70 to 90 cases.    I was able to do my job at all times.

16.     *In June of 2004 I was diagnosed with prostate cancer. I underwent approximately forty-two (42) weekly radiation treatments on an out-patient basis. I informed Mr. McPhillips of my treatments and I asked that he accommodate me by permitting me to go to the cancer center for treatments during working hours. I went to the treatments mostly during my lunch hour but occasionally, I would be a little bit late getting back to the office. MR. McPHILLIPS was very hostile to me about my being gone from the office for short periods of time for my cancer treatments. He complained and complained about it and made it clear that he thought it was unreasonable for me to go and receive my cancer treatments even though most of the time I was absent was within my lunch hour. During this time I always completed my work in a timely manner and I never received a negative employee performance appraisal rating. MR. McPHILLIPS did not criticize my work; he only criticized my being gone to the cancer center for short periods of time.   I was able to perform my job duties at all times.*

17.     *My cancer treatments were showing signs of success and eventually my treatments were scaled back to once every two (2) weeks. Again, my treatments were usually scheduled during my lunch hour but sometimes I would be away from the office for slightly more than an hour. My wife, BETTY, made it a point to always inform office manager AMY STRICKLAND when I was going to be late returning to the office. Again, I successfully managed my caseload and no time deadlines or statute(s) of limitation for filing pleadings or other documents were ever missed because I was at the cancer center. MR. McPHILLIPS continued to complain about me leaving the office for brief periods of time to obtain my cancer treatments or to*

visit my doctor's office.  Over the many years that I was associated with MR. McPHILLIPS I personally observed his attitude toward employees who were sick or ill.  MR. McPHILLIPS had a pattern and practice of refusing to grant reasonable accommodations to such employees.  One instance which I witnessed was in the Fall of 1995 and it involved MR. McPHILLIPS' then-personal secretary, LYNDELL HOWARD.  Ms. Howard's then-adolescent daughter had been admitted to a psychiatric hospital in New Orleans for emotional and behavioral problems.  MS. HOWARD wanted to travel to New Orleans to be with her daughter but MR. McPHILLIPS initially refused to allow MS. HOWARD to be gone from work.  He ultimately relented and gave her a couple of days off, yet he walked around the office complaining to anyone who would listen that it was somehow wrong for Ms. Howard to request this time off to go be with her hospitalized daughter.

18.    While I was receiving cancer treatments Mr. McPHILLIPS was very open and candid in his hostility towards me for leaving the office to receive my cancer treatments.  Never once, though, did he criticize me about any decline in the quality of my work-product, nor did he claim that my short absences resulted in the untimely filing of pleadings or other legal documents.  I performed my job at all times.

19.    With respect to associate attorney ELIZABETH BERN SPEAR, who has paternal Jewish ancestry, the DEFENDANTS terminated my job and re-assigned my caseload to her.  As for her training, it was I who began training her on how to litigate workman's compensation cases.

20.    During the twenty-six (26) year period that I worked for JULIAN

McPHILLIPS, he usually expressed gratitude for all of my hard work in helping him to build his law practice.  His gratitude ceased only when I became ill.  He made many statements to me over a twenty-six (26) year period that if I would continue to help him build his law practice, and help him build up his real estate holdings, that he would "not let [me] down."  He constantly referred to us as a "team"  and expressed to me, both directly and by implication, that I had a lifetime employment contract with his law firm.  MR. McPHILLIPS convinced me that I would remain employed  by his law firm for as long as I wanted to be.

21.    Way prior to my termination, I complained to office manager AMY STRICKLAND about others in the law firm rummaging through my assigned case files in my office without my knowledge and removing them from my office without my knowledge.  Everyone was being very hostile so I asked MS. STRICKLAND if the law firm was "trying to run me off?"

22.    Not long after this the assignment of new client case files to me totally ceased.  Even though I was cut off from receiving new cases, there was still a total lack of criticism by anyone, much less MR. McPHILLIPS, of the quality of my work and/or my work performance and/or work habits.  At about this same time, MR. McPHILLIPS and MS. STRICKLAND began to demand that I provide an accounting of my work time.  This was totally unprecedented.  I had never before in twenty-six (26) years been asked to keep time sheets.  Moreover, I have never known any attorney in that law firm to keep time cards or time sheets.

23.    Even during the last few months before my termination I continued to generate income for the McPHILLIPS SHINBAUM law firm.  Numerous individuals

who were personally acquainted with me would come directly to me to begin the process of hiring the law firm to represent them in their legal matters. They most often paid up-front retainer fees to the law firm and a lawyer in the firm was assigned to work on their cases with me.

24.    I would submit that Mr. McPhillips' affidavit does not comply with Rule 56 of <u>The Fed. R. Civ. Pro.</u>  He states that his wife LESLIE still has his power of attorney, which tends to indicate a continued incapacity of some kind, and thus incompetency to make the affidavit, and it raises the question of whether or not he has personal knowledge of the facts set forth in his affidavit.

25.    MR. McPHILLIPS' contention that my termination was related to poor economic conditions at the law firm is not true. I noticed that DEFENDANT McPHILLIPS, in his summary judgment materials filed with the Court, did not attach any financial statements, any profit/loss statements, nor any income tax returns, all of which would confirm the truthfulness or falsity of his defenses. MR. McPHILLPS complains that business was down, yet he hired two (2) young females during this time period: legal assistant ALLISON HIGHLEY at an annual salary of $35,000.00, and then-legal assistant ELIZABETH BERN-SPEAR at annual salary of $30,000.00. Without having the opportunity to subpoena records, it is difficult to determine what the true financial condition of the law firm was at that time. As a management tool (and one which he frequently bragged about using) MR. McPHILLIPS would often cry "wolf" as a tactic to pressure other lawyers in the firm to work harder to bring in more and more money in settlements and judgments. He often asserted that there was a financial crisis when in truth and in fact there was not one. As a result of my

*involvement as an advisor in the financial affairs of the law firm, I would submit that the financial condition of the law firm during the last five (5) years was sound and stable. This is illustrated by the fact that MR. McPHILLIPS hired the two young female legal assistants at a time, as claimed in his affidavit, that the firm was rapidly exhausting it's line of credit at a local bank. At about this time, MR. McPHILLIPS was always complaining about my age and how old I was.*

*26.    Contrary to the assertions in his affidavit, I personally witnessed MR. McPHILLIPS come to work almost every day and keep lengthy office hours in the Spring of 2006. Moreover, there was never any rule that I could be supervised only by MR. McPHILLIPS. I have been supervised by many partners and associates in the law firm down through the years: Jim Debardeleben, Frank Hawthorne, Jr., William Gill, Allen Stoner, Mary Goldwaithe, Joseph Guilot, and Karen Sampson Rodgers, just to name a few. All of these lawyers supervised me on cases without any involvement whatsoever by MR. McPHILLIPS.*

*27.    In Response to paragraph 8 of MR. McPHILLIPS' affidavit, I deny that MR. McPHILLIPS required of me a monthly updating of my case list. I further deny that my case list was frequently late. Periodically AMY STRICKLAND would go to my wife, BETTY PUCKETT, and tell her that MR. McPHILLIPS would like for me to update my case list. My wife would immediately start working on it and within the same day or next day she would have it ready to give to AMY STRICKLAND to give to MR. McPHILLIPS for review. MR. McPHILLIPS and I met on February 14, 2006, to review the case list. I have a memorandum which is attached hereto in which MR. McPHILLIPS states "Carroll, thank you for taking the time to go over your case list*

*with me, and following up the meeting by getting the statue of limitations. Please*

*know that you are a dear friend, and I appreciate all that you do for me and the firm.*

*Know that I am here to help in any way possible. Thank you!   Julian" Never do I*

*recall any statement from MR. McPHILLIPS to the effect that he was unhappy with*

*me because I was late with an update.    During this time frame my wife and I went*

*on vacation and upon my return I noticed that someone had been in my office*

*reorganizing some large files. I inquired into this matter and was informed that AMY*

*STRICKLAND  had been going though my files to see if she could help me organize*

*my files. Then Amelia Strickland came back to my office stating that she needed to*

*take some of my files and turn them over to Aaron Luck and Jim Bodin, two*

*associate attorneys in the firm who needed some more work to do since their case*

*load was 15 to 25 each.  My case load at the time was between 70-80 cases.  I gave*

*her a few automobile cases that we were about ready to try to close.  Within the next*

*few days Mrs. Strickland came back into my office wanting to pick up several of my*

*files and stating that she and MR. McPHILLIPS were going to reassign these files to*

*other attorneys.  After some discussion I complained to AMY STRICKLAND  about*

*the way I was being treated, i.e., people coming into my office when I was on*

*vacation, at night and on week-ends, and taking my files prematurely (the cases*

*were nowhere close to a settlement) and giving them to attorneys without my*

*consent or being able to assist the attorneys on the cases.  After this MS.*

*STRICKLAND then made arrangements with my son, Paul Puckett, to be a mediator*

*between the firm and myself regarding the re-assignment of cases.  I continued to*

*question why my cases were being taken from me and neither Julian McPhillips nor*

*Amy Strickland ever gave me a straight answer. This lasted during February 2006 through April 2006, during which time I was required to report weekly as to the activity on each case and also during this time all of my cases were taken from me and turned over to attorneys in the firm. Furthermore, from February 2006, to March 31, 2006, Amelia Strickland set up a system at the office whereby I would receive no new telephone prospects, no appointments with new prospective clients, nor walk-in potential clients to talk with about their case. The only new cases I received were those coming directly to me for the firm to handle. MR. McPHILLIPS, when reviewing my files on February 14, 2006, said nothing to me during that review about any of my cases not being aggressively handled, nor did he claim some need to turn them over to other attorneys in the firm. To the contrary he commended what I was doing for the firm and for him.*

28. *Contrary to the assertions at paragraph no. 9 of his affidavit, MR. McPHILLIPS never told me that he was removing case files which had been assigned to me. To the contrary, one day Amelia Strickland and Kenneth Shinbaum came into my office, sat down with all of my case-files, and started re-assigning each case to other legal assistants and attorneys in the law firm. I was seated at my desk and they ignored me and acted as if I was not even in the room. They never said a word to me, it was almost like I was not sitting there.*

29. *In response to the contentions of MR. SHINBAUM at paragraph no. 5 of his affidavit I would submit the following. Mr. SHINBAUM was not the person who I asked for accommodation(s) for my illnesses. I asked Amelia Strickland since she was the one designated by MR. McPHILLIPS to receive accommodation requests.*

*When I had a left kidney removed in December 2002, which was a major life-threatening condition, I requested time off for the surgery and recuperation. In June of 2003 I experienced another major life-threatening disability when I had a minor stroke and was in the hospital and rehabilitation center for approximately three (3) weeks. I requested accommodation for this time off and time for rehabilitation. In September 2003 I had another major life-threatening condition for which I was hospitalized for four (4) days due to anemia, and I had to have four (4) pints of blood due to internal bleeding caused by plavix and aspirin. I asked for accommodations and was granted time off. Again, in December 2003, I asked for accommodations for a three (3) day hospitalization due to gastrointestinal impaction. In June 2005, I was diagnosed with prostate cancer and underwent 42 radiation treatments at the Montgomery Cancer Center, and then two (2) years worth of hormone shots. Due to diabetes and high blood pressure, and the relationship of these conditions to kidney function, I have to go to the Montgomery Cancer Center every other week for blood testing and to receive shots for my blood cells to keep from being anemic. For all of this I had to formally request approval each time I went to the doctor or cancer center. Even though these absences took a lot of time, I made up that time by doing my work before or after regular hours plus using my vacation time and sick leave. Throughout each illness I have always been able to perform the duties of my job.*

*30.     Further, since ELIZABETH BERN-SPEAR was the last person hired, it is curious that she was not the first person to be laid off once the so-called "economic slow-down" started at the law firm. When ELIZABETH BERN-SPEAR*

*came to the law firm she had recently graduated from the same law school I had graduated from, Jones School of Law of Faulkner University and both of us had the same juris doctorate degree. ELIZABETH BERN-SPEAR was a law clerk/legal assistant the same as I was inasmuch as she worked in that capacity for one and one-half months before she became a licensed attorney. On the first day of ELIZABETH BERN-SPEAR'S employment with McPHILLIPS SHINBAUM L.L.P., MR. McPHILLIPS came to me and informed me that he and MR. SHINBAUM wanted me to spend a lot of time training ELIZABETH because I knew more about worker's compensation law than any one else in the firm except MR. SHINBAUM. I thought it strange at the time because MR. SHINBAUM and I worked on and handled all of the worker's compensation cases coming to the firm, and we had done so for years. But I did what I was told to do. I did not realize at the time that MR. SHINBAUM had hired BERN-SPEAR to replace me in the firm. I worked with MS. BERN-SPEAR from August 2005, until February 2006, at which time MR. SHINBAUM took over her training and she never came to my office again until I moved out of the building on May 31, 2006. Prior to that time I saw her almost daily. During those months I worked with ELIZABETH BERN-SPEAR and I gave her more than 20 cases to work on in which more than 10 of these cases had been given a 100% vocational disability. I contend that MR. SHINBAUM is Jewish and that ELIZABETH BERN-SPEAR is likewise Jewish. I contend that MR. SHINBAUM discriminated against me during August 2005 to May 31, 2006, in that he was a driving force in my termination due to national origin discrimination. MR. SHINBAUM is a past president of Agudath Israel Synagogue in Montgomery, Alabama. My wife and I attended the Bat Mitzah*

ceremony for both of MR. SHINBAUM'S daughters. Both MR. SHINBAUM and MRS. SHINBAUM are of the Jewish faith. ELIZABETH BERN-SPEAR likewise is of Jewish decent as admitted in the answer by the law firm given to the EEOC in response to my charge of national origin discrimination.

31.    MR. SHINBAUM claims in his affidavit that in his opinion I did not have the ability to draft a trial brief for a worker's compensation case and that I did not have the ability to draft an Order of Judgment in a worker's compensation case. He further claims that I have never been able to perform either of these tasks at any time during my employment with the law firm and that it was his opinion that I never would never be able to. This allegation is totally untrue. My response to this charge is that I have handled every aspect of worker's compensation case settlement packages many times during my 27 years with the firm. Usually the Defendant's attorney would prepare the necessary documents for settlement in the Circuit Court. I would review these documents prior to handing them over to the attorney supervising me. Furthermore, on some occasions, our firm would be asked to prepare the necessary documents, including a draft of a proposed Order of Judgment in settled worker's compensation cases. I would usually set up the appointment with the Circuit Judge for approval. MR. McPHILLIPS and I would go to the court for the entry of Judgment in the case. I usually handled for the firm 40 to 50 worker's compensation cases per year. With respect to the cases that I handled with MR. SHINBAUM, he and I both would review the closing documents and make suggestions to defendant's counsel relative to necessary changes which were in the interest of our client. In all of my experience with the firm we never had a case

which I worked on to go up on an appeal to an appellate court.   This is because I was always attentive to making sure every aspect of our workman's compensation cases were in proper order. Out of the 20 or so worker's compensation, wrongful termination, and auto accident cases given by me to ELIZABETH BERN-SPEAR, it was I who prepared the complaint in several of these cases.  I also prepared the initial discovery requests such as interrogatories, request for production, request for admissions, and deposition notices.   This was part of the training I gave ELIZABETH BERN-SPEAR.

32.    MR. SHINBAUM falsely states that ALLISON HIGHLEY and I were the only law clerks in the firm.  He further said that any other legal assistants in our office at that time were fully capable of performing the full duties of a legal secretary. The truth of the matter is that on April 28, 2006, the date my termination notice, the roster in our office listed the following: the paralegal or legal assistants on staff were DONNA PUCKETT, SUZANNE CLEMENS, SHARON DUKE, PAGE McKEE, JENNIFER LEE, PATRICIA WILLIAMS, TIA WILKINSON, CARROLL PUCKETT AND BETTY PUCKETT.   Each of these paralegals/legal assistants not only performed the work of such, but we were at the same time performing the work of legal secretary when called upon to do so.  MR. SHINBAUM falsely claims that I was not capable of performing the full duties of a legal secretary.  The truth of the matter is that I am fully capable of same, and that I have been performing the full duties of legal secretary during the entire 27 years that I have been employed by McPHILLIPS' law firm.  In addition to the secretarial work  that I did, my wife, BETTY PUCKETT was employed by the firm  as a secretary.  The only law clerk listed on the McPHILLIPS

SHINBAUM, L.L.P. roster on April 28, 2006, was ALLISON HIGHLEY. She also was a legal assistant to Mr. McPHILLIPS working mainly on criminal cases. Therefore, during the time that ALLISON HIGHLEY was employed by the firm from the summer of 2005 until May 31, 2006, she was serving the firm as legal assistant/law clerk, the same as I was. She did her own secretarial work the same as I did. She was hired initially for only one year since her husband is in the military. She was never hired with the understanding that she would be admitted to the bar in Alabama and become an attorney for the firm. MS. HIGHLEY could not practice law in the State of Alabama and neither could I. If anyone should have been terminated for economic reasons it should have been ALLISON HIGHLEY. I was handling between 70 and 100 cases during that time for the firm whereas she was handling only a small handful. I was much more productive in generating revenue for the law firm than she was, yet MR. McPHILLIPS kept complaining that I was "too old."

33.    MR. SHINBAUM, AMELIA STRICKLAND and other members of the law firm have placed great emphasis on the fact that I have been unsuccessful in passing the bar examination. I contend that I was not given the same privileges by MR. McPHILLIPS as others in the firm who were taking the bar examination. MR. MCPHILLIPS would not allow me to take any time off to study. If I was not at the office when he needed me I would receive a scolding about not being available when he wanted me. However, with respect to other employees of the firm, who were eligible to take the bar exam, they were allowed as much as two months off with pay for exam preparation. SIM PETTWAY, a younger legal assistant who holds a law degree, took the Alabama State Bar Examination twice and, on each occasion, MR.

McPHILLIPS gave him two (2) weeks off <u>with pay</u> in order for him to study. REGINA BARRON, a young legal assistant and MR. McPHILLIPS' former young confidential secretary, was likewise given time off with pay to study for the bar exam. Other employees who were given time off and who were much younger than me include the following: AARON LUCK (now an associate attorney at the firm); JIM BODIN (now an associate attorney at the firm); KAREN SAMPSON-ROGERS (a former associate attorney at the firm); and JOE GUILOT (a present associate attorney in the law firm). Never once did MR. McPHILLIPS permit me to take even one (1) day off from work to study for the bar examination. When I asked for time off with pay to study for the bar MR. McPHILLIPS became very hostile. Furthermore, my job with the firm was not conditioned on whether or not I passed the bar examination. Neither was my productivity related to whether or not I was a licensed attorney. I brought more legal fees in to the firm because of my work as a legal assistant than some of the attorneys in the firm. MR. McPHILLIPS was continually praising me for my communication skills with clients and others and for my productivity for the firm.

34.    My word processing skills and my knowledge of computers would enable me to perform full secretarial duties for any attorney in the law firm had I been asked to do so. I was never asked to do it. I was already doing the secretarial work on the cases which had been assigned to me.

35.    The hostility towards me reached a crescendo when MR. McPHILLIPS instructed me to go through AMY STRICKLAND whenever I wanted to talk to him. After twenty-six (26) years he all of a sudden wanted me to start going through an intermediary before I could even speak to him. This development did not occur until

*I started experiencing illnesses.*

36.    *In or about February of 2006, I was in the downstairs conference room interviewing a prospective client.  MR. SHINBAUM and MS. BERN-SPEAR walked in unannounced, told the client to come upstairs with them, and left me seated in the conference room.   Not so much as one word was spoken to me by SHINBAUM or BERN-SPEAR.   They took the client and refused to even speak to me.*

*Further the affiant saith not.*

*Signed under the pains and penalties of perjury on this 25th day of April, 2007.*

X *Carroll Puckett*
**CARROLL PUCKETT**

**STATE OF ALABAMA**                    )

**MONTGOMERY COUNTY**                    )

<u>**VERIFICATION**</u>

*Before me, the undersigned Notary Public, personally appeared CARROLL PUCKETT, who being known to me and being first duly sworn, deposes and says that he is the PLAINTIFF in the above-captioned matter, that he has read the contents of the foregoing, and that the contents of same are true and correct to be the best of his knowledge, information and belief.*

*SWORN TO AND SUBSCRIBED BEFORE, me this the 25th day of April, 2007.*

X *Carroll Puckett*
**CARROLL PUCKETT**

*Notary Public*

NOTARY PUBLIC STATE OF ALABAMA AT LARGE
MY COMMISSION EXPIRES: Aug 23, 2009
BONDED THRU NOTARY PUBLIC UNDERWRITERS

**(SEAL)**

*My Commission Expires:*

# Exhibit B

STATE OF ALABAMA                    )

MONTGOMERY COUNTY                   )

## CONSOLIDATED COUNTER-AFFIDAVIT OF
## BETTY PUCKETT

1.      *My name is Betty Puckett. I am over nineteen (19) years of age, I have personal knowledge of the facts set forth in this affidavit, and I am competent to testify as to the matters contained herein. I understand that this counter-affidavit is to be proffered in opposition to a DEFENDANTS' Motion for Summary Judgment in the case of PUCKETT vs. McPHILLIPS SHINBAUM, ET AL., Case No. 2:06 cv-1148-ID, which is presently pending in The United States District Court for the Middle District of Alabama, in which CARROLL W. PUCKETT is the PLAINTIFF.*

2.      *I understand that MR. PUCKETT seeks monetary damages and other relief against the DEFENDANTS, and each of them, for violations of Title VII of The Civil Rights Act of 1964, the 1991 amendments to Title VII of The Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and Alabama's Age Discrimination Act of 1997. I also understand that he asserts claims under the pendent or supplemental jurisdiction of the Court for defamation and fraud.*

3.      *I have read the Motion for Summary Judgment filed by the DEFENDANTS in this case, and I have read the memorandum brief prepared by their attorneys. I have read the Affidavit of JULIAN McPHILLIPS and the Affidavit of KENNETH SHINBAUM, both of whom are DEFENDANTS in this case. Also, I have read the Affidavit of AMY STRICKLAND, who is also a DEFENDANT in this case.*

EXHIBIT "B"

4.    I am married to CARROLL W. PUCKETT and we have been married for fifty-three (53) years.  From 1999 to 2006, I was employed by the law firm of McPHILLIPS SHINBAUM on a full-time basis to assist my husband, CARROLL PUCKETT, with his legal work.  Prior thereto, from 1990 to 1999, I was employed on a part-time basis with the law firm to work with my husband.

5.    From 2004 until my husband's termination from the law firm in 2006, officer manager AMY STRICKLAND would constantly question me about "when" Carroll was going to retire.  She would ask me in a demanding tone, "when is Carroll going to retire?" On other occasions in this two (2) year period she would say "why doesn't Carroll just go ahead and retire?"  My reply would always be that there was "no reason" for Carroll to retire and that he enjoyed his job and he enjoyed what he was doing.

6.    In or about June of 2003, when CARROLL had a minor stroke and was out of work for approximately three (3) weeks, I prepared a list of Carroll's active cases, along with a brief description of the status of each case, and I provided it to office manager AMY STRICKLAND.  She never stated that there were any problems with any of CARROLL'S cases and he resumed working the cases upon his return to the office.

7.    Following my husband's stroke, he was in rehabilitation for approximately two (2) weeks, and he returned to work at McPHILLIPS, SHINBAUM the very next day.  From that day until his termination some three (3) years later, CARROLL rarely missed a day of work or called in sick.  The only time he was away from the office during that period was: (i) when we were on vacation; (ii) a 3-day

hospitalization in September 2004 for stomach bleeding caused by the prescription drug plavix; (iii) and a 3-day hospitalization in December of 2004 for bowel impaction. CARROLL also took radiation treatments for his cancer which required him to miss an hour or so of work when the treatments were scheduled. To make up the lost work time, CARROLL always arrived at the law firm early, stayed at the law firm late, or took work home with him.

8.    Following CARROLL'S stroke an employee of the law firm named SUZANNE CLEMENT, who was DEFENDANT KENNETH SHINBAUM'S secretary, complained to me that CARROLL'S case files were not being assembled and maintained correctly. I then went to the office manager, DEFENDANT AMY STRICKLAND, and asked her if there was an official firm policy with respect to how case files should be assembled and maintained. DEFENDANT STRICKLAND replied "no," that there was no such policy. I then reported SUZANNE CLEMENT'S remarks about the files to DEFENDANT STRICKLAND and she said in essence that MS. CLEMENT'S claims were untrue,

9.    Following CARROLL'S stroke I noticed that the cases being assigned to CARROLL by DEFENDANT McPHILLIPS were marginal in terms of possible liability and of little recovery potential. I complained about this to AMY STRICKLAND. I also kept complaining to DEFENDANT STRICKLAND that DEFENDANT KENNETH SHINBAUM'S secretary, SUZANNE CLEMENT, was continuing to harass CARROLL about the assembly and maintenance of his case files.

10.    In January of the year that CARROLL was terminated we went on a vacation.  When we returned to the law firm we discovered that CARROLL'S nameplate had been removed from one of the doors leading to his office.  I later learned that DEFENDANT KENNETH SHINBAUM personally removed CARROLL'S nameplate from the door.

Further the affiant saith not.

Signed under the pains and penalties of perjury on this _25th_ day of April, 2007.

_Betty Puckett_
BETTY PUCKETT

STATE OF ALABAMA            )

MONTGOMERY COUNTY           )

### VERIFICATION

Before me, the undersigned Notary Public, personally appeared BETTY PUCKETT, who being known to me and being first duly sworn, deposes and says that she is the AFFIANT in the above-captioned matter, that she has read the contents of the foregoing, and that the contents of same are true and correct to be the best of her knowledge, information and belief.

SWORN TO AND SUBSCRIBED BEFORE, me this the _25th_ day of April, 2007.

_Betty Puckett_
BETTY PUCKETT

_Notary Public_          NOTARY PUBLIC STATE OF ALABAMA AT LARGE
                         MY COMMISSION EXPIRES: Aug 23, 2009
                         BONDED THRU NOTARY PUBLIC UNDERWRITERS

(SEAL)

My Commission Expires:_____

## M E M O R A N D U M

TO:        Carroll Puckett

FROM:      Julian McPhillips

DATE:      February 13, 2006

SUBJECT:   Case List

I would like to get with you about your case load.  Please let me and/or Donna know what we can do to help you expedite some of them.

*Enjoyed our visit last Friday. There is simply a way for me to help you & the firm get the best results. jm*

EXHIBIT "C"

# M E M O R A N D U M

TO:        Carroll Puckett

FROM:      Julian L. McPhillips, Jr.

DATE:      February 14, 2006

SUBJECT:   Case List


      Carroll, thank you for taking the time to go over your case list with me, and following up the meeting by getting the statute of limitations.  Please know that you are a dear friend, and I appreciate all that you do for me and the firm.  Know that I am here to help in any way possible.

                                               Thank you!


**EXHIBIT "D"**

# MEMORANDUM

TO:          CARROLL PUCKETT

FROM :    JULIAN L. MCPHILLIPS

DATE:      JANUARY 20, 1999

   Words cannot express my gratitude for you coming down during the late night hours last night, and meeting with the police, and staying here so long and getting the door replaced with plexiglass. I know that it was a hard effort, took a great deal of your time and energy, and please know how grateful I am. The effort alone is heroic and is deeply appreciated by me and everyone here in the office.

cc:     All attorneys and employees

**EXHIBIT "E"**