**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| CARROLL W. PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: |
| | ) | 2:06-cv-1148-ID |
| MCPHILLIPS SHINBAUM, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

I.    **Mr. Puckett has failed to create a genuine issue of material fact to support a prima facie**

    **A. Age discrimination and gender discrimination.**

Mr. Puckett has failed to create a genuine issue of material fact to support a prima facie case of age discrimination or gender discrimination, i.e., that he was treated differently from someone similarly situated.  See Knight v. Baptist Hospital of Miami, 330 F.3d 1313, 1316 (11th Cir. 2003).[1]

Nowhere in his response to Defendants' summary judgment motion does he contest the following facts regarding Alison Highley: (1) she was scheduled to take the Alabama bar exam when he was terminated and expected to pass it with no problems[2], see First Strickland Aff. ¶ 8(H), Shinbaum Aff. ¶ 13; (2) had already passed another state bar and could therefore practice pro hac

---

[1]Mr. Puckett contends that he has properly stated Title VII, ADA, and ADEA claims against the individual defendants.  The case law he cites for this proposition does not support his argument.  Defendants refer the Court to the case law cited in their original brief as to this issue without addressing it again in this brief.

[2]His affidavit states only that she was scheduled to take the bar exam when she was *hired*, but that was several months before his termination.

1

vice in Alabama courts, id.; and (3) had a much lower salary ($35,000.00) than he did ($70,000), a salary which was reduced another $5,000.00 to $30,000.00 during the economic crisis experienced by the law firm, see First Strickland Aff. ¶¶ 8(H) & 8(O).  Thus, he has failed to create any genuine issue of material fact which would support his claim that he was similarly situated to Highley.

Nowhere in his response does he contest the following facts regarding Elizabeth Spear: (1) At the time of his termination she had taken the bar examination and passed, see Shinbaum Aff. ¶ 8; (2) she had graduated at the top of her class at Jones Law School, id.; and (3)  her salary was $40,000, in comparison to his salary of $70,000, see First Strickland Aff. ¶¶ 8 (O) & 9.  Thus, he has failed to create any genuine issue of material fact to support his contention that he was similarly situated to Bern-Spear.

Nowhere in his response does he contest the following facts regarding the secretary/legal assistants in the law firm: (1) Unlike him each of the secretary legal assistants did secretarial work for one or more lawyers in the firm, see Second Strickland Aff. (attached as Exhibit 1) ¶¶10-11; (2) Each of them earned significantly less money then he did, id. ¶ 13 (highest paid secretary was $32,000 at the time of Mr. Puckett's departure); (3) Whether he had secretarial skills or not, he had never been asked by anyone in the firm to undertake secretarial work for them, C. Puckett Aff. ¶ 34 (he was never asked to perform secretarial duties for any attorney); and (4) unlike him, the secretary/legal assistants had, of course, themselves no secretarial support, see First Strickland Aff. ¶ 8(O) ($10,000 was cost of Puckett's part-time secretary).[3]

In short, there simply was no one similarly situated to Mr. Puckett at the McPhillips

---

[3]Mr Puckett does not attempt to compare himself with Amelia Strickland, the office manager.

Shinbaum law firm when Mr. Puckett was terminated, and he cannot therefor make out a prima facie case of age or gender discrimination.  No amount of discovery he could do can change that fact.

### B.    National origin discrimination

 Mr. Puckett claims that he was discriminated against on the basis of national origina because Elizabeth Bern Spear, who he claims is of Jewish descent (it is uncontested that she is not Jewish), "replaced" him.  As with gender and national origin discrimination, Mr. Puckett would have to present evidence that he and Spear were similarly situated.  See Knight, supra.  As noted above, it is uncontested that Ms. Spear had her bar license, graduated at the top of her law school class, and had a lower salary than  Mr. Puckett's. Thus, he simply cannot show that they were similarly situated and cannot prove a prima facie case.

Moreover, even if she were similarly situated, Puckett would have no claim.  Being of Jewish descent is irrelevant in a national origin discrimination case because being Jewish has no relation to one's nationality:

> Lapine v. Edward Marshall Boehm, Inc., No. 89 C 8420, 1990 WL 43572, *5 (N.D.Ill. March 28, 1990). . . is instructive. In Lapine, the plaintiff, a Jewish woman, sued her former employer under Title VII for employment discrimination. The plaintiff alleged that the employer terminated her because she was Jewish. Id. at * 1. The plaintiff asserted discrimination claims based on religion and national origin. Id. The employer moved to dismiss the national origin claim under Rule 12(b)(6) on the grounds that Judaism is a not a basis for a national origin discrimination claim. Id.
>
> The district court agreed. "Plaintiff can point to no authority for the proposition that the characteristic of being 'Jewish' indicates national origin." Id. at *5. The court acknowledged that Judaism is indisputably a religion and has been held to constitute a race as well. Id., citing Shaare Tefila Congregation v. Cobb, 481 U.S. 615 (1987). But being Jewish gives no indication of an individual's country of origin "[n]or does it indicate the country of origin of one's ancestors or suggest the physical or cultural characteristics of a national origin group." Id. "Indeed, Jews, like Catholics and Protestants, hail from a variety of different countries." Id. Applying the standards for national origin laid out in Espinoza v.Farah Mfg. Co., 414 U.S. 86 (1973), the court found that the plaintiff had failed to state a claim for national origin

discrimination."

Larson v. Portage Tp. School, 2006 WL 1660752 *4-5 (N.D.Ind. 2006).

**II.      Mr. Puckett has failed to produce evidence that the legitimate non-discriminatory reason for his termination was pretextual or unlawful.**

Mr. Puckett's age, gender and national origin claims fail for the reasons set forth above, and this Court need go no further in analyzing those claims. However, even if Mr. Puckett had made a prima facie case as to any of those claims, Mr. Puckett has failed to create a genuine issue of material fact as to the legitimate non-discriminatory reason for his termination.

In his attempt to show evidence of pretext, Puckett says in his affidavit that Mr. McPhillips came to work in the spring of 2006 almost everyday, C. Puckett Aff. at ¶ 26, and that the firm, to his knowledge, was financially stable, C. Puckett Aff. at ¶ 25. In other words, Mr. Puckett attempts to allege that the reason for his termination was pretextual because the firm was not experiencing a financial crisis and McPhillips was working.

That alone does not create a genuine issue of material fact as to the legitimate non-discriminatory reason for his dismissal in this case. Whatever the reason for the cost-cutting measures, it remains utterly undisputed that the McPhillips Shinbaum law firm was drastically cutting expenses in 2006, beginning in February. See First Strickland Aff. ¶¶ 6-8. Thus, it remains uncontested that Mr. Puckett's termination was part of a large-scale "downsizing". Whether this was caused by real financial problems or was just what Mr. Puckett calls "cry[ing] 'wolf'", C. Puckett Aff. at ¶ 25 (alleging that Mr. McPhillips often asserted there was a financial crisis when there was not one), does not create a genuine issue of material fact. In other words, whatever the *cause* of these drastic cost-cutting measures (McPhillips' illness, financial crisis, or perceived financial crisis), their existence is undisputed.

4

Mr. Puckett's only attempt to contest the otherwise undisputed facts regarding the enormous cost-cutting measures which took place in 2006 was his allegation that Highley and Spear were hired "during this time period." C. Puckett Aff. at ¶ 25. However, he does not define what "this time" means, and the undisputed facts are that they were not hired during the time period when the drastic cost-cutting took place.

The time period in question began in February 2006. First Strickland Aff. at ¶¶ 6 - 8 (McPhillips fell ill in February 2006 and instructed Strickland to begin formally cutting costs on April 3, 2006). Spear was hired August 15, 2005. See Shinbaum Aff. at ¶ 8. According to Puckett, Spear was the "last person hired" before his termination.C. Puckett Aff. ¶ 30. Thus, Highley was hired before Spear and well before the 2006 cost-cutting started.

Mr. Puckett does not contest that cost-cutting measures were undertaken beginning in February 2006, including:

- renegotiating contracts with the copy machine company and ITC Deltacom,

- eliminating public relations costs,

- eliminating all raises from February to July 2006,

- discontinuing all repairs to the building,

- charging postage to clients,

- eliminating rent payments to McPhillips,

- eliminating McPhillips' secretary's position in April 2006 until his return to work in October 2006, and

- discontinuing replacement of office

5

First Strickland Aff. at ¶¶ 8 - 9.

The most notable of the cost-cutting measures was the elimination of multiple positions at the law firm. As noted above, several employees left during the period in question and have not, to this day, been replaced, including Sim Pettway, a paralegal, who resigned in March 2006, Karen Rodgers, an attorney, who resigned in August 2006, and Mary Goldthwaite, an attorney, who resigned in September 2006. The secretarial positions for the two attorneys were also eliminated. Second Strickland Aff. at ¶¶ 12 - 14.

The full amount saved by the firm, counting only those costs which were not re-incurred, was $363,800. Second Strickland Aff. at ¶ 16. There was an additional one-time savings due to cost-cutting of $128,419.02. Id. Thus, the total amount saved as a result of cost-cutting measures was close to half a million dollars.

Mr. Puckett contended in his brief that Defendants would have to show financial statements and the like to substantiate the financial crisis at the firm. As noted above, it matters not whether the crisis was real or perceived for purposes of Defendants' summary judgment motion because the severe cost-cutting measures which took place over these months are not contested. Nevertheless, the financial statements are attached to Amelia Strickland's second affidavit and show that the firm's income was significantly reduced during the relevant period in 2006 from what it had been in 2005. In particular, in 2006, Mr. McPhillips generated only about one tenth the income he had generated during the relevant periods in 2005. See Second Strickland Aff. ¶¶ 17-18 (setting out the actual income amounts) & Exh. B. Mr. Puckett's vague assertion that he believed that the firm was financially "stable" when he was terminated is belied by these documents. Of course, the Court need not reach this issue, as noted above.

There is yet another basis for ruling that McPhillips Shinbaum did not terminate Puckett based on any unlawful discriminatory motive. Puckett alleges that Kenneth Shinbaum made the decision to replace him with Spear because of her Jewish "national origin." Because being of Jewish descent does not constitute a national origin, even taking Mr. Puckett's allegations to be entirely true, i.e., that he was terminated because he was not of Jewish descent, it is uncontested that his termination was not based on gender, age, national origin or disability as he contends.

## III.    Harassment/Hostile work environment

In <u>Apodaca v. Secretary of Dept. of Homeland Sec</u>., 161 Fed.Appx. 897 (11th Cir. 2006) the Eleventh Circuit held that:

> To establish a hostile work environment claim, a plaintiff must show: "(1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." A hostile work environment claim under Title VII is established upon proof that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." .... "In evaluating the objective severity of the harassment, we consider, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.... Moreover, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (citation omitted).

Taking the facts in the light most favorable to Mr. Puckett and based on the undisputed facts, Mr. Puckett has failed to present evidence upon which a jury could find that he was working in an environment permeated with "discriminatory intimidation, ridicule, and insult," much less that such

alleged intimidation and ridicule were based on a protected characteristic. None of the allegations on which Mr. Puckett relies as the basis for his hostile environment claim would support such a claim. Each of them is addressed separately below. In addition, even taken together, his allegations coupled with the undisputed facts, would not support a hostile environment claim.

The first allegation is that Mr. Puckett's name plate was removed from his door. Even after Mr. Puckett's evidentiary submission, it remains uncontested, however, that Mr. Puckett's name plate was removed from the door of an office which led to Mr. Shinbaum's secretary's office, and that it was taken down for the purpose of preventing people from wandering into her office. See Strickland Aff. ¶ 15. It likewise remains uncontested that Mr. Puckett had a nameplate at another door, the main door to his office. Id. Mr. Puckett simply takes no issue with these facts which render this incident completely benign.      Another allegation is that he was instructed to "go through Amy Strickland" to speak with Julian McPhillips in 2006. C. Puckett Response Brief at 16.[4] What Mr. Puckett fails to acknowledge is that in 2006 *everyone* at McPhillips Shinbaum except Amelia Strickland and Kenneth Shinbaum was asked to communicate with Julian through Amelia Strickland. Second Strickland Aff. at ¶ 7.

Mr. Puckett's assertion that he was chastised for not following "phantom law firm" policies also cannot support a hostile environment claim. Nothing in Mr. Puckett's affidavit speaks to this allegation. Only Betty Puckett's affidavit does, and it states that Suzanne Clement complained to *her* about the way Mr. Puckett's files were kept, and she adds vaguely in another paragraph that she complained to Strickland because Clement was "continuing to harass Carroll about the assembly and

---

[4]We know that Mr. Puckett is alleging that this took place in 2006. Mr. Puckett alleges he was given this instruction after twenty-six years of employment, which would have been in 2006, since Mr. Puckett alleges that he was terminated in his twenty-sixth year.

maintenance of his case files." B. Puckett Aff. ¶¶ 8-9. In a nutshell, the allegation is only that Suzanne Clement did not like the way he kept his files. Clement is Mr. Shinbaum's *secretary*. See B. Puckett Aff. ¶ 8; Second Strickland Aff. ¶ 11. She is therefore not a decision-maker in the McPhillips Shinbaum law firm. She is obviously not a supervisor of, nor superior to, Mr. Puckett. In addition, Puckett himself has put forward no evidentiary basis for concluding that Clement's alleged accusation that Puckett's files were not maintained correctly resulted from any illegal motive.

Moreover, when Betty Puckett went to Strickland to ask about the law firm policy that Clement allegedly referred to, Ms. Strickland told her that there was no such policy. B. Puckett Aff. ¶ 8.

Mr. Puckett's main complaint appears to be that, in 2006, his files were gone through and files were taken away from his office without his consent. First, it is uncontested that Mr. Puckett was not an attorney, much less a partner, in the McPhillips Shinbaum law firm. Thus, the files were not "his files" as he appears to believe. The files belonged to the clients and the firm. Next, Mr. Puckett acknowledges in his affidavit that some of his files were turned over to two attorneys in the firm because they did not have enough work: "Then Amelia Strickland came back to my office stating that she needed to take some of my files and turn them over to Aaron Luck and Jim Bodin, two associate attorneys in the firm who needed some more work to do since their case load was 15 to 25 each. My case load at the time was between 70-80 cases." C. Puckett Aff. ¶ 27.

In other words, it is uncontested that work was redistributed from Puckett to attorneys for good reason, i.e., the attorneys did not have enough cases. Moreover, Mr. Puckett does not allege that he was left without work to do. Finally, it is certainly within the discretion of any law firm to

redistribute work, particularly where lawyers in the firm are lacking work to do, and doing so cannot be considered evidence that any unlawful motive exists. Moreover, every law firm is required to provide supervision to paralegals handling legal files, which, necessarily requires lawyers to "go through" the paralegal's files. It is axiomatic that doing these things cannot be considered harrassment.

Mr. Puckett further contends that he experienced a hostile work environment and/or harassment because the cases being assigned him were "of poor quality" and of " little settlement value."[5] There is no evidence that the types of cases being assigned to Mr. Puckett had any bearing on his income; it is uncontested that he was paid a salary. C. Puckett Aff. ¶ 8. It would certainly be a legitimate business decision, which could not be reasonably connected to any unlawful motive, to assign cases of poorer quality to a paralegal and assign the other cases to attorneys.

The things that Mr. Puckett is largely complaining about in connection with the assignment of files and the review of files by others are merely business decisions. What Mr. Puckett is essentially asking the Court to do is call into question how the McPhillips Shinbaum firm was run, which is not this court's role. See Chapman v. AI Transport, 229 F.3d 1012, 1031 (11th Cir.2000) (en banc) ("While King's management style may or may not have been effective, and the changes in Liberty National's business practices may or may not have been wise, it is not our place to tell employers how to run their businesses.").

Mr. Puckett further contends that Mr. McPhillips "constantly complained" about Mr. Puckett's age. This assertion, without more, is not useful in analyzing a hostile work environment

---

[5]Even if this were the truth, there is no evidence that the cases coming in at the time and being assigned elsewhere were not also of poor quality and of little settlement value.

claim. Mr. Puckett has the burden of showing that the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Apodaca, supra. As noted above, the Court in considering a summary judgment motion is charged with analyzing: " (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance...." Id. "'Simple teasing'" and "'offhand comments'" will not amount to discriminatory changes in the terms and conditions of employment. Id.

Due to the extreme generality of his allegation concerning McPhillips' complaints about his age, Mr. Puckett has failed to create a genuine issue of material fact as to his hostile work environment claim. The "complaints" alleged could have been gentle teasing or statements altogether misconstrued by Mr. Puckett and which could not even reasonably be considered as complaints about his age. Mr. Puckett has even failed to allege what he means by "constantly complaining." See, e.g., Edwards v. Wallace Comm. College, 49 F.3d 1517, 1522 (11th Cir. 1995) (dismissing hostile environment claim because there was insufficient information as to "how [statements] were made, to whom they were made, and how and when they were made known to" plaintiff). Even if he had alleged the nature and the frequency of the complaints with specificity, the existence of complaints alone would not constitute an environment "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

Alleged questions posed to Mr. Puckett's wife about when Mr. Puckett was going to retire can also not be considered harassment or as a basis for a hostile environment claim. First, it is

uncontested that these statements were never made to Mr. Puckett directly, suggesting that, in fact, in contrast to their being an attempt to intimidate, they were made to his wife so as not to upset him. Second, Amelia Strickland, the office manager, was not Mr. Puckett's supervisor, and she had no authority to fire anyone or to require, or even to ask, anyone to retire.  Second Strickland Aff. at ¶ 9.  Furthermore, the paragraph in Betty Puckett's affidavit in which this was alleged shows that the comments were innocuous at best:

> From 2004 until my husband's termination from the law firm in 2006, office manager Amy Strickland would constantly question me about "when" Carroll was going to retire.  She would ask in a demanding done, "when is Carroll going to retire?"  On other occasions in this two (2) year period she would say "why doesn't Carroll just go ahead and retire?"  My reply would be that there was "no reason" for Carroll to retire and that he enjoyed what he was doing.

B. Puckett Aff. ¶ 5.

There is certainly nothing actionable in asking a third party when someone is planning on retiring even if the question is presented in an allegedly "demanding tone".  Similarly, asking someone why another party does not go ahead and retire is also not objectionable.  There is certainly always curiosity regarding how long someone who is eligible to retire is going to work.  It is common conversation for an employee to contemplate when an older employee is going to retire and why he or she does not go ahead and do it.  Such speculation exists in large part because of curiosity along the lines of questions like: "Why don't you go ahead and get married?" and "When are you planning on having kids?"  These are not always welcomed questions, but they do not a hostile work environment make, especially when directed at a third person.  At most these were "mere[ly] offensive utterances," id., but they really do not even arise to that level.

Finally, in his statement of facts, though not in the hostile environment argument section of his brief, Mr. Puckett refers to Mr. McPhillips' alleged "complaints" regarding Mr. Puckett's cancer

treatments. It is undisputed that the cancer treatments ended about a year and a half before Puckett's termination, and, thus, that the alleged complaints would have ended then. Even taken as true, though, such complaint would not have been about disability, age or gender. Instead, what Puckett described was a boss complaining about an employee's missing work but otherwise permitting him freely to miss the work to take the treatments, as is undisputed. According to Puckett, there were no negative employment evaluations as a result of the work missed. C. Puckett Aff. ¶16.[6]

Even taking all of Mr. Puckett's allegations together, he still has created no triable issue as to his hostile environment claim. The removal of his name plate has an undisputed utterly benign explanation. The questions of a co-worker with no supervisory duties over him to his wife about his retirement were neither intimidating, abusive, nor even made directly to him but were run of the mill kinds of questions that people often ask out of curiosity, even if made in a "demanding" tone as alleged. Law firm personnel had every right to go through Mr. Puckett's files in his office – both the files and the office belonged to the firm and Mr. Puckett's work was being supervised by lawyers in the firm and necessarily worked on by lawyers, not just by Mr. Puckett. Cases were reassigned from Mr. Puckett to lawyers in the firm who needed work. Reassigning cases is nothing out of the ordinary, much less actionable. It is uncontested that every other employee of the firm was required to communicate to Mr. McPhillips through Strickland in 2006. Finally, disagreements among staff members over how to do the filing is certainly no basis for a harassment lawsuit. T h e   o n l y

---

[6]This is also an instance in which Mr. Puckett's allegations are so vague that they cannot state a claim for hostile work environment. The substance of any statements or actions taken by McPhillips is absent. Puckett simply generically asserts, "Mr. McPhillips was very hostile to me about being gone from the office for short periods of time for my cancer treatments. He complained and complained about it and made it clear that he thought it was unreasonable for me to go and receive cancer treatments even though most of the time I was absent was within my lunch hour."

allegations which were even remotely out of the ordinary or unpleasant were the allegations (strongly denied by Defendants) that McPhillips was "hostile and uncooperative" when Puckett took cancer treatments in 2004 and that McPhillips "constantly complained" about Mr. Puckett's age. Even if both claims were true, they simply would not be sufficient to support a jury verdict in favor of Mr. Puckett on a hostile environment claim.  It is undisputed that Mr. Puckett was permitted to take cancer treatments without any further repercussions except what amount, based on the actual contents of Mr. Puckett's affidavit, to complaints about time missed from work over and beyond the lunch hour, and it is likewise undisputed that these behaviors ended in 2004 when Puckett stopped receiving treatment.  Likewise, Mr. Puckett's vague allegations of complaints about his age cannot be a sufficient basis on which to find that the atmosphere at McPhillips Shinbaum was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment..." Apodaca, supra.

Because Mr. Puckett himself necessarily has all knowledge of the incidents he contends make up his hostile work environment/harassment claim, no amount of discovery would, or could, result in a different outcome for this claim.

**IV.    Disability Discrimination**

Mr. Puckett has likewise failed to create a genuine issue of material fact as to his disability discrimination claim.  He has utterly failed, for instance, to show proximate causation.  The argument in his brief relating to disability discrimination is an extreme logical leap that fails utterly.

Mr. Puckett and Defendants agree that he had no disability and that he was performing all job functions.  See, e.g., Puckett Response Brief at 22.  It is likewise undisputed that the last time

that he was ill or receiving any treatments for illness was almost a year and a half before his termination. See Shinbaum Aff. ¶ 7.

Indeed, Mr. Puckett claims only that Defendants *perceived* him to be disabled. The sole evidentiary basis for this assertion is set out by Mr. Puckett as follows:

> Because a hostile work environment, and ultimately termination, ensued subsequent to Mr. Puckett's illness, the conclusion is inescapable that McPhillips-Shinbaum perceived that he was disabled.

Puckett Response Brief at 22. The conclusion Puckett reaches is far from inescapable.

As noted above, Puckett's allegations do not support a hostile work environment claim. Moreover, nothing in Mr. Puckett's allegations in connection with his hostile environment claim point to any perception that he was disabled, nor has he attempted to show any relationship between some perceived disability and the incidents that constituted the alleged hostile environment. The only allegation that even comes close to having anything to do with a disability is Mr. Puckett's contention that Mr. McPhillips became "hostile whenever Mr. Puckett needed to go to cancer treatments." Puckett Response at 22. The Puckett affidavit itself shows that it was Puckett's absence that McPhillips allegedly complained about, not any disability: "Mr. McPhillips was very hostile to me about my being gone from the office for short periods of time for my cancer treatments." "Mr. McPhillips did not criticize my work; he only criticized my being gone to the cancer center for short periods of time." C. Puckett Aff. ¶ 16 . Even if it were true that McPhillips complained, that necessarily ended when the cancer treatments did, one and a half years before Puckett's termination. See  Shinbaum Aff. ¶ 7 (Puckett's recovery was almost one and a half years before termination).

The allegation that someone was ill in 2004 and that his employer was unhappy about his absence during that time cannot be sufficient evidence to support a claim for unlawful termination

in 2006 based on an alleged perceived disability.[7]

Moreover, Mr. Puckett has failed to show that the legitimate, nondiscriminatory reason for his termination was pretextual, as discussed above.  Just as with his other claims, there is no discovery that he could, or did, identify that would change the fate of his disability discrimination claim.

## V.    Retaliation

Mr. Puckett has also failed to create a dispute of fact regarding his retaliation claim that would preclude summary judgment.  A prima facie case of retaliation contains three elements: *"first, the plaintiff engaged in statutorily protected conduct*; second, the plaintiff suffered an adverse employment action; and finally, the adverse action was causally related to the protected expression."  Farley v. Nationwide Mutual Ins. Co., 197 F.3d 1322, 1336 (11th Cir.1999) (elements of a retaliation claim are the same under the ADA and Title VII) (emphasis added).

According to Plaintiff's own brief and supporting affidavit, the only "complaint" that he made prior to his termination was to Amelia Strickland.  He allegedly asked her "[A]re you trying to run me off?" in connection, apparently, with his alleged concern that his office was being "rummaged through and files taken and reassigned."  Plaintiff's Response Brief at 19.

The first problem that Puckett has, even taking the facts in the light most favorable to him, is that his complaint was just a general one and did not refer in any way to discrimination on the basis of age, gender, disability, national origin or anything else.  The Eleventh Circuit has twice

---

[7]Mr. Puckett's claims that Mr. McPhillips had some pattern of hostility toward those in his office who were ill is not borne out by the facts. See Strickland's Second Aff. at ¶ 4 regarding her experience and that of another employee who were employed with McPhillips Shinbaum while receiving cancer treatments.

recently held that general complaints that do not refer to unlawful discrimination per se do not constitute protected activity for purposes of a retaliatory discharge claim.

In <u>Brown v. City of Opelika</u>, 2006 WL 3690693 (11th Cir. 2006), the Eleventh Circuit held that the plaintiff had stated no retaliation claim where:

> [T]he record contained no evidence that Brown engaged in a protected activity by making a complaint about racial discrimination or harassment. Brown admitted that she never mentioned the word "race" when she complained about Kirby's behavior.... Moreover, Brown did not engage in a protected activity because she never voiced a complaint that the City was engaged in an unlawful employment practice.

In <u>Jeronimus v. Polk County Opportunity Council, Inc.</u>, 145 Fed.Appx. 319 (11th Cir. 2005), the Court similarly rejected a retaliation claim for failing to show that there was any protected activity.

> The only actions which could conceivably qualify as protected activity were Jeronimus's casual mention to Etzel of Wooten's "white boy" comment and the email that he sent to Etzel complaining that he was being unjustly singled out. All indications, including Jeronimus's contemporaneous reaction, are that the "white boy" comments were isolated, ephemeral, and ambiguous. And in the email, while Jeronimus complained of being "singled out," being subjected to "a campaign of harassment," and working in a "hostile environment," *he never suggested that this treatment was in any way related to his race or sex.*

<u>Id</u>. (emphasis added).

Thus, a generalized complaint that one is being mistreated is not sufficient to support the first element of a retaliation claim.  The <u>Jeronimus</u> case was even stronger than the case at bar because there was at least some mention of a racially derogatory statement.  Here, however, taking the facts in the light most favorable to Mr. Puckett, he has failed to show any protected activity because nothing in his complaint related to discrimination.

In addition, a complaint cannot be protected for purposes of a retaliation claim where there is no basis for a good faith belief that was objectively reasonable that the allegations complained of

constitute unlawful discrimination. See Eastman v. Tropicana Products, Inc., 2006 WL 3791255 (11th Cir. 2006). In this case, there simply was no good faith or objectively reasonable basis for concluding that there was unlawful discrimination, as is evidenced by the discussion above.

Again, there is no discovery that would alter the conclusion that his retaliation claim is due to be dismissed. It is he himself who holds the information regarding the nature of the complaint he made to Strickland.

## VI.    Defamation

As noted in Defendants' initial brief, this Court, once it has dismissed Mr. Puckett's federal claims, could also dismiss Mr. Puckett's state law fraud and defamation claims. If the Court decides to reach those claims, however, it will find that they, too, are due to be dismissed. The only statement even alleged by Mr. Puckett as defamation is that Mr. McPhillips told other personnel "not to assign new cases to Puckett." Mr. Puckett contends that that implied that he was incompetent.

> To establish a prima facie case of defamation, a plaintiff must show:
> "[1] that the defendant was at least negligent [2] in publishing [3] a false and defamatory statement to another [4] concerning the plaintiff, [5] which is either actionable without having to prove special harm (actionable per se) or actionable upon allegations and proof of special harm (actionable per quod).

Delta Health Group, Inc. v. Stafford, 887 So.2d 887, 891 (Ala.2004) (quoting Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085, 1091 (Ala.1988) (citations omitted)).

Under Alabama law, as this Court recognized in Hayes v. Wal-Mart Stores, Inc., 953 F.Supp. 1334 (M.D.Ala.1996) (De Ment, J.), a statement made about an employee within a corporation is not considered published for purposes of defamation.

> To sustain an action for slander, the plaintiff must show that the "alleged defamatory matter was published," Ala.Code § 6-5-182, "by proof of communication of the defamatory matter to someone other than [herself]." K-Mart Corp. v. Pendergrass, 494 So.2d 600 (Ala.1986); see Nelson v. Lapeyrouse Grain Corp., 534 So.2d 1085

18

(Ala.1988).  The alleged accusation by Mr. Cullifer is subject to a "special" publication rule applicable to corporations, as described by the Alabama Supreme Court in <u>Burney v. Southern Railway Co.</u>, 276 Ala. 637, 165 So.2d 726 (1964) and <u>McDaniel v. Crescent Motors, Inc.</u>, 249 Ala. 330, 31 So.2d 343 (1947). In <u>McDaniel</u>, the Court wrote:

> The fact that the words were spoken by one of defendant's managers in the presence of two other managers in the course of transacting defendant's business, and in the line of their duty as officers of defendant, all in respect to defendant's relations with plaintiff as an employee against whom complaint had been made in connection with his duties as an employee and in respect to that complaint does not alone make the conversation public so as to constitute slander.

31 So.2d at 345. The holding in <u>McDaniel</u> was reiterated in <u>Burney</u>, where the Court went on to hold:

> [W]here [a] letter is dictated by a corporate employee to a fellow corporate employee in the course of transacting the corporation's business and in the line of their duty as employees of the corporation and the letter is sent to another fellow employee and it is in respect to that employee's relations with the corporation, there is not sufficient publication to sustain an action for libel.

165 So.2d at 730. More recently, the Alabama Supreme Court has reaffirmed that communications among the managerial personnel of a corporation about the company's business do not constitute a publication. See <u>Dixon v. Economy Co.</u>, 477 So.2d 353, 354 (Ala.1985); <u>K-Mart Corp. v. Pendergrass</u>, 494 So.2d at 603.

Here, Wal-Mart argues that, because Mr. Cullifer was the District Loss Prevention Manager charged with investigating loss prevention and security problems, and Ms. Barber was the plaintiff's supervisor, the alleged communication by Mr. Cullifer in Ms. Barber's presence did not constitute "publication." See <u>K-Mart</u>, 494 So.2d at 604 (no "publication" where communication between district loss control director and store manager to the effect that the plaintiff had been terminated for misappropriation was between managerial employees and concerned corporate business). In addition, the fact that a loss prevention associate was also present does not change the result. In <u>Nelson v. Lapeyrouse Grain Corp.</u>, 534 So.2d 1085 (Ala.1988), the plaintiff appealed an order granting summary judgment in favor of his former employer on a defamation claim. One of the issues on appeal was whether accusations of theft made by a management employee in the presence of a non-managerial employee during the course of an investigation of the plaintiff constituted a defamatory publication. Noting that the defendant was in the business of buying and selling grain and that investigating shortages of grain therefore

19

concerned corporate business, the Supreme Court of Alabama held that the corporate defendant was not liable for the management employee's alleged defamatory communications to other corporate employees during the course of the theft investigation. The Court stated:

> As long as a communication to a non-managerial employee falls within the proper scope of that employee's knowledge or duties, the McDaniel/Burney rule applies to non-managerial employees as well as to managerial employees. A corporation can act only through its servants, agents, or employees ... and when officers and employees of a corporation act within the scope of their employment and within the line and scope of their duties, they are not third persons vis-a-vis the corporation.

Lapeyrouse, 534 So.2d at 1093 (citations omitted).

Hayes, supra at 1339-1340.

In light of this case law, it is obvious that any instructions by Mr. McPhillips to others not to give new cases to Mr. Puckett would have been a corporate act and a communication to those employees whose duties were to assign cases, acting within the scope of their employment and duties. Thus, there was no publication to a third person, and there is no actionable defamation claim.

## VIII.   Fraud

Mr. Puckett has failed to create a genuine issue of material fact which could preclude summary judgment as to his fraud claim for the reasons set forth in the Defendants' first brief and for two additional reasons.  First, Mr. Puckett's claim is time barred because he should have been on inquiry notice of the claim in 1995 and 2001 when all employees received a Personnel Handbook which states very clearly that all employees of the firm are at will employees.  See Second Strickland Aff. at ¶¶ 5 - 6 and exhibit thereto.  The two-year statute of limitations for a fraud claim begins to run when the plaintiff is privy to facts which, if followed up on, would lead to the discovery of the fraud, i.e., "inquiry notice"; actual knowledge of the fraud is not required.  Auto-

<u>Owners Ins. Co. v. Abston</u>, 822 So.2d 1187 (Ala. 2001).

Moreover, having received the handbook, Mr. Puckett could not have relied on Mr. McPhillips' alleged representation of life-long employment.  Where the language of a document which a plaintiff receives and has an opportunity to read gives the plaintiff reason to doubt the truth of an alleged representation, it is not reasonable for the plaintiff to rely on the alleged representation. <u>See</u>, <u>Tyler v. Equitable Life Assur. Soc. Of U.S.</u>, 512 So.2d 55 (Ala. 1987); <u>see</u> <u>also</u> <u>Foremost Ins. Co. v. Parham</u>, 693 So.2d 409 (Ala. 1997) (re-adopting reasonable reliance standard).

## CONCLUSION

Summary judgment is due to be granted as to all of plaintiff's claims.  Alternatively, summary judgment as to the federal claims is due to be granted and the state claims are due to be dismissed.

Respectfully submitted,

 s/Shannon L. Holliday
Robert D. Segall  (SEG003)
Shannon L. Holliday (HOL088)
COPELAND, FRANCO, SCREWS & GILL, P.A.
444 South Perry Street (36104)
P.O. Box 347
Montgomery, AL 36101-0347
Telephone: 334-834-1180
Fax: 334-834-3172
Email: holliday@copelandfranco.com

21

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 9,  2007, I electronically filed the foregoing with the Clerk of
the Court using the CM/ECF system which will send notification of such filing to the following:

- **George E. Jones, III**
  slick481957@yahoo.com

 s/Shannon L. Holliday       <br>
Of Counsel

## SECOND AFFIDAVIT OF AMELIA A. STRICKLAND

Before me, the undersigned Notary Public, on this day personally appeared

**Amelia A.** Strickland, who first being duly sworn stated the following:

1.    My name is Amelia A. Strickland.  I am the office manager and

bookkeeper of McPhillips Shinbaum, L.L.P., where I have been employed

since November 19, 1996.  I am competent to make this affidavit, and this

affidavit is made upon my personal knowledge.

2.    I am one of the defendants named in the complaint filed by Carroll W.

Puckett against the law firm of McPhillips Shinbaum, L.L.P. and against

Julian L. McPhillips, Jr. , Kenneth Shinbaum, and me.

3.    I hereby incorporate my prior affidavit of January 24, 2007 herein as if fully

set out.

4.    The Plaintiff alleges that he was discriminated against because of his

prostate cancer and other illnesses. For what it's worth, I also was

diagnosed with cancer while working for McPhillips Shinbaum, L.L.P.

More particularly, in 2003, I was diagnosed with, and received treatment

for,  cervical cancer.  Throughout this process, I was treated with respect,

compassion and understanding by the partners in McPhillips Shinbaum,

L.L.P.   In addition, in 2000, the firm's bookkeeper was diagnosed with

-1-

**EXHIBIT 1**

lung cancer. She received treatment which included having a lung removed. Throughout this process, the bookkeeper was treated well by the firm, and left the firm later only because she decided to do so. This former employee maintains a cordial relationship with the firm to this day.

5. As office manager of McPhillips Shinbaum, L.L.P., it was my responsibility to provide each new employee with a copy of the Personnel Handbook, originally prepared on August 31, 1995, and revised on February 16, 2001. Employees already employed by the firm at the time of the Handbook production were provided copies of the new handbook. On page 1, entitled "A word from the Partners", it states that "...it should be noted that nothing in this Personnel Handbook is to be construed as creating any contractual rights or obligations. All employees are at-will, meaning that any employee can be terminated at any time for any reason whatsoever. Likewise, any employee is free to resign at any time for any reason." A copy of this page number one from the Personnel Handbook is attached hereto as Exhibit "A" and is incorporated herein.

6. I am personally aware that Plaintiff Puckett received a copy of the Personnel Handbook.

7. During Defendant McPhillips' illness in 2006, and at the request of his wife, only Mr. Shinbaum and I were supposed to speak with Mr. McPhillips about business, legal and administrative matters. Not only Mr. Puckett, but also all other staff members wanting to speak with Mr. McPhillips were asked to go through one of us. It was up to Mr. Shinbaum and me to

determine whether Mr. McPhillips' input was required.  Only after Mr. McPhillips returned to work full time was complete access given to him.

8.    No one other than the firm paid any portion of Mr. Puckett's salary for the work he did for McPhillips Shinbaum, L.L.P.  Mr. McPhillips did not contribute any portion of Mr. Puckett's salary. Mr. Puckett also did no real estate work for Mr. McPhillips personally at anytime in the six years prior to the termination of Mr. Puckett's employment.

9.    My role at McPhillips Shinbaum, L.L.P. was at all times relevant to this case administrative in nature.  Although I dispute that I ever did anything to suggest that Mr. Puckett retire, I had no authority to fire anyone, and certainly had no authority to require, or even ask, anyone to retire. I have never had such authority at McPhillips Shinbaum, L.L.P.

10.    In paragraph 8 of my original affidavit dated January 24, 2007, I set out examples of the steps taken in 2006 to reduce the expenses of the firm. To this date, neither the attorneys who left the firm in 2006, nor any paralegal / legal assistant, who did not also perform secretarial work for lawyers, has been replaced.  At the present time, the firm has no "senior legal assistant", the role filled by Mr. Puckett, nor any other employee who performs only paralegal work.

11.    On the date Mr. Puckett was informed he was being terminated (April 28, 2006),  the following legal assistants were performing primarily legal secretarial duties for the following attorneys at McPhillips Shinbaum, L.L.P.  Suzanne Clemens was performing primarily legal secretarial duties

-3-

for attorney Kenneth Shinbaum. Sharon Duke was performing primarily legal secretarial duties for attorney Mary Goldthwaite. Page McKee was on maternity leave but when not on maternity leave, she would be performing primarily legal secretarial duties for attorney Aaron Luck. Donna Puckett, while Page McKee was on maternity leave, was performing primarily legal secretarial duties for attorney Aaron Luck. Jennifer Lee was performing primarily legal secretarial duties for attorney Jim Bodin. Patricia Williams was performing primarily legal secretarial duties for attorney Joe Guillot. Tia Wilkinson was performing primarily legal secretarial duties for attorney Karen Sampson Rodgers. Betty Puckett was performing primarily legal secretarial duties for Carroll Puckett, who performed primarily law clerk duties, and who did not perform legal secretarial duties for a lawyer in the firm. Indeed, at the time of the termination of Mr. Puckett's employment, the only person besides Mr. Puckett performing strictly paralegal or law clerk work was Ms. Highley, who was a licensed lawyer in another state and was expected to pass, and has now passed, the Alabama State Bar.

12.     In addition to the information provided about savings in my earlier affidavit, I should note that when Sim Pettway, a law clerk with McPhillips Shinbaum, L.L.P. tendered his resignation in March 2006, the firm saved approximately $35,000.00 in salary and benefits.  As stated above, no one has been hired to fill Mr. Pettway's position.

13.     On August 17, 2006, Karen S. Rodgers tendered her resignation with the

firm. Her position of attorney, along with her secretarial support was not refilled. This saved the firm approximately $100,000.00 in salaries.

14.    Further, on September 14, 2006 Mary Goldthwaite tendered her resignation with the firm. Her position of attorney, along with her secretarial support, was not refilled. This saved the firm approximately $120,000.00 in salaries.

15.    In addition to the salary reductions during February through September, 2006, the firm decreased its payment of benefits for the above described 7 employees, amounting to approximately $2,800.00 during this time period.

16.    The total of annualized expenses eliminated in 2006 that have not been re-incurred was $363,800.00, of which $80,000.00 was attributable to the elimination of Mr. Puckett's and his wife's position with the firm. In addition the firm's effort to cut expenses in 2006 resulted in one time savings of $128,419.02.

17.    Due to Mr. McPhillips' absence from the firm from **March through August 1, 2006**, the income of the firm suffered. The firm realized approximately 26% less in attorney fees than it did for the same period in the prior year of 2005. The firm's profit and loss statement reflected a 35.5% drop from 2005's profit and loss for the same period, down from $573,867.51 in 2005 to $370,653.50 in 2006. Mr. McPhillips, personally, brought in only $19,186.82 during the 6 month period, compared to the $222,192.86 he

had brought in during the same period in 2005.

18.     To further substantiate the loss in revenues experienced by the firm, I

have attached hereto as Exhibit "B", the firm's six month financial

statement for the period of **January 1, 2005 to July 30, 2005** and as

Exhibit "C", the firm's six month financial statement for the period of

**January 1, 2006 to July 30, 2006**.  As the attached statements reflect,

Mr. McPhillips earned $344,793.03 in 2005, compared to the $38,382.22

in 2006. Overall the firm's Profit and Loss statement shows the net

income from 2005 to 2006 was approximately $203,000 less during the

above described period of time.

Further, affiant sayeth not.

_____
Amelia A. Strickland


Sworn to and subscribed before me this the 30 day of April, 2007.

_____
Notary Public

My Commission Expires: 5/24/2011

# McPhillips, Shinbaum, Gill, & Stoner

*Attorneys and Counselors at Law*

*516 South Perry Street*
*Montgomery, AL    36104*

*Mailing Address:*
*Post Office Box 64*
*Montgomery, AL    36101*

*(334)   262-1911*
*Facsimile:   (334) 263-2321*

# PERSONNEL HANDBOOK

### ALL EMPLOYEES OF LAW FIRM

*Associate/Staff Attorneys*
*Legal Assistants/Paralegals*
*Law Clerks*
*Legal Secretaries*
*Receptionist*
*Runners*


EXHIBIT
A

## **TABLE OF CONTENTS**

**PAGE**

I.  A WORD FROM THE PARTNERS.................................... 1
    A.   General Expectations of the Partners.............. 2

II. GENERAL INFORMATION and PERSONNEL POLICIES............. 3

    A.   Office Hours........................................ 3
    B.   Lunch Hours......................................... 4
    C.   Employee Breaks..................................... 4
    D.   Payroll Checks...................................... 4
    E.   Dress Code.......................................... 5
    F.   Use of Break Rooms.................................. 6
    G.   No Smoking Policy................................... 6
    H.   Leaving the Office on Official Business............ 7
    I.   Daily Upkeep of Office.............................. 7

III. EMPLOYEE BENEFITS........................................ 8

    A.   Vacation Leave...................................... 8
    B.   Sick Leave.......................................... 8
    C.   Maternity and/or Emergency Leave.................... 8
    D.   Holidays............................................ 9
    E.   Other Benefits...................................... 9
    F.   Retirement Accounts................................ 10

IV. PROCEDURES FOR SUPPORT STAFF............................ 11
    A.   Use of Telephone................................... 11
         1.   Answering the Telephone....................... 11
         2.   Taking Telephone Messages..................... 11
         3.   Returning Phone Calls......................... 12
         4.   Handling New Client Incoming Calls............ 12
         5.   Paging Staff Members.......................... 12
         6.   Using the "Message" Feature................... 13
         7.   Personal Telephone Calls...................... 13

    B.   Accounting Procedures.............................. 14
         1.   General Procedures............................ 14
         2.   Cash Advances................................. 15

    C.   Purchases for Office............................... 16
    D.   Mileage/Expense Reimbursements..................... 16
    E.   Filing a lawsuit in Montgomery County.............. 17
    F.   Filing a lawsuit out-of-town....................... 17
    G.   Issuing Subpoenas.................................. 18
    H.   Serving Subpoenas.................................. 19
    I.   Use of Conference Rooms for Depositions, Etc...... 20
    J.   Safeguarding Client Possessions Left in Office.... 20
    K.   Confidentiality and Professionalism............... 21

i

## A WORD FROM THE PARTNERS:

Our goal is to provide the best legal services possible for our clients. In order to accomplish this task, it takes every employee striving to be both effective and efficient in their particular job description. As we work together and function as a team we will see an increase in production, a decrease in unnecessary expenses, and an elimination of wasted time and money. Each of these will ultimately reap both personal and financial benefits for everyone.

The purpose of this manual is to provide a composite of the partners' expectations, employee benefits offered by the firm, policies, general office procedures, and helpful hints. We have also provided, for the benefit of both attorneys and secretaries, a sample of various correspondence and/or articles which will assist each of us in doing a more efficient job. This manual is not intended to be a comprehensive guide containing all conceivable issues, but a source of information to assist employees on a day-to-day basis. In addition, it will be a tremendous help to new employees in making an easier adjustment to our expectations and working environment.

If, however, the policies outlined in this manual are not effective or observed by the employees of this law firm, the only other alternative the partners have is to weigh and measure this when it comes time to consider raises and whether or not bonuses are merited. Bonuses are not automatic and can vary from employee to employee, depending on productivity, merit, etc.

We hope that you will read this handbook and use it to help each of us accomplish our goal. However, it should be noted that nothing in this Personnel Handbook is to be construed as creating any contractual rights or obligations. All employees are at-will, meaning that any employee can be terminated at any time for any reason whatsoever. Likewise, any employee is free to resign at any time for any reason.

Thank you for your cooperation and the good work you do on a daily basis.

### THE PARTNERS

JULIAN L. McPHILLIPS, JR.

KENNETH SHINBAUM

G. WILLIAM GILL

ALLEN R. STONER

12:22 PM
04/30/07
Cash Basis

# McPhillips Shinbaum L.L.P.
# Profit & Loss
### January 1 through July 30, 2005

|  | Jan 1 - Jul 30, 05 |
|---|---|
| **Ordinary Income/Expense** | |
| **Income** | |
| Interest Income | 37.43 |
| **Legal Fees** | |
| A Luck | 243,192.94 |
| J Bodin | 177,960.59 |
| J Guillot | 77,015.65 |
| J McPhillips | 344,793.03 |
| K Rodgers | 105,241.17 |
| K Shinbaum | 232,496.11 |
| M Goldthwaite | 72,564.21 |
| **Total Legal Fees** | 1,253,263.70 |
| Refund to Firm | 1,581.00 |
| Transfer | -9,000.00 |
| **Total Income** | 1,245,882.13 |
| **Expense** | |
| **Accounting** | |
| CPA Services | 1,305.00 |
| Accounting - Other | 15,132.64 |
| **Total Accounting** | 16,437.64 |
| Adjustment | -100.00 |
| Advertising | 71,173.49 |
| **Bank Chrg** | |
| NSF Check | 1,200.00 |
| Bank Chrg - Other | 1,358.73 |
| **Total Bank Chrg** | 2,558.73 |
| **Case Expense & Receipts** | |
| Attorney Fees | 561,735.90 |
| Case Expense | 465,672.07 |
| Case Expense Deposit | -105,158.50 |
| Case Expense Reimbursed | -622.23 |
| Settlement Paid to Client | 1,477,863.84 |
| Settlement Proceeds Received | -2,385,961.78 |
| Case Expense & Receipts - Other | 40,259.24 |
| **Total Case Expense & Receipts** | 53,788.54 |
| Casual Labor | 1,310.00 |
| Continuing Legal Education | 3,240.67 |
| Employee personal expenditure | 0.00 |
| Insurance Expense | 52,844.39 |
| Interest Expense | 377.11 |
| Legal & Prof Exp | 20,498.96 |
| Lunch | 10.79 |
| Misc Expenses | 9,027.40 |
| Office copies | 63.94 |
| **Office Expense** | |
| Computer supplies | 7,586.40 |
| Gasoline Expense | 319.73 |
| Office Auto Expense | 8,564.10 |
| Office Copier | 4,344.20 |
| Office Equip | 2,694.44 |
| Office postage | 6,488.96 |
| Office supplies | 14,629.74 |
| Tax processing | 1.50 |
| Telephone | 11,158.51 |
| Utilites | 1,225.33 |
| Office Expense - Other | 536.64 |
| **Total Office Expense** | 57,549.55 |
| **Payroll Expenses** | |
| Bonus (no F/S taxes) | 9,941.61 |
| Bonus (with F/S taxes) | 1,250.00 |



EXHIBIT
B

12:22 PM

04/30/07

Cash Basis

# McPhillips Shinbaum L.L.P.
## Profit & Loss
### January 1 through July 30, 2005

| | Jan 1 - Jul 30, 05 |
|---|---|
| Salaries | 229,720.40 |
| Payroll Expenses - Other | 0.00 |
| **Total Payroll Expenses** | 240,912.01 |
| Payroll Tax Expense | 20,371.68 |
| Political Cont | 500.00 |
| Postage Supplies | 68.00 |
| Prof Dues - Meetings | 5,465.50 |
| Prof Publicatio | 5,184.45 |
| Prof Serv Exp | 500.00 |
| Professional Books | 419.89 |
| Public Relations | 49,272.34 |
| Refunds to Clients | 2,643.56 |
| Rent | 22,400.00 |
| Repairs & Maint | 31,684.96 |
| Settlement pd to Refer Attorney | 2,600.00 |
| Shipping / Freight | 389.99 |
| Taxes & Licenses | 395.04 |
| Travel & Entertainment | 391.85 |
| **Total Expense** | 671,980.48 |
| **Net Ordinary Income** | 573,901.65 |
| **Net Income** | **573,901.65** |

EXHIBIT

B

12:21 PM
04/30/07
Cash Basis

# McPhillips Shinbaum L.L.P.
## Profit & Loss
### January 1 through July 30, 2006

|                                       | Jan 1 - Jul 30, 06 |
|---------------------------------------|-------------------:|
| **Ordinary Income/Expense**           |                    |
| **Income**                            |                    |
| NSF Redeposit                         | 340.00             |
| Interest Income                       | 5.62               |
| **Legal Fees**                        |                    |
| A Luck                                | 240,880.42         |
| E Spear                               | 40,055.48          |
| J Bodin                               | 173,368.68         |
| J Guillot                             | 76,576.27          |
| J McPhillips                          | 38,382.22          |
| K Rodgers                             | 120,060.11         |
| K Shinbaum                            | 200,135.10         |
| M Goldthwaite                         | 30,568.26          |
| **Total Legal Fees**                  | 920,026.54         |
| Refund to Firm                        | 4,207.06           |
| Transfer                              | 0.00               |
| **Total Income**                      | 924,579.22         |
| **Expense**                           |                    |
| Reconciliation Discrepancies          | 4.96               |
| **Accounting**                        |                    |
| CPA Services                          | 3,803.00           |
| Accounting - Other                    | 10,867.32          |
| **Total Accounting**                  | 14,670.32          |
| Advertising                           | 95,635.49          |
| **Bank Chrg**                         |                    |
| NSF Check                             | 3,043.73           |
| Bank Chrg - Other                     | 1,138.38           |
| **Total Bank Chrg**                   | 4,182.11           |
| **Case Expense & Receipts**           |                    |
| Attorney Fees                         | 535,656.69         |
| Case Expense                          | 333,010.81         |
| Case Expense Deposit                  | -85,348.95         |
| Case Expense Reimbursed               | -5,998.13          |
| Settlement Paid to Client             | 1,162,494.80       |
| Settlement Proceeds Received          | -1,966,703.14      |
| Case Expense & Receipts - Other       | -436.37            |
| **Total Case Expense & Receipts**     | -27,324.29         |
| Employee personal expendure           | 0.00               |
| Insurance Expense                     | 56,144.20          |
| Interest Expense                      | 3,547.19           |
| Legal & Prof Exp                      | 24,928.49          |
| Misc Expenses                         | 702.76             |
| **Office Expense**                    |                    |
| Computer supplies                     | 1,493.50           |
| Gasoline Expense                      | 1,115.22           |
| Office Auto Expense                   | 9,154.00           |
| Office Copier                         | 2,755.16           |
| Office Equip                          | 5,317.53           |
| Office postage                        | 5,247.96           |
| Office supplies                       | 15,795.22          |
| Telephone                             | 8,380.77           |
| Utilites                              | 6,429.50           |
| **Total Office Expense**              | 55,688.86          |
| **Payroll Expenses**                  |                    |
| Bonus (no F/S taxes)                  | 3,862.00           |
| Bonus (with F/S taxes)                | 5.31               |
| Salaries                              | 237,300.01         |
| Payroll Expenses - Other              | 4,089.14           |
| **Total Payroll Expenses**            | 245,256.46         |



EXHIBIT
C

12:21 PM
04/30/07
Cash Basis

# McPhillips Shinbaum L.L.P.
## Profit & Loss
### January 1 through July 30, 2006

|  | Jan 1 - Jul 30, 06 |
| --- | --- |
| Payroll Tax Expense | 19,838.36 |
| Political Cont | 500.00 |
| Postage Supplies | 72.00 |
| Prof Dues - Meetings | 5,078.00 |
| Professional Books | 475.50 |
| Public Relations | 10,219.15 |
| Refunds to Clients | 1,637.56 |
| Rent | 9,373.88 |
| Repairs & Maint |  |
| Janitorial | 750.00 |
| Repairs & Maint - Other | 15,376.13 |
| Total Repairs & Maint | 16,126.13 |
| Retirement Contributions | 12,149.02 |
| Settlement pd to Refer Attorney | 3,376.84 |
| Taxes & Licenses | 1,362.00 |
| **Total Expense** | 553,644.99 |
| **Net Ordinary Income** | 370,934.23 |
| **Net Income** | **370,934.23** |



EXHIBIT