IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| CARROLL W. PUCKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. 2:06cv1148-ID |
| v. | ) | (WO) |
| | ) | |
| McPHILLIPS SHINBAUM, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Plaintiff Carroll W. Puckett ("Puckett"), a Caucasian male over the age of forty, sues the law firm where he formerly was employed, two of the firm's attorneys and the firm's business manager.  Puckett alleges that he was terminated, retaliated against for engaging in protected activity, and subjected to a hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621-634, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111-12117. Puckett also raises state-law claims.

Before the court is Defendants' motion for summary judgment, which is accompanied by three affidavits and a brief.  (Doc. Nos. 7-8.)  Puckett submitted a response in opposition to the motion, as well as two counter-affidavits.  (Doc. No. 20.) Defendants filed a reply, which is accompanied by an affidavit.  (Doc. No. 23.)  After

careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that Defendants' motion for summary judgment is due to be granted in part and denied in part.

## II.  JURISDICTION AND VENUE

This is a civil rights employment discrimination action brought pursuant to federal statutes and state law.  The court exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).  (See Compl. ¶ 3.)  Personal jurisdiction is not disputed.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986) (citations omitted).

Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The movant can meet this burden by presenting evidence showing that there is no dispute of material fact or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  Id. at 322-23, 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  FACTS

The facts contained in the parties' evidentiary submissions, viewed in the light most favorable to Puckett, show the following.  Puckett, a Caucasian male who is in his seventies, has performed work since 1979 in various capacities for Defendant Julian McPhillips ("McPhillips") and his law firm, which is now known as McPhillips

3

Shinbaum LLP ("the firm").  (Puckett Aff. ¶ 5); (McPhillips Aff. ¶ 1); (Shinbaum Aff.

¶ 1.)  At all material times to this litigation, Puckett was an employee of the law firm.

McPhillips and Defendant Kenneth Shinbaum are attorneys licensed to practice law in

Alabama.  (McPhillips Aff. ¶ 1); (Shinbaum Aff. ¶ 1.)  Defendant Amelia Strickland

("Strickland") has been employed by the firm since 1996 as the law firm's office manager

and bookkeeper.  (Strickland Aff. ¶ 1.)

　　　Puckett describes his work over the years for McPhillips and the firm as

encompassing real estate transactions, financial advice and the performance of

paralegal/legal assistant duties.  In 1985, after attending classes at night at a local law

school while working for the firm during the day, Puckett earned his Juris Doctorate

degree.  Puckett, however, is not licensed to practice law in the State of Alabama.  He has

taken the Alabama State Bar examination at least twice without passing, and, for that

reason, Puckett provided paralegal/legal assistance until his termination on April 28,

2006.  (Puckett Aff. ¶¶ 32-33); (Shinbaum Aff. ¶ 11.)

　　　At the time of his termination, Puckett earned an annual salary of $70,000.  His

total compensation was the sum of three categories of work he performed for the firm.

Specifically, he earned $44,000 for paralegal responsibilities, $18,000 for accounting

work, and $8,000 for building management.  (Strickland Aff. ¶ 8.)  His wife worked as

his legal secretary, earning a $10,000 annual salary.  (Betty Puckett Aff. ¶ 4.)  His and

her salaries were paid by the law firm.  (Strickland Second Aff. ¶ 8.)

During his tenure with the firm, Puckett experienced "life-threatening" illnesses. (Puckett Aff. ¶ 29.)  In December 2002, he underwent surgery for the removal of a kidney.  As a consequence, he was hospitalized for two days, but was "back at work" within three or four days.  (Id. ¶ 12.)  In June 2003, Puckett suffered a "minor" stroke, causing him to miss work for approximately three weeks.  (Id. ¶ 13.)  In September 2003, Puckett was hospitalized for "bleeding in [his] stomach," a side effect of prescribed medication, and he missed about a week of work.  (Id. ¶ 14.)  In December 2003, he was again hospitalized for three or four days for gastrointestinal problems.  (Id. ¶ 15.)  None of these illnesses, however, caused Puckett to fall behind at work or otherwise rendered him unable to fully and successfully perform his job duties.  (Id. ¶ 29.)

In June 2004, Puckett was diagnosed with prostate cancer, necessitating that he undergo forty-two outpatient radiation treatments, initially on a weekly basis but, later, on a biweekly basis.  (Id.)  For the most part, Puckett confined his treatments to his lunch hour, but "occasionally, [he] would be a little bit late getting back to the office."  (Id. ¶ 16.)  Throughout this time until his "recover[y]," Puckett performed all aspects of his job, and McPhillips did not criticize his work performance.  (Puckett Summ. J. Resp. at 4 (Doc. No. 20)); (Puckett Aff. ¶¶ 16-17.)

Puckett, though, attests that, beginning during the time period that he was undergoing radiation treatments, a "hostile work environment . . . ensued."  (Puckett Summ. J. Resp. at 4 (Doc. No. 20).)  Puckett says that the hostility took ten different forms.  (Id.)  First, McPhillips "was very hostile to [Puckett] about [his] being gone from

the office for short periods of time for [his] cancer treatments."  (Puckett Aff. ¶ 16);

(Puckett Summ. J. Resp. at 4 (Doc. No. 20).)  Second, after Puckett "started experiencing

illnesses," McPhillips refused to speak to him directly, instead requiring him to

communicate through an "intermediary."  (Puckett Aff. ¶¶ 27, 35); (Puckett Summ. J.

Resp. at 4 (Doc. No. 20).)  Third, in January 2006, while Puckett was on vacation, his

nameplate was removed from his office door.  (Betty Puckett Aff. ¶ 10); (Puckett Summ.

J. Resp. at 4 (Doc. No. 20).)  Fourth, from 2004 until Puckett was fired, Strickland

"would constantly question" his wife (Betty Puckett) about "when" Puckett "was going to

retire," sometimes asking, "Why doesn't [Puckett] just go ahead and retire?"  (Betty

Puckett Aff. ¶ 5); (Puckett Summ. J. Resp. at 4 (Doc. No. 20).)

     Fifth, on one occasion, which occurred "[w]ay prior to [his] termination," Puckett

discovered that "others in the law firm [were] rummaging through [his] assigned case

files in [his] office without [his] knowledge and [were] removing them[.]"  (Puckett Aff.

¶ 21.)  This discovery prompted Puckett to ask Strickland if the law firm was "'trying to

run [him] off?'"  (Id. ¶¶ 21, 27.)  Sixth, and relatedly, on several occasions, Strickland

retrieved files from Puckett's office and reassigned them to attorneys in the firm, and

McPhillips and Strickland "began to demand that [Puckett] provide an accounting of [his]

work time" which was "totally unprecedented."  (Id. ¶¶ 22, 27); (Betty Puckett Aff. ¶ 8);

(Puckett Summ. J. Resp. at 4 (Doc. No. 20).)  Seventh, McPhillips began assigning

Puckett cases which "were marginal in terms of possible liability and of little recovery

potential."  (Betty Puckett Aff. ¶ 9); (Puckett Summ. J. Resp. at 4 (Doc. No. 20).)

Eighth, Puckett was accused of violating "phantom" firm policies with respect to organizing his case files.  (Puckett Summ. J. Resp. at 4 (Doc. No. 20)); (Betty Puckett Aff. ¶ 8.)  Ninth, eventually, Puckett was no longer assigned new client cases or permitted to talk to clients.  (Puckett Aff. ¶¶ 22, 27, 36.)  Tenth, McPhillips began complaining about Puckett's age.  (Id. ¶ 25); (Puckett Summ. J. Resp. at 4 (Doc. No. 20).)

On April 28, 2006, Puckett was fired.  (McPhillips Aff. ¶ 6.)  McPhillips attests that Puckett's termination was a business necessity triggered by bad economic times at the firm.  Beginning in February 2006, McPhillips says that he became ill to the point that he was unable to work, and, consequently, the firm began losing revenue and had to undertake "cost saving measures."  (McPhillips Aff. ¶¶ 5, 7); (Shinbaum Aff. ¶ 15); (Strickland Aff. ¶ 6.)  The terminations of Puckett and Puckett's wife were part of these measures.  (McPhillips Aff. ¶ 6); (Shinbaum Aff. ¶ 15); (Strickland ¶ 5.)

Defendants have submitted a memorandum from McPhillips to Puckett and his wife, dated April 28, 2006, memorializing the firm's decision to terminate them.  (Doc. No. 7-2.)  It states, in pertinent part, as follows:

> This is to confirm the communication Kenneth [Shinbaum] and I had with you, Carroll [Puckett], yesterday that, because of a reduction of the firm's business and a reduction in what you are doing for the firm, this firm needs to pair down its expenses of operation, and therefore your services are no longer needed.  We are taking other measures to reduce expenses as well, in order to survive as a firm.

(Id.)  Puckett's accounting and building management responsibilities, for which he was paid $26,000, were absorbed by Strickland, who performed these duties "for the same

7

money [she] received as office manager and bookkeeper."  (Strickland Aff. ¶ 8.)  Also, Puckett's cases were reassigned to the firm's attorneys who were tasked with handling the cases without help from a paralegal.  (Id.); (McPhillips Aff. ¶¶ 8-9.)

Concerning the firm's "other measures to reduce expenses" (Doc. No. 7-2), Strickland explains that in April 2006 McPhillips, with the concurrence of the law firm's partners, "instructed" her to assist in reducing the firm's expenses.  (Strickland Aff. ¶ 7.) To name a few of the cost-cutting measures, a law clerk agreed to leave the firm effective March 3, 2006, saving the firm approximately $35,000 in salary and benefits, and McPhillips' legal secretary "was relieved of her duties with [McPhillips] in April 2006," and that position was not filled until McPhillips returned to work in October 2006. (Strickland Aff. at 2-6); (Strickland Second Aff. ¶ 12); (McPhillips Aff. ¶ 7.)  The firm also eliminated all public relations costs from February 2006 to August 2006, discontinued repairs to the firm's building, and began charging postage to clients. (Strickland Aff. at 2-6.)

Strickland explains that, due to McPhillips' illness and the fact that McPhillips did not see clients from April 2006 through July 2006, McPhillips' cases were divided among the other attorneys in the firm.  (Strickland Aff. ¶ 11.)  According to Strickland, "attorneys took over all cases previously worked on by non-attorneys in the firm." (Strickland Aff. ¶ 12.)  Also, "the firm determined that it could no longer afford a position for anyone who performed only law clerk or paralegal duties and who was not expected

8

ever to pass the Alabama bar exam." (Defs. Summ. J. Br. at 1 (Doc. No. 8), citing Strickland Aff. ¶¶ 11-13).)

In his affidavit, Puckett lists seven "paralegal or legal assistants" who were working for the firm when Puckett and his wife were fired. (Puckett Aff. ¶ 32.) Each of these individuals performed, among other duties, secretarial work for attorneys (id.), with the highest paid one earning an annual salary of $32,000. (Strickland Aff. ¶ 13.) Shinbaum and Strickland say that "Puckett did not have the skills necessary to perform secretarial duties for the attorneys." (Strickland Aff. ¶ 13); (Shinbaum Aff. ¶ 15.) For present purposes, however, the court accepts Puckett's contention that he "was capable of performing the full duties of a legal secretary." (Puckett Aff. ¶ 32.)

Puckett argues that "McPhillips' contention that [his] termination was related to poor economic conditions at the law firm is not true." (Puckett Aff. ¶ 25.) Puckett contends, among other things, that he was fired so that two "young females" could replace him. (Id. ¶¶ 25, 30.) The first "young female[]" is Elizabeth Bern-Spear ("Spear"), who Puckett contends is "Jewish." (Id. ¶ 19.) Puckett says that Shinbaum, who also is "Jewish," hired Spear to replace him and reassigned Puckett's caseload to Spear when Puckett was fired.[1] (Puckett Aff. ¶¶ 19, 30.)

Spear began working for the firm on August 15, 2005, and, that same month, Puckett "began training [Spear] on how to litigate work[er]'s compensation cases." (Id.

---

[1] The court notes that Shinbaum attests that Spear is not Jewish. (Shinbaum ¶ 12.)

9

¶¶ 10, 30); (Shinbaum Aff. ¶ 8.)  For the initial one-and-a-half months of her employment with the firm, Spear worked as a "law clerk/legal assistant" because, while she had taken the Alabama State Bar examination, she had not yet received the results.  (Shinbaum ¶ 8.) On September 30, 2005, Spear learned that she had passed the Bar examination, after which she became an attorney licensed to practice law in the State of Alabama.  (Id.) Shinbaum says that the firm intended that, once Spear was licensed to practice law in Alabama, she would handle the firm's worker's compensation cases independently without assistance from another lawyer.  (Id. ¶ 9.)  When hired, Spear's annual salary was $30,000.  By April 2006, Spear was earning a salary of $40,000, and was "reaching the point where she was able to try a worker's compensation case by herself."  (Shinbaum Aff. ¶ 9); (Strickland Aff. ¶ 9); (Puckett Aff. ¶ 25.)

The second "young female[]" who Puckett contends replaced him is Allison Highley ("Highley").  Highley, who during her tenure with the firm was a licensed attorney in the state of Washington, worked for the firm as a "legal assistant/law clerk" from the summer of 2005 until May 31, 2006.  (Puckett Aff. ¶ 32); (Strickland ¶¶ 8A, 11,13.)  Highley was hired at an annual salary of $35,000 (Puckett Aff. ¶ 25), but, in or around April 2006, Highley's salary was reduced by $5,000, as part of the firm's multiple cutbacks.  (Puckett Aff. ¶ 25); (Strickland Aff. ¶ 8H.)  Puckett complains that, "about" the time that Spear and Highley were hired, McPhillips "was always complaining about [Puckett's] age and how old [he] was."  (Puckett Aff. ¶ 25); (see also id. ¶ 32 (McPhillips "kept complaining that I was 'too old.'")); (Puckett Summ. J. Resp. at 4 (Doc. No. 20).)

10

Defendants say that the firm retained Spear, but not Puckett, because she was an attorney licensed to practice law in Alabama who could take over the firm's worker's compensation litigation.  The firm retained Highley, but not Puckett, because on April 28, 2006 (the date of Puckett's termination), Highley planned on taking the Alabama Bar examination in July 2006 and the firm anticipated that Highley would pass the exam, given that she had passed the bar examination in another state.  At that point, Highley would be able to "try legal cases without the assistance of another attorney."  (Shinbaum Aff. ¶ 13.)  It is undisputed that Puckett had taken the Alabama State Bar examination more than once without success, that he had never passed a bar examination in another state, and that, as of the date of his termination, Puckett "was not planning on taking the Alabama Bar Exam again."  (Id. ¶¶ 11, 13.)  Consequently, Puckett was unable to "handle and try a worker's compensation case by himself," but, rather, "could only assist an attorney."  (Id. ¶ 11.)  Defendants also explain that Puckett was more expensive to retain as an employee than either Highley or Spear:  Puckett's $70,000 annual salary was double Highley's salary and substantially more than Spear's $40,000 annual salary.  (Id. at 12.)

Believing that his termination and treatment were the result of intentional discrimination and retaliation, Puckett filed this lawsuit on December 27, 2006, against the firm and its employees, namely, McPhillips, Shinbaum and Strickland.  The complaint contains eight counts.  In Count I, Puckett alleges "that he has been damaged by the age discrimination practiced by the Defendant[s'] termination of [him]," in violation of the

11

ADEA and Alabama's Age Discrimination in Employment Act ("AADEA"), Ala. Code § 25-1-20 *et seq.* (Compl. ¶¶ 26-28.)  Counts II and IV allege wrongful termination arising from "sex discrimination" and "national origin" discrimination, in violation of Title VII.  (Id. ¶¶ 29-32, 36-39.)  Count III alleges a Title VII "hostile work environment" claim.  (Id. ¶¶ 33-35.)  Count V is a Title VII retaliation claim, and Count VI embodies an ADA wrongful termination claim.  (Id. ¶¶ 40-46.)  Counts VII and VIII allege state-law claims for defamation and fraud.  (Id. ¶¶ 47-49.)

## V.  DISCUSSION

Defendants move for summary judgment on all claims in Puckett's complaint. Puckett opposes the motion.  The court turns to a discussion of the summary judgment arguments.

### A.  Puckett's Argument that Summary Judgment Must Be Denied until the Completion of Discovery

Puckett urges the court to defer a ruling on the summary judgment motion, asserting that the only evidence in the record is affidavits, that he "should be permitted to exhaust the discovery process," and that the procedural tool of summary judgment is "seldom" appropriate in employment discrimination cases which require application of the burden-shifting framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).  (Puckett Summ. J. Resp. at 7-12 (Doc. No. 20).)  For at least three reasons, the

court finds that Puckett has not demonstrated that the procedural posture of this case warrants either an outright denial of the summary judgment motion or a deferral on a ruling.

First, Puckett's "Rule 56(f) Statement" is not the equivalent of an affidavit (see Doc. No. 20 at 11), nor does the "Rule 56(f) Statement" set out in specific terms why Puckett "cannot present facts essential to justify its opposition."  Fed. R. Civ. P. 56(f); see Cormier v. Pennzoil Exploration & Prod. Co., 969 F.2d 1559, 1561 (5th Cir. 1992) ("To obtain a Rule 56(f) continuance, the nonmovant must present specific facts explaining how postponement of a ruling on the motion will enable him to rebut the movant's showing of the absence of a genuine issue of fact.").  Second, as pertains to the court's rulings which are adverse to Puckett, the court finds that, as to some claims, the record fails to show that further discovery is likely to produce the facts needed to withstand the summary judgment motion.  See Cormier, 969 F.2d at 1561.  As to other claims (such as discussed in Section V.B. below), the court finds that the issues raised by Defendants do not go to the merits and, thus, do not require discovery.

Third, the fact that this case involves employment discrimination claims subject to McDonnell Douglas' testing does not excuse Puckett from the summary judgment process.  Contrary to Puckett's argument, the summary judgment rule applies the same in

13

employment discrimination cases "just as in other cases."[2]  Chapman v. A1 Transp., 229

F.3d 1012, 1026 (11th Cir. 2000) (en banc).  Similarly, there is no requirement in the

governing rules that discovery must be completed prior to the filing of a summary

judgment motion.  See generally Celotex Corp., 477 U.S. at 317.


### B.  Individual Liability under Title VII, the ADEA and ADA

Defendants correctly argue that relief under Title VII, the ADEA and the ADA is

limited to the employer and is not available against employees in their individual

capacities.  See Mason v. Stallings, 82 F.3d 1007, 1009 (11th Cir. 1996) ("We hold that

the [ADA] does not provide for individual liability, only for employer liability."); Smith

v. Lomax, 45 F.3d 402, 404 n.4 (11th Cir. 1995) (individuals "cannot be held liable under

the ADEA or Title VII"); (Defs. Summ. J. Br. at 6-7 (Doc. No. 8).)  Puckett does not take

issue with Defendants' argument or the foregoing Eleventh Circuit cases upon which

Defendants rely, but instead argues that McPhillips, Shinbaum and Strickland "are due to

remain . . . in this action in their 'official capacities.'"  (Puckett Summ. J. Resp. at 15

(Doc. No. 20).)  Puckett, though, has named his former employer which is the firm; thus,

it is unnecessary and redundant for him also to name the firm's individual employees in

their official capacities.  See, e.g., Clifton v. Ga. Merit Sys., 478 F. Supp.2d 1356, 1362

---

[2] It also has not gone unnoticed by the court that, while this case has been pending
for more than fourteen months, and discovery has been ongoing for a substantial period
of time, Puckett has not moved to supplement his opposition to the present motion.

(N.D. Ga. 2007) (dismissing ADA claims against individual employees in their official capacities as redundant of claims against the employer); <u>Jamison v. City of Forsyth, Georgia</u>, No. 5:06-cv-399, 2007 WL 1231663, *1 (M.D. Ga. April 26, 2007) ("where the employer is named as a defendant [under Title VII], it is unnecessary also to name an employee as an agent, even if the employee is named solely in his official capacity"). Based on the foregoing, the court finds that summary judgment is due to be entered in favor of Defendants on Puckett's Title VII, ADEA and ADA claims against McPhillips, Shinbaum and Strickland.

## C.  Title VII, the ADEA and the AADEA

In Counts I, II, and IV of his complaint, Puckett contends that he was terminated against on the basis of his gender, national origin, and age, in violation of Title VII, the ADEA and the AADEA.  (Compl. ¶¶ 26-32, 36-39); (<u>see generally</u> Puckett Summ. J. Resp. at 17-18, 24 (Doc. No. 20).)  Title VII states, in relevant part, that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. § 623(a)(1).

Because Puckett does not contend that there is direct evidence of discrimination, the allocation of proof on his Title VII, ADEA and AADEA claims shifts in accordance with the three-step procedure established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).  See Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 n.6 (11th Cir. 2001) (noting that "[a]though the McDonnell Douglas framework originally applied to Title VII cases, it is now widely accepted that the framework applies to claims of discrimination under the ADEA as well"); Bonham v. Regions Mortgage, Inc., 129 F. Supp.2d 1315, 1321 (M.D. Ala. 2001) (applying McDonnell Douglas to an AADEA claim "because it is self-evident that the AADEA's purpose and prohibition are like the ADEA's").

First, the employee must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated against him or her in taking the alleged adverse employment action.  See St. Mary's Honor Ctr., 509 U.S. at 506.  Second, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason.  Id. at 509.  The employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'"  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 509). Third, to avoid summary judgment, the employee must respond with pretext evidence,

which may include previously produced evidence establishing a prima facie case, which

demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could find them unworthy of credence."  Combs v. Plantation

Patterns, Meadowcraft, Inc., 106 F.3d 1519, 1538 (11th Cir. 1997) (citation and internal

quotation marks omitted).

     Urging summary judgment, Defendants rely on Knight v. Baptist Hospital of

Miami, Inc., in which the Eleventh Circuit held that a plaintiff establishes a prima facie

case of discrimination by showing that (1) he belongs to a protected class, (2) he was

subjected to an adverse employment action, (3) the employer treated similarly-situated

employees outside the protected class more favorably, and (4) he was qualified for the

position held.  330 F.3d 1313, 1316 (11th Cir. 2003); (Defs. Summ. J. Br. at 7 (Doc. No.

8).)  Defendants argue that, under the third requirement, Puckett cannot demonstrate that

he was "treated differently from anyone who was similarly situated" because "[t]here are

no law clerk/paralegal positions at [the firm] now."  (Defs. Summ. J. Br. at 8 (Doc. No.

8).)  Furthermore, Defendants assert that Puckett cannot bypass the "similarly situated"

prong by demonstrating instead that he was replaced by someone outside of his protected

class.  See Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003); Cuddeback

v. Fla. Bd. of Educ., 381 F.3d 1230, 1235 (11th Cir. 2004).  Defendants state that Puckett

was not replaced because Puckett was fired as a cost-cutting measure and his position

was completely eliminated.  (Defs. Summ. J. Br. at 8 (Doc. No. 8).)  Defendants also submit evidence that Puckett's duties merely were absorbed by other existing employees in the firm.  Hence, under both prima face tests, set out above, Defendants argue that Puckett fails to raise an inference of discrimination.

Puckett, however, insists that he was impermissibly replaced by Highley and Spear who were hired during the summer preceding his April 2006 termination.  On his Title VII national origin discrimination claim, Puckett maintains that Spear, an individual of "Jewish de[s]cent" and "paternal Jewish ancestry," was hired to replace him.  (Puckett Summ. J. Resp. at 17 (Doc. No. 20)); (Puckett Aff. ¶¶ 19, 30.)  Puckett says that, when Spear was hired in August 2005, he was assigned to train her on how to litigate worker's compensation cases and that, when he was fired, he was "replaced" by her.  (Puckett Aff. ¶¶ 10, 30.)  On his Title VII gender discrimination claim, Puckett contends, without elaboration, that he was "replaced" by Highley.  (Puckett Summ. J. Resp. at 18 (Doc. No. 20).)  As to Puckett's age discrimination claim, the court infers that Puckett is arguing that he was replaced by the "young" Highley and Spear.  (Puckett Aff. ¶ 25.)  Puckett also may be contending that Spear, Highley and possibly seven other named "paralegal or legal assistants" are similarly-situated employees, outside of his protected class, who were retained in lieu of him.  (Puckett Aff. ¶¶ 30, 32.)

Although not addressed by the parties, the court finds that a threshold issue is whether it is appropriate to apply either the Knight or Maynard prima facie case to the

18

facts of this case.  Defendants' position is that Puckett was fired purely for "economic reasons" as part of a reduction in force triggered by a financial crisis at the firm and that Puckett's job was eliminated in its entirety.[3]  (See Defs. Summ. J. Br. at 1-2 (Doc. No. 8).)  When an allegedly discriminatory firing takes place as part of a reduction in force, "the prima facie case is modified somewhat, such that the plaintiff must show (1) that []he is a member of a protected class, (2) that []he was terminated, (3) that []he was qualified for another position at the time of termination, and (4) that the employer intended to discriminate in failing to consider the plaintiff for another position."  Coutu v. Martin County Bd. of County Comm'rs., 47 F.3d 1068, 1073 (11th Cir. 1995); see also Jones v. BE&K Eng'g Co., 146 Fed. Appx. 356, 359 (11th Cir. 2005) (the modified prima facie formulation applies in a reduction-in-force "case . . . where a position is eliminated in its entirety").  The prima facie test is altered because in reduction-in-force cases, "the employer seldom seeks a replacement for the discharged employee."  Mauter v. Hardy Corp., 825 F.2d 1554, 1557 (11th Cir. 1987).

Although the Coutu formulation appears to align with their summary judgment arguments, Defendants have not relied on this formulation or mentioned it.  Puckett

---

[3] The court notes that "[a]n employer need not dismiss any particular number of employees, or terminate a set percentage of the work force, to institute a reduction in force."  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 845 (1st Cir. 1993).  "Rather, '[a] work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company.'"  Id. (internal quotations and emphasis omitted).

implicitly rejects <u>Coutu</u> by his express argument that he was replaced by Spear and Highley.  The court, thus, first must decide whether Puckett was replaced.

The Sixth Circuit in <u>Barnes v. GenCorp., Inc.</u>, provides guidance for determining whether a terminated employee's position was eliminated or whether the terminated employee was impermissibly replaced:

> [A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.  A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d 1457, 1465 (6th Cir. 1990); <u>see</u> <u>also</u> <u>Lilley v. BTM Corp.</u>, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement."); <u>Minton v. Am. Bankers Ins. Group, Inc.</u>, No. 02-12942, 2003 WL 21303330, *1 (11th Cir. Feb. 6, 2003) (affirming summary judgment for employer on ADEA claim and holding that plaintiff's termination was part of a legitimate reduction-in-force where plaintiff's many "former duties were scattered among several employees, some . . . younger than [plaintiff], and some within the same age group").

Turning first to Highley, the court carefully has examined the evidentiary record as a whole.  Puckett, though, has not pointed to any evidence or even argued that, prior to or after his termination, Highley was assigned any of Puckett's case load or any of his other firm duties.  Puckett's argument that Highley replaced him finds support neither in the

case law nor in the record.  Accordingly, as to Puckett's Title VII gender discrimination claim, the court finds that Puckett cannot argue that he was replaced by Highley.

Puckett, though, attests that Spear was "reassigned [his] caseload" when he was terminated.  (See Puckett Aff. ¶ 19.)  At the same time, Puckett has submitted evidence that the redistribution of Puckett's cases also fell on other existing firm employees. Notably, Puckett mentions two male attorneys by name to whom some of his cases were reassigned.  (Puckett Aff. ¶ 27.)  Puckett, thus, cannot maintain that *all* of his cases were reassigned to Spear; however, even if he could, he has not pointed to any evidence that Spear was assigned his caseload in lieu of her other duties.  He also has not argued, and appropriately so, that Spear, who was an attorney, was not already performing related work.  Also, in this case, it is undisputed that Puckett had other nonlegal responsibilities at the firm, namely, accounting and building management duties, and that Spear did not absorb these other duties.  Rather, the evidence establishes that, in addition to Strickland's job responsibilities as office manager and bookkeeper, Strickland took over Puckett's accounting and building management functions at no additional pay.[4] (Strickland Aff. ¶ 8.)  Based on these undisputed facts in light of the principles espoused in Barnes, *supra*, and the other cases cited above, the court finds that Puckett was not replaced by Spear, but rather that his multifaceted duties were redistributed among multiple, existing employees in the law firm.  No single employee assumed all of his

---

[4] The court notes that no argument has been advanced that Strickland "replaced" Puckett.  The argument, though, even if it had been advanced, would not be convincing.

duties, and there is no evidence that any employee who absorbed his duties, other than Spear, was of a different national origin than Puckett.  In other words, the court finds that, in this case, the reallocation of Puckett's duties among the firm's existing employees, only one of whom arguably is of a different national origin than Puckett, is consistent with, and indeed the very essence of, a reduction in force.  Accordingly, as to Puckett's Title VII national origin discrimination, the court finds that Puckett cannot argue that he was replaced by Spear.  Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 59 n.4 (1st Cir. 2005).

Because the evidence establishes that Puckett was not replaced, the court finds that it is appropriate to apply the Coutu prima facie formulation.  As stated, Defendants have not relied on this formulation, and the court declines to decide these claims based on a legal premise not advanced or briefed by Defendants.  Accordingly, the court assumes, without deciding, that Puckett has established a prima facie case of national origin and

sex discrimination.[5]  The court, thus, proceeds directly to the second and third prongs of the McDonell Douglas burden-shifting framework.

Defendants argue that, even if Puckett could demonstrate a prima facie case under either Title VII or the ADEA on his termination claims, Puckett would be unable to raise a genuine issue of material fact as to whether the firm's proffered reason for his termination is pretextual.  Defendants argue that the "indisputable facts show that [] Puckett's termination came at a time during which [the] law firm was experiencing financial difficulties and was cutting expenses substantially."  (Defs. Summ. J. Br. at 11-12 (Doc. No. 8).)   According to Defendants' evidence, the cutbacks began in February 2006, and ultimately included the termination of Puckett, yielding an annual savings for the firm of $70,000 in Puckett's salary alone.  Defendants also explain that Puckett's $70,000 annual salary was twice that of Highley's annual salary and substantially more than Spear's $40,000 annual salary and that Puckett's higher-paying salary, coupled with his failure to attain a license to practice law, made him less valuable

_____

[5] The court notes that the first prima facie element in a discrimination case requires the plaintiff to demonstrate that he or she is a member of a protected class.  As to Puckett's Title VII national origin discrimination claim, there is no evidence as to Puckett's national origin.  In his complaint, Puckett identifies himself as a "citizen of the United States of America," (Compl. ¶ 4), but the Supreme Court of the United States in Espinoza v. Farah Manufacturing Co., distinguished between the concepts of national origin and citizenship in interpreting Title VII's protections and held that Title VII does not protect against citizenship discrimination.  See 414 U.S. 86 (1973).  Defendants, though, have not challenged the first prima facie element, and, therefore, the court has assumed that Puckett is a member of a protected classification for purposes of his Title VII national origin discrimination claim.

to the firm than either Highley or Spear.  Shinbaum also points out that Puckett's termination "was particularly economical to the firm" because Puckett was the only "legal assistant [who] required the use of secretarial staff" and that, consequently, the firm was able to save an additional $10,000 which it paid to Puckett's wife who worked as Puckett's assistant.  (Shinbaum Aff. ¶ 15); (Betty Puckett Aff. ¶ 4.)

The court finds, and no contrary argument has been advanced, that Defendants have "clearly set forth, through the introduction of admissible evidence, the reasons for [Puckett's] [termination]."  Texas Dep't of Cmty. Affairs v. Burdine ("Burdine"), 450 U.S. 248, 255 (1981).  The court also finds that Defendants' properly-supported reasons are legitimate and non-discriminatory.  Coutu, 47 F.3d at 1073; see also Barnes, 896 F.2d at 1465 n.10 ("When work force reductions by the employer are a factor in the decision, 'the most common legitimate reasons' for the discharge are the work force reductions").

Because Defendants have satisfied their burden of producing competent evidence of a legitimate, nondiscriminatory reason for Puckett's termination, the burden shifts to Puckett to "meet [the proffered] reason head on and rebut it."  Chapman, 229 F.3d at 1030.  To satisfy his burden on summary judgment, Puckett must "present concrete evidence in the form of specific facts which show that [the firm's] proffered reason is mere pretext.  Mere conclusory allegations and assertions will not suffice."  Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990).  "The plaintiff must demonstrate weaknesses or implausibilities in the employer's proffered legitimate reasons

for its action sufficient for a reasonable factfinder to disbelieve the reasons." Rioux v.
City of Atlanta, Ga., ___ F.3d ___, ___, *7 2008 WL 710441 (11th Cir. March 18, 2008)
"It is the plaintiff's burden not merely to raise a suspicion regarding an improper motive,
but rather to demonstrate there is a genuine issue of material fact that the employer's
proffered reason for his [termination] was pretextual." Id. For the reasons to follow, the
court that Puckett has not met this task.

        In his brief, Puckett points to several types of evidence which he says
demonstrates pretext. (Puckett Summ. J. Resp. at 25-26 (Doc. No. 20).) First, Puckett
attempts to prove discrimination by arguing that the reduction-in-force itself was
pretextual. In this regard, Puckett argues that he has raised a genuine issue of material
fact as to whether the firm's revenue actually was declining. Namely, he asserts that the
firm's asserted reason of "declining revenue is belied by the fact that two . . . new
paralegals/law clerks were hired just prior to Puckett's termination." (Puckett Summ. J.
Resp. at 25-26 (Doc. No. 20), (citing Puckett Aff. ¶ 25).) The two "new paralegals/law
clerks" to whom Puckett is referring are Spear and Highley. Puckett's argument, though,
ignores the timing of Spear's and Highley's hiring. The uncontradicted evidence
establishes that the hiring of Highley and Spear preceded Puckett's termination by at least
eight months and, significantly, occurred some five months prior to the starting point of
the firm's economic downturn. Specifically, Highley was hired in the "summer of 2005"
and Spear in August 2005; the firm's cutbacks began in February 2006; and Puckett was

25

terminated in April 2006. This evidence demonstrates that neither Spear nor Highley was hired during the period of time when the firm was experiencing financial turmoil, but, rather that the firm's financial decline postdated the hiring of both Spear and Highley by more than six months. See Doan v. Seagate Tech., Inc., 82 F.3d 974, 977 (10th Cir. 1996) ("The fact that [employer's] managers were hiring before they learned of the RIF is irrelevant to proving that the RIF was pretextual."). Moreover, Puckett has not pointed to any evidence that the firm hired any new employees during the firm's asserted time of financial stress. Indeed, the affirmative evidence establishes that between March 2006 and September 2006, one law clerk and two attorneys resigned and that these three employees were not replaced. (See Strickland Second Aff. ¶¶ 12, 13 14 (Doc. No. 23-2).) In sum, the court finds that Puckett's bare-bone argument that the firm incurred expenses for new hires during its period of economic instability is not supported by the evidence.

Second, it appears that Puckett attempts to show pretext by challenging the necessity of the reduction in force. Puckett contends that, at the very least, he should be permitted to conduct discovery to ascertain "the true financial condition of the law firm" at the time of his termination, noting also that Defendants did not submit "financial statements, any profit/loss statements, []or any income tax returns . . . [to] confirm the truthfulness or falsity" of the asserted financial crisis. (Puckett Aff. ¶ 25); (Puckett Summ. J. Resp. at 25-26 (Doc. No. 20).) As part of their reply, Defendants submit evidence of a financial decline during the period in question, but, assert that whether the downsizing "was caused by real financial problems or was just what [] Puckett calls

26

'cry[ing] wolf'" is immaterial for purposes of summary judgment.  (See generally
Strickland Second Aff. (Doc. No. 23-2)); (Defs. Reply Br. at 4 (Doc. No. 23).)  The court
agrees with Defendants.

The Eighth Circuit has held that "'when a company exercises its business
judgment in deciding to reduce its work force, it need not provide evidence of financial
distress to make it a legitimate RIF.'"  Evers v. Alliant Techsystems, Inc., 241 F.3d 948,
956 (8th Cir. 2001) (citation omitted).  "'A company's exercise of its business judgment is
not a proper subject for judicial oversight.'"  Id. (internal quotations and citations
omitted).  Similarly, in Doan, supra, the Tenth Circuit held that the plaintiff's evidence
offered to show his employer's "financial health and profitability" was insufficient to
demonstrate pretext in a reduction-in-force ("RIF") case, reiterating that "'the wisdom of
a RIF is not for a court or jury to decide'" and that "'[t]he ADEA is not a vehicle for
reviewing the propriety of business decisions.'"  82 F.3d at 977 (citation omitted).  Case
law in this circuit is not to the contrary.  See Mitchell v. Worldwide Underwriters Ins.
Co., 967 F.2d 565, 567 (11th Cir. 1992) (holding that "[e]ven if the Company was wrong
on its cost effective determination, if that was the reason for the employment action, its
error in that determination would not be a basis for claiming age discrimination").

In this case, there is no dispute that the firm began cutting expenses in February
2006.  The reason underlying the firm's business decision to cut expenses and whether

that reason was judged incorrectly by the firm are not proper inquires at the <u>McDonnell Douglas</u> pretext stage based upon the foregoing authorities.

Third, Puckett argues that Spear and Highley are similarly-situated employees outside of Puckett's class (both being females and Spear allegedly being of a different national origin than Puckett[6]) who were treated more favorably than Puckett because they were retained, while he was terminated. (Puckett Aff. ¶ 30.) To show pretext, a plaintiff may rely on evidence of disparate treatment of a similarly-situated employee outside the protected class. See <u>Rioux v. City of Atlanta</u>, ___ F.3d ___, ___, 2008 WL 710441, *5

_____

[6] The court notes that whether or not Spear is of Jewish descent is contested. (Compare Puckett Aff. ¶¶ 19, 30, with Shinbaum Aff. ¶ 12.) Defendants, though, would contend that, for purposes of determining whether Spear is outside Puckett's protected class, the factual dispute is immaterial because "being Jewish" is not a protected classification for purposes of a Title VII national origin discrimination claim. (Defs. Summ. J. Br. at 9 (Doc. No. 8)); (Defs. Reply Br. at 3-4 (Doc. No. 23).) As support for their argument, Defendants rely on <u>Larson v. Portage Township School Corp.</u>, No. 2:05 CV 431 PS, 2006 WL 1660752 (N.D. Ind. June 14, 2006). (Defs. Reply Br. at 3-4 (Doc. No. 23).) In <u>Larson</u>, the court rejected a plaintiff's argument that she could base her Title VII national origin discrimination claim on allegations that she was treated less favorably than an alleged similarly-situated Jewish employee. As support for its finding, the <u>Larson</u> court relied upon <u>Lapine v. Edward Marshall Boehm, Inc.</u>, No. 89 C 8420, 1990 WL 43572 (N.D. Ill. March 28, 1990). As set out in <u>Larson</u>, the <u>Lapine</u> court "acknowledged that Judaism is indisputably a religion and has been held to constitute a race as well[,]" but found that "being Jewish gives no indication of an individual's country of origin '[n]or does it indicate the country of origin of one's ancestors or suggest the physical or cultural characteristics of a national origin group.'" <u>Larson</u>, 2006 WL 1660752 at *5 (quoting <u>Lapine</u>, 1990 WL 43572 at * 5). The parties have not cited any authority from this circuit, and the court is not aware of any. The court, however, finds that it is unnecessary to decide this issue because even assuming that Spear is outside Puckett's protected class, the court finds, for the reasons set out in this opinion, that Spear is not similarly situated to Puckett.

(11th Cir. March 18, 2008) (analyzing sufficiency of comparator evidence at the

McDonnell Douglas pretext stage).  A plaintiff, though, must show that the employees are

"similarly situated in all relevant respects."  Holifield v. Reno, 115 F.3d 1555, 1562 (11th

Cir. 1997).  Indeed, "[t]he comparator must be nearly identical to the plaintiff to prevent

courts from second-guessing a reasonable decision by the employer."  Wilson v. B/E

Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004).

At the time of Puckett's termination, Spear was a licensed attorney in the State of

Alabama, while Puckett was not.  Spear was hired with the expectation that she would

practice with the firm as an attorney, not as a paralegal or legal assistant, like Puckett.

Although Puckett arguably could competently perform many of the jobs performed by

Spear based upon his experience and legal education, he was not a licensed attorney who

could independently manage a case from its inception through trial, and it is this

distinction which makes him dissimilarly situated to Spear, who in addition to holding a

Juris Doctorate degree, was licensed to practice law in Alabama.  Puckett, thus, cannot

compare himself to Spear.

Puckett, though, argues that Highley is a similarly-situated comparator because

during her tenure with the firm, "she was serving the firm as legal assistant/law clerk, the

same as [Puckett] was."  (Puckett Aff. ¶ 32.)  "If anyone should have been terminated for

economic reasons," Puckett says, "it should have been . . . Highley."  (Id.)  Although

Highley and Puckett may have shared a similar job title, the court disagrees that this similarity is sufficient to deem Highley a proper comparator for the following reasons.

At the pretext stage, "[t]he inquiry . . . centers upon the employer's beliefs[.]" Holifield, 115 F.3d at 1565 (citations omitted).  Defendants have expressed their beliefs that Highley was situated differently than Puckett, because on April 28, 2006 (the date of Puckett's termination), Defendants anticipated that Highley would take and pass the Alabama Bar examination in July 2006, and that, at that point, Highley would be able to "try legal cases without the assistance of another attorney."  (Shinbaum Aff. ¶ 13.)  The facts support Defendants' belief given that Highley had passed the bar examination in another state and was planning on taking the Alabama Bar examination in July 2006.  At the same time, Defendants did not believe that a prospect existed that Puckett would obtain a license to practice law in the State of Alabama, or in any other state.  The facts also support this belief of Defendant, as it is undisputed that Puckett had failed the Alabama State Bar examination more than once, had never passed a bar examination in any other state, and, on the date of his termination,  "was not planning on taking the Alabama Bar Exam again."  (Shinbaum Aff. ¶¶ 11, 13.)  Puckett simply has not provided any evidence which casts doubt on Defendants' belief that Highley was more valuable to the firm based upon her potential to contribute to the law firm as a licensed attorney. Accordingly, the court finds that Highley is not similarly situated to Puckett.

Moreover, the court finds that Spear and Highley are not similarly situated to Puckett because, as discussed above, Puckett held additional job duties not shared by Spear and Highley and for which he received additional compensation.  Also, Puckett at $70,000 a year, Puckett earned a substantially higher salary than Spear, who was paid $40,000 annually, and Highley who was paid $30,000.  Puckett has not cited any authority that an employer faced with a financial crisis cannot juxtapose employees' salaries and contributions when deciding which employees or positions would be the most cost effective to eliminate.  See Ramige v. McNeil Nutritionals, Inc., No. 05-0101-BH-B, 2006 WL 2798774, *17 (S.D. Ala. Sept. 29, 2006) (finding that employee who was terminated as part of a reduction-in-force was not similarly situated to retained employee and considering, among other factors, that the terminated employee "was compensated at a significantly higher rate").

Fourth, Puckett contends that he was capable of performing the duties of a legal secretary, and, for summary judgment purposes, the court accepts Puckett's contention. (Puckett Aff. ¶ 32); (But see Strickland Aff. ¶ 13 ("Puckett did not have the skills necessary to perform secretarial duties for the attorneys"); (Shinbaum Aff. ¶ 13 ("Puckett was not capable of performing the full duties of a legal secretary").)  It is not clear precisely why Puckett focuses on his legal secretarial qualifications.  To the extent that Puckett relies on this evidence to demonstrate that he was qualified for another position with the firm at the time of his termination, that issue comprises the second element of the Coutu prima facie case.  As discussed above, the court has assumed, for purposes of

31

the present analysis, that Puckett has satisfied this and all elements of the prima facie case.[7]  To the extent that Puckett is contending that he is similarly situated to the seven named legal secretaries, who he says also performed paralegal duties and who were retained, (Puckett Aff. ¶ 32), the argument is unavailing.  Puckett has not identified the national origin of any of these seven individuals; thus, Puckett has not shown that they are outside of his protected class for purposes of his Title VII national origin discrimination claim.  As to his gender discrimination claim, even assuming that each is female, it is undisputed that the highest paid of these seven individuals earned $32,000 annually, which is significantly lower than Puckett's $70,000 annual salary.  The court finds that these seven individuals are not similarly-situated comparators based upon the substantial disparity in pay between their salaries and Puckett's salary and also because Puckett's job entailed additional specialized duties and, thus, his job did not parallel their jobs in all relevant respects.

Fifth, and relatedly, the court has considered Puckett's arguments that he was more valuable to the firm than Highley and Spear based on his years of experience, the "superior quality of his work," his seniority with the firm and the fact that he "handled" substantially more cases than Highley.  (Puckett Aff. ¶ 32.)  The court accepts as true Puckett's evidence of his qualifications, abilities and quality of work and recognizes that

---

[7] The court notes that it has presumed this element to be satisfied, notwithstanding that there is no evidence in the record that Puckett would have taken a job as a legal secretary with a pay cut or that such a position was open.  See Mitchell, 967 F.2d at 568.

in a reduction-in-force scenario, "it is possible to show pretext by asserting superior qualifications[.]"  Tippie v. Spacelabs Med., Inc., 180 Fed. Appx. 51, 55 (11th Cir. 2006); Ash v. Tyson Foods, Inc., 546 U.S. 454, 457 (2006) (per curiam) ("[Q]ualifications evidence may suffice, at least in some circumstances, to show pretext.").  A plaintiff, however, only will be successful in establishing pretext if the "'disparities in qualifications [are] of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'"  Ash, 546 U.S. at 457 (citation omitted).  The court, though, finds, for the same reasons that Highley and Spear are not similarly-situated comparators, that Puckett's evidence fails to demonstrate that his qualifications were so much better than Spear's or Highley's that no reasonable employer could have chosen to terminate Puckett, while retaining Spear and Highley.  See id.

Based on the foregoing discussion, the court finds that Puckett has failed to present sufficient evidence to rebut Defendants' legitimate, non-discriminatory reason for terminating his employment with the firm so as to warrant the entry of summary judgment in favor of Defendants on Puckett's Title VII gender and national origin discrimination claims.

The foregoing analysis, though, does not conclude the court's discussion on Puckett's ADEA claim because he has presented additional evidence which is specific only to this claim.  Namely, Puckett complains that, around the time that Spear and

Highley were hired, McPhillips "was always complaining about [Puckett's] age and how old [he] was." (Puckett Aff. ¶ 25); (see also id. ¶ 32 (McPhillips "kept complaining that I was 'too old.'")); (Puckett Summ. J. Resp. at 4 (Doc. No. 20).) Puckett also points to "constant[]" inquires made by Strickland of Puckett's wife concerning "when" Puckett "was going to retire" and "[w]hy doesn't [Puckett] just go ahead and retire?" (Betty Puckett Aff. ¶ 5.)

In Jones v. Gerwens, the Eleventh Circuit stated that the "[d]isparate treatment analysis requires that none of the participants in the decision-making process be influenced by racial bias." 874 F.2d 1534, 1541 n.13 (11th Cir. 1989). "[A]s a general rule, remarks that show bias are particularly probative of discrimination when they are made by the person charged with making the employment decision at issue." Herawi v. Ala. Dep't. of Forensic Scis., 311 F. Supp.2d 1335, 1347 (M.D. Ala. 2004). On the other hand, biased comments by non-decisionmakers generally are insufficient to establish pretext. See Wallace v. O.C. Tanner Recognition Co., 299 F.3d 96, 101 (1st Cir. 2002); Mauter v. Hardy Corp., 825 F.2d 1554, 1558 (11th Cir. 1987).

In Alphin v. Sears, Roebuck & Co., an ADEA case, the plaintiff was terminated after thirty years of service with Sears. 940 F.2d 1497, 1498 (11th Cir. 1991). When he was fired, the plaintiff was the "most senior" and the "most highly paid" of the sales managers in the store where he worked. Id. at 1498. The only negative performance evaluations the plaintiff received while employed by Sears occurred the same year that he

was fired, and the manager who issued the negative evaluations was the one who made the decision to fire the plaintiff.   See id. at 1498, 1501.  During the same time period, the manager who fired the plaintiff also "repeatedly suggested that [the plaintiff] resign" and, on one occasion, said to the plaintiff,  "'[B]oth of us had been around too long and [are] too old and [are] making too much money." Id. at 1499.  The Eleventh Circuit held that the "remark that [the plaintiff] was 'too old,' although ambiguous, certainly supports a showing of discriminatory intent if we interpret the remark in the light most favorable to [the plaintiff]." Id. at 1501.  The court also considered that the plaintiff had a "history of favorable job evaluations" and noted specifically that the "timing" of one of the plaintiff's job citations was particularly "suspicious." Id.  Reversing the grant of summary judgment in the employer's favor, the Eleventh Circuit held that the plaintiff had met his burden of establishing a prima facie case and that the plaintiff was entitled to a jury trial on the issue of whether discriminatory intent motivated the plaintiff's discharge.  Id. at 1502.

Here, McPhillips undisputedly, along with Shinbaum, made the decision to terminate Puckett, and McPhillips authored the memorandum to Puckett memorializing the termination decision.  (See Doc. No. 7-2.)  The context of McPhillips' alleged statements to Puckett that he was "too old" admittedly is not clear and, thus, is "ambiguous," as was the manager's statement in Alphin.  Alphin, 940 F.2d at 1501.  The court nonetheless finds, as in Alphin, that this circumstantial evidence is indicative of discriminatory intent when construed in the light most favorable to Puckett.  In one regard, the evidence is stronger than that in Alphin because, according to Puckett,

McPhillips repeatedly complained that Puckett was too old in contrast to the manager's "too old" comment in Alphin which occurred on a single occasion.  Cf. Siegel v. Alpha Wire Corp., 894 F.2d 50, 55 (3rd Cir. 1990) (reversing summary judgment for employer on ADEA claim and holding that plaintiff demonstrated pretext in light of company's president's repeated use of the phrase "old dogs won't hunt").  Moreover, as in Alphin, the onset of the statements occurred less than a year prior to Puckett's termination, thereby suggesting a relatedness between the comments and the employment decision. Also similar to the facts in Alphin, McPhillips' alleged remarks were accompanied by criticisms of Puckett's job performance (see, e.g. McPhillips Aff. ¶ 8), when previously Puckett had "never received an unfavorable performance evaluation."  (Puckett Aff. ¶ 11.)

Defendants argue that Strickland's inquiries to Puckett's wife about when Puckett was going to retire are not probative because Strickland did not have the authority to fire Puckett.  (Defs. Reply Br. at 12 (Doc. No. 23).)  Defendants point to Strickland's attestation that she "had no authority to fire anyone, and certainly had no authority to require, or even ask, anyone to retire."  (Strickland Second Aff. ¶ 9.)  In her original affidavit, however, Strickland attests that McPhillips "instructed" her "to cut out all unnecessary expenses[.]"  (Strickland Aff. ¶ 7.)  In the next paragraph, Strickland cites "examples" of the steps taken to "reduce the overhead expenses," specifically listing, among other "examples," Puckett's termination.  (Id. ¶ 8.)  Construing these evidentiary inferences in Puckett's favor, one could infer that Strickland played an instrumental part in the determination of what expenses to eliminate.  In short, the court cannot find as a

36

matter of law that Strickland had no involvement in the decision to terminate Puckett based on the present record.  Defendants also argue that there is "nothing actionable in asking . . . when [an employee] is planning on retiring[.]"  (Defs. Reply Br. at 12 (Doc. No. 23).)  Defendants, however, do not cite any authority in support of their argument, and the court finds that Defendants' statement as a legal proposition is too broad.  For example, in <u>Wallace</u>, where the plaintiff was asked several times "about his retirement plans," the First Circuit held that none of the inquiries "had significant probative value" on the plaintiff's age discrimination claim.  299 F.3d at 99-100.  The court, however, did not reach the question of the "possible weight these comments might have had if" the employees who had asked the questions had been involved in the decision to terminate the plaintiff because it was undisputed that "neither of them played a role in the termination.  <u>Id.</u> at 101.

As an additional observation, the court observes that Defendants focus on McPhillips' "too old" comments and Strickland's retirement inquiries as comprising part of Puckett's hostile work environment claim.  (Defs. Reply Br. at 10-12 (Doc. No. 23).)  The complaint, however, does not contain an ADEA hostile work environment claim.[8]  In this sense, Defendants' legal arguments as to the probative value of the alleged age-tinged remarks are undeveloped.  The court also reiterates that, as discussed *supra*, for a similar reason, the court assumed *arguendo* that Puckett satisfied the ADEA prima facie

---

[8] With that said, the court notes that Defendants focus is understandable given that Puckett's pleadings are not models of clarity.

requirements.  The incomplete nature of the legal arguments also counsels against terminating the ADEA claim on summary judgment at this time.  While the court finds that summary judgment in Defendants' favor on the ADEA claim against the firm is due to be denied at this juncture, the court stresses, as did the court in <u>Alphin</u>, that Puckett's evidence "is in no sense dispositive of the allegations of age discrimination which he asserts" and that this court does "'not sit as a super-personnel department that reexamines an entity's business decisions.'"  940 F.2d at 1501 (citation omitted).  Indeed, further factual development may warrant the re-filing of a summary judgment motion on the age discrimination claims at a later time.  The court merely is saying that, based upon the state of the record and the arguments, summary judgment presently is not appropriate.

### D.  <u>The ADA</u>

Count VI of the complaint embodies an ADEA termination claim.  (Compl. ¶¶ 43-46.)  The ADA prohibits an employer from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  A claim under the ADA is analyzed under the same burden-shifting analysis applicable to Title VII claims.  <u>Earl v. Mervyns, Inc.</u>, 207 F.3d 1361, 1365 (11th Cir. 2000).  To establish a prima facie case of ADA discrimination, a plaintiff

38

"must demonstrate that [he] (1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability."  Greenberg v. BellSouth Telecomms., Inc., 498 F.3d 1258, 1263 (11th Cir. 2007) (internal quotations omitted).

For summary judgment purposes, Defendants focus on the first element, arguing that Puckett cannot make out a prima facie case because Puckett has not submitted any evidence that he is "disabled" or that the firm "regarded" him as disabled.  (Defs. Summ. J. Br. at 10 (Doc. No. 8).)  Puckett counters that he had a kidney removed in 2002, had a stroke in 2003, was hospitalized twice for gastrointestinal problems in 2003, and was diagnosed with prostate cancer in June 2004, the latter of which required weekly and biweekly outpatient radiation treatments.  Puckett alleges that he was terminated on April 28, 2006, on the basis of these "health problems," in violation of the ADA.  (Puckett Summ. J. Resp. at 22 (Doc. No. 20).)  Puckett argues that, at the very least, the firm perceived that he was disabled and that he "has shown that his perceived impairment has limited his employment generally[.]"  (Puckett Summ. J. Resp. at 22 (Doc. No. 20).)

The ADA defines "disability," in pertinent part, as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual" or "being regarded as having such an impairment."  42 U.S.C. § 12102(2)(A) & (C).  "Major life activities" encompass "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working*."  29 C.F.R § 1630.2(I) (emphasis added); Standard v. A.B.E.L. Servs., Inc., 161

F.3d 1318, 1327 n.1 (11th Cir. 1998).  The major life activity upon which Puckett relies is "working."  "When individuals claim that they are substantially limited in the major life activity of 'working,' their condition 'must significantly restrict [their] ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training skills and abilities.'"  Stewart v. Happy Herman's Cheshire Bridge, 117 F.3d 1278, 1285 (11th Cir. 1997).

The problem with Puckett's claim is that he has not presented any evidence that his physical illnesses – which include kidney removal, gastrointestinal problems, a stroke and prostate cancer – restricted in any manner his ability to perform his job at the firm, much less a class of jobs.  In fact, his evidence is to the contrary.  Namely, in his affidavit, Puckett attests no less than six times that "at all times" during his illnesses, he "was able to perform" all the duties of his job and was not restricted by his health problems in his ability to work.  (Puckett Aff. ¶¶ 12-18); (Puckett Summ. J. Resp. at 22 (Doc. No. 20).)  Based on the undisputed evidence, the court finds that Puckett has not raised a genuine issue of material fact as to whether he suffered a physical impairment which substantially limited a major life activity.

Alternatively, Puckett argues that, because he was terminated after his illnesses, rather than before, "the conclusion is inescapable that [the firm] perceived that he was disabled."  (Puckett Summ. J. Resp. at 22, 23 (Doc. No. 20).)  Puckett fails to cite any authority for this proposition, and, as discussed below, the argument is not cogent.

40

Pursuant to 42 U.S.C. § 12102(2)(C), an individual is "regarded as" disabled if his employer holds a false belief that he has a disability, that is, if the employer believes that the employee's impairment substantially limits his ability to work when, in fact, it does not.  See 29 C.F.R. § 1630.2( 1 ); Standard, 161 F.3d at 1327 ("the impairment must also be perceived to substantially limit a major life activity").  At best, Puckett has introduced evidence suggesting that the limited time he took from work to receive treatment for prostrate cancer angered McPhillips.  (Puckett Aff. ¶ 16.)  It is not enough, though, for Puckett to show that his employer was aware of his physical illnesses.  Puckett also must point to evidence from which it can be inferred that the firm perceived, considered or treated Puckett's prostrate cancer or other health problems as substantially limiting Puckett's ability to perform a broad class of jobs.  Roberts v. Rayonier, Inc., 135 Fed. Appx. 351, 356 (11th Cir. 2005) (observing that the Supreme Court has "stressed the difference between being severely restricted with regards to a particular job and the ADA's more stringent requirement that one be "unable to work in a broad class of jobs") (citation omitted).  The evidence in the record, however, is to the contrary.  Indeed, Puckett admits that McPhillips did not criticize his work performance during the time period that Puckett was away from the office receiving radiation treatments for his cancer or otherwise treat Puckett as incapable of performing his job (much less a broad class of jobs) either during or after any of his illnesses.  (Puckett Aff. ¶ 16.)  As Puckett points out, he (Puckett) never received a critical evaluation concerning his ability to perform his job responsibilities.  There simply is no evidence that McPhillips, or any other employee

with the law firm, regarded Puckett as physically unable, or substantially limited in his

ability, to perform his job as a paralegal or any other job.[9]

In sum, the court finds that Puckett has failed to create a genuine issue of material

fact, either that he had a disability, or that the firm regarded him as having one, as those

terms are defined by the ADA.  Accordingly, the court finds that Defendants' motion for

summary judgment on Puckett's ADA claim is due to be granted.

---

[9] The court also agrees with Defendants' alternative argument that the temporal proximity between Puckett's firing and his diagnosed illnesses is too remote to demonstrate a causal nexus between Puckett's alleged perceived disability and his termination.  See Johnson v. Boardman Petroleum, 923 F. Supp. 1563, 1569 (S.D. Ga. 1996) (ADA prima facie case requires a plaintiff to "show that the decision to terminate her was causally connected to or motivated by the employer's discrimination against a disability"); (Defs. Reply Br. at 14 (Doc. No. 23).)  Where an employee relies on temporal proximity to demonstrate the nexus, the temporal proximity "must be 'very close.'"  Garrett v. Univ. of Ala. at Birmingham Bd. of Trs., 507 F.3d 1306, 1316 (11th Cir. 2007) (citation omitted).  Here, the evidence establishes that prostrate cancer was Puckett's last illness of which the firm had knowledge, that Puckett was fired almost two years after his June 2004 diagnosis of prostrate cancer, and that Puckett's radiation treatments for the cancer had ceased with effective results by approximately June 2005 (about ten months before his termination).  (Puckett Aff. ¶¶ 16-17); (Shinbaum Aff. ¶ 7).  The Eleventh Circuit has held that time intervals less than that present here were insufficient to establish the requisite causal connection.  See Garrett, 507 F.3d at 1317 (holding that protected activity and adverse employment action "were not temporally close, much less 'very close'" where four and one-half months transpired between these two events).  Based on Garrett, the court finds that the substantial amount of time between Puckett's termination and Puckett's cancer diagnosis (as well as the cessation of radiation treatments) suggests that his termination was not causally connected to an actual or perceived disability.

E.   Title VII Retaliation

In Count V of his complaint, Puckett alleges a Title VII retaliation claim.  (Compl.

¶¶ 40-42.)  To establish a Title VII prima facie case of retaliation, a plaintiff must show

that (1) he "engaged in statutorily protected expression; (2) [he] suffered an adverse

employment action; and (3) the adverse action was causally related to the protected

expression."  Davis v. Coca-Cola Bottling Co. Consol., ___ F.3d ____, ____, 2008 WL

314962, *11 n.52 (11th Cir. 2008) (citation and internal quotations omitted).

Moving for summary judgment, Defendants contend that Puckett's "first report of

discrimination" occurred when Puckett filed his charge with the Equal Employment Opportunity

Commission ("EEOC") in July 2006.  (Defs. Summ. J. Br. at 13 (Doc. No. 8).)  Because

Puckett was fired in April 2006, prior to filing an EEOC charge, Defendants assert that

Puckett cannot demonstrate that "his termination was causally related to his complaint of

discrimination."  (Id.)  Puckett responds that the protected activity upon which he relies is

not the filing of his EEOC charge, but is his pre-termination inquiry to Strickland as to

whether the law firm was "'trying to run [him] off'" which he made in connection with

his discovery that others in the law firm were "rummaging through" and "removing" case

files from his office.[10]  (Puckett Aff. ¶ 21); (Puckett Summ. J. Resp. at 19 (Doc. No. 20).)
Addressing Puckett's argument in their reply, Defendants contend that Puckett still fails
to demonstrate that he engaged in statutorily protected expression because his comment
to Strickland is "general" in nature and does not refer to "unlawful discrimination."
(Defs. Reply Br. at 16-17 (Doc. No. 23).)  For the reasons to follow, the court agrees with
Defendants.

The issue is whether Puckett's pre-termination statement to Strickland qualifies as
protected expression under Title VII's opposition clause.[11]  "Under the opposition clause,
an employer may not retaliate against an employee because the employee 'has opposed
any practice made an unlawful employment practice by this subchapter.'"  Total Sys.

_____

[10] The court notes that, while Puckett's complaint alleges a Title VII retaliation
claim, Puckett argues an ADA retaliation claim in his response to the summary judgment
motion.  (Puckett Summ. J. Resp. at 19 (Doc. No. 20).)  Puckett cannot change the
statutory basis of his claim in a brief.  See Gilmour v. Gates, McDonald & Co., 382 F.3d
1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument
in a brief opposing summary judgment.").  In any event, the elements of a retaliation
claim are the same under the ADA and Title VII, see Farley v. Nationwide Mut. Ins. Co.,
197 F.3d 1322, 1336 (11th Cir. 1999), and Puckett's failure to convey to Strickland that he
was opposing any type of unlawful employment practice by the firm, as discussed below,
would cause his claim also to fail under the ADA.

[11] Because the filing of Puckett's EEOC charge postdated his termination, Puckett
correctly has not relied on his EEOC charge as the protected activity.  See EEOC v. Total
Sys. Servs., Inc., 221 F.3d 1171, 1174 (11th Cir. 2000); Perryman v. Johnson Prods. Co.,
698 F.2d 1138, 1142 n.8 (11th Cir. 1983) (noting that "a prima facie case of retaliatory
discharge" includes a requirement that the plaintiff prove "that he or she engaged in
protected opposition to Title VII discrimination or participated in a Title VII proceeding
[and] was disadvantaged by an action of the employer simultaneously with or subsequent
to such opposition or participation").

<u>Services, Inc.</u>, 221 F.3d at 1174 (quoting 42 U.S.C. § 2000e-3(a)).  Defendants cite two unpublished decisions from this circuit to support their position that Puckett's statement is not protected expression.  In <u>Brown v. City of Opelika</u>, the Eleventh Circuit affirmed the district court's summary judgment ruling on a Title VII retaliation claim in favor of the employer where the employee argued that her statement to a superior that she "wanted to make a complaint of 'harassment'" constituted protected activity.  <u>See</u> 211 Fed. Appx. 862, 863 (11th Cir. 2006); <u>Brown v. City of Opelika</u>, No. 3:05-CV-236-W, 2006 WL 1515836, *4 (M.D. Ala. May 30, 2006).  Affirming the judgment, the Eleventh Circuit explained that there was no evidence that, when making her complaint, the employee referred to "racial discrimination or harassment" or "mentioned the word 'race'" and that "she never voiced a complaint that the City was engaged in an unlawful employment practice."  <u>Brown</u>, 211 Fed. Appx. at 211; <u>see also</u> <u>Jeronimus v. Polk County Opportunity Council</u>, 145 Fed. Appx. 319, 326 (11th Cir. 2005) (plaintiff did not engage in Title VII protected activity when he complained of being "singled out" and being subjected to "harassment" and a "hostile environment" because plaintiff did not "suggest[] that his treatment was in any way related to his race or sex").

The court is persuaded by the reasoning of <u>Brown</u> and <u>Jeronimus</u> that Puckett's inquiry of Strickland does not constitute opposition to an unlawful employment practice by the firm.  Puckett merely asked Strickland whether the law firm was trying to rid him from its employ.  In his question to Strickland, Puckett did not use the words "sex" or "national origin" or otherwise indicate that he believed he was the victim of any type of

illegal discrimination whatsoever.  Put differently, Puckett's statement does not contain

any pronouncement that he believed the firm was trying to "run him off" based upon a

criterion protected by Title VII or any other federal anti-discrimination statute, nor did

Puckett express or even suggest that he was opposing an unlawful employment practice

of the firm.  Accordingly, the court finds that summary judgment is due to be entered in

Defendants' favor on Puckett's Title VII retaliation claim because Puckett cannot

establish a prima facie case.


## F.  Title VII Hostile Work Environment

Count III of Puckett's complaint alleges a Title VII hostile work environment

claim.[12]  (Compl. ¶¶ 33-35.)  Under Title VII, a hostile work environment claim "is

established upon proof that 'the workplace is permeated with discriminatory intimidation,

ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment.'"  Abbes v. Embraer

Servs., 195 Fed. Appx. 898, 901 (11th Cir. 2006) (examining Title VII national origin

hostile work environment claim and quoting Miller v. Kenworth of Dothan Inc., 277 F.3d

---

[12] Neither in his complaint nor in his brief does Puckett identify upon which Title
VII protected characteristic he bases his hostile work environment claim.  The court
generously has construed Puckett's Title VII hostile work environment claim as
encompassing both national origin and gender harassment, and it is on these types of
harassment which the court focuses.

46

1269, 1275 (11th Cir. 2002)).  To establish a hostile work environment claim on the basis

of sex or national origin harassment, a plaintiff must demonstrate that:

> (1) he belongs to a protected group; (2) he has been subjected to
> unwelcome harassment; (3) the harassment was based on the protected
> characteristic; (4) the harassment was sufficiently severe or pervasive to
> alter the terms and conditions of employment and thus create a
> discriminatorily abusive work environment; and (5) the employer is
> responsible for that environment under a theory of either direct or vicarious
> liability.

Id.

Defendants argue that Puckett has not demonstrated that the alleged harassing

actions "were taken because of his gender or national origin" and points out that "[t]he

allegations related to the hostile work environment claim were taken by other men who

were of the same national origin as [Puckett]."  (Defs. Summ. J. Br. at 14-15 (Doc. No.

8).)  Additionally, Defendants contend that, from an objective perspective, Puckett's

allegations of harassment are not sufficiently severe or pervasive.  (Id. at 15.)

Defendants, thus, argue that Puckett cannot satisfy the third and fourth Abbes elements.

Puckett's arguments are not directly responsive to Defendants'.  Puckett says that

"the atmosphere at the firm turned quite hostile towards him after his health problems

began."[13]  (Puckett Summ. J. Resp. at 16 (Doc. No. 20).)  Puckett, in essence, delineates

ten categories of harassment, which the court outlined earlier in this opinion (see, *supra*,

at pages five - seven) and which include (among other allegations) the removal of

---

[13] Puckett's argument is curious because Puckett has not brought an ADA hostile
work environment claim, but rather a Title VII hostile work environment claim.

Puckett's nameplate from his door, suggestions by firm employees that Puckett should

retire, and the reassignment of Puckett's cases.  (Puckett Summ. J. Resp. at 16-17 (Doc.

No. 20).)  Puckett argues that "[a]ll of this clearly constitutes abusive conduct which

affected conditions of [his] employment."  (Id. at 17.)  For the reasons to follow, the

court finds that Puckett fails to hurdle the summary judgment standard.

Title VII does not forbid abusive work environments "alone, however severe and

pervasive.  Instead, Title VII prohibits discrimination, including harassment that

discriminates *based on a protected category such as sex*."  Baldwin v. Blue Cross/Blue

Shield of Ala., 480 F.3d 1287, 1301-02 (11th Cir. 2007) (emphasis added); Oncale v.

Sundowner Offshore Servs., 523 U.S. 75, 80 (1998) (observing that the federal

anti-discrimination laws are not "a general civility code"; they prohibit only harassment

which is motivated by specified improper considerations).  In his brief, Puckett makes no

distinction between national origin and gender harassment.  In fact, he does not mention

either type of harassment in his brief or complaint.  Puckett merely complains of a hostile

work environment.  He has not alleged or argued that any of the incidents were motivated

by his gender or national origin, much less provided any evidentiary support.  Puckett's

failure to attribute any of the alleged harassing actions to his membership in a protected

category is fatal, in and of itself, to his Title VII hostile work environment claim.

Notwithstanding the dearth of analysis from Puckett, the court independently has

studied the incidents in question in the light most favorable to Puckett.  The court finds,

48

however, that all of the actions, on their face, have nothing to with gender or national

origin, and there is nothing in the record which would permit an inference that the alleged

abuse inferentially is connected to Puckett's protected status as an American or a male.

Cf. Dar Dar v. Associated Outdoor Club, Inc., 201 Fed. Appx. 718, 721 (11th Cir. 2006)

(holding that seven instances of alleged harassment "were neither sexual in nature nor

based on [plaintiff's] sex" as required to support claim of hostile work environment

sexual harassment under Title VII).  At best, the alleged harassing actions demonstrate

that Puckett was subjected to unequal or unfair treatment, but unfair treatment alone will

not suffice.  Puckett must demonstrate that the treatment would not have occurred but for

his gender or national origin.  Cf. Coutu, 47 F.3d at 1074 ("[u]nfair treatment, absent

discrimination based on race, sex, or national origin, is not an unlawful employment

practice under Title VII").  This he has failed to do.

     In sum, the court finds that the evidence does not create a genuine issue of material

fact on Puckett's Title VII claims of hostile work environment gender and national origin

harassment because Puckett has failed to demonstrate or even argue that any of the

alleged harassment was motivated by his national origin or gender.[14]  Because the

harassing incidents about which Puckett complains are plainly not based on gender or

national origin, they do not amount to "harassing conduct" to which the fourth element's

"severe or pervasive" test can be applied.  Dar Dar, 201 Fed. Appx. at 722 n.2.  Because

Puckett cannot demonstrate an essential element of his Title VII hostile work

environment prima facie case, Defendants are entitled to summary judgment on these

claims.


G.  State-law Claims:  Defamation and Fraud

       Puckett also brings state-law claims under Alabama law for defamation and fraud,

collectively against all "Defendants."  (Compl. ¶¶ 47-49.)  Defendants move for summary

judgment on both claims.  (Defs. Summ. J. Br. at 15-17 (Doc. No. 8).)

_____

       [14] See, e.g., Nettles v. LSG Sky Chefs, 211 Fed. Appx. 837, 839 (11th Cir. 2006)
(while plaintiff presented evidence that supervisor disagreed with and undermined
plaintiff, denied him training and unfavorably compared minority staff members with
non-minority staff members, plaintiff's "failure to show [that] any of these actions were
motivated by his race [was] fatal to his harassment claim"); Apodaca v. Sec'y of the
Dept. of Homeland Sec., 161 Fed. Appx. 897, 901-02 (11th Cir. 2006) (holding that
plaintiff "fail[ed] to establish a prima facie case for a pervasive hostile work environment
because he provides no evidence that any of his allegations were based on race or
national origin"); Smalls v. Allstate Ins. Co., 396 F. Supp.2d 364, 372 (S.D.N.Y. 2005)
("where there is no evidence that an allegedly hostile work environment was motivated by
a plaintiff's race, the claim must be dismissed").

*1.  Defamation*

In <u>Delta Health Group, Inc. v. Stafford</u>, the Supreme Court of Alabama set out the

elements of a defamation claim:

> "To establish a prima facie case of defamation, the plaintiff must show
> [1] that the defendant was at least negligent, [2] in publishing [3] a false
> and defamatory statement to another [4] concerning the plaintiff, [5] which
> is either actionable without having to prove special harm (actionable per se)
> or actionable upon allegations and proof of special harm (actionable per
> quod)."

887 So.2d 887, 895 (Ala. 2004) (quoting <u>Nelson v. Lapeyrouse Grain Corp.</u>, 534 So.2d

1085, 1091 (Ala. 1988)).

In their opening brief, Defendants point out that they have submitted affirmative

evidence that none of the Defendants ever has made an untrue statement about Puckett.

(Defs. Summ. J. Br. at 16 (Doc. No. 8)); (McPhillips Aff. ¶ 3); (Shinbaum Aff. ¶ 3);

(Strickland Aff. ¶ 3.)  Defendants, thus, contend that Puckett cannot establish the first

element.  Defendants also argue that Puckett fails to demonstrate the publication element

of his defamation claim.  (Defs. Summ. J. Br. at 16 (Doc. No. 8).)  In response, Puckett

says that "McPhillips defamed [him] when he instructed office personnel 'not to assign

any new cases to [Puckett]'" because McPhillips' instruction "implie[d] that [Puckett]

[was] incompetent in his profession, trade or business."  (Puckett Summ. J. Resp. at 27

(Doc. No. 20), citing Puckett Aff. ¶ 22 & Betty Puckett Aff. ¶ 9).)

51

Initially, because Puckett has mentioned only an alleged defamatory statement by McPhillips, the court finds that Puckett has abandoned his defamation claims against all Defendants, except McPhillips.  See Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ("the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").  Additionally, the court finds that the evidence upon which Puckett relies does actually prove that McPhillips directed anyone in the firm to reassign Puckett's cases.  In paragraph twenty-two of his affidavit, Puckett merely states that "the assignment of new cases to [him] totally ceased."  (Puckett Aff. ¶ 22.)  Puckett does not attribute the cessation of his case assignments to an express directive made by McPhillips to a third party.  Also, in paragraph nine of her affidavit, Betty Puckett's allegation is not that McPhillips directed others in the firm to stop giving Puckett cases.  Rather, her complaint is that McPhillips assigned Puckett cases which "were marginal in terms of possible liability and of little recovery potential."  (Betty Puckett Aff. ¶ 9.)  Assuming for the sake of argument, though, that McPhillips expressly directed firm employees to quit giving Puckett cases, the court agrees with Defendants that Puckett cannot demonstrate a publication.[15]

In Hayes v. Wal-Mart Stores, 953 F. Supp. 1334 (M.D. Ala. 1996), cited by Defendants, this court discussed in detail Alabama's publication rule applicable in

_____

[15] The court bypasses the issue of whether a mandate by McPhillips to reassign Puckett's cases implies a false fact about Puckett

52

defamation actions involving intracorporate communications.  The court need not repeat those principles here, but will apply them to the facts of this case.  Specifically, to the extent that McPhillips instructed other firm employees not to assign Puckett any new cases, there is no evidence that McPhillips' instruction was made to anyone other than firm employees whose duties encompassed the assignment of cases or was made other than in the line and scope of transacting the firm's business.  Accordingly, the court finds that there is insufficient evidence of a publication to sustain an action for defamation under Alabama law.  See id.  Accordingly, the court finds that summary judgment is due to be entered in Defendants' favor on Puckett's state-law defamation claim.

### 2.  Fraud

The arguments raised by Defendants in their opening summary judgment brief focus on the failure of Puckett to plead his fraud claim with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure.  (Defs. Summ. J. Br. at 16-17 (Doc. No. 8).)  Defendants, though, have not addressed whether, based on the posture of this case, Rule 9(b) is a proper basis for summary judgment.  The absence of discussion from Defendants on this issue is significant for at least three reasons.  First, a Rule 9(b) challenge typically should be addressed through a motion filed pursuant to Rule 12(e) of the Federal Rules of Civil Procedure.  See, e.g., Coffey v. Foamex L.P., 2 F.3d 157, 162 (6th Cir. 1993) (holding that "despite the plaintiffs' failure to satisfy the requirements of

Rule 9(b), in the absence of defendants' motion for more definite statement under Rule

12(e), dismissal on this basis alone would not be appropriate"); cf. Hayduk v. Lanna, 775

F.2d 441, 445 (1st Cir. 1985) (observing that as concerns Rule 9(b)'s particularity

requirement, "federal courts must be liberal in allowing parties to amend their

complaints").  Second, there is authority that a Rule 56 summary judgment motion should

not be decided solely on Rule 9(b) grounds.  See, e.g., Firstar Bank, N.A. v. Faul

Chevrolet, Inc., 249 F. Supp.2d 1029, 1043 (N.D. Ill. 2003) (declining to grant summary

judgment on the argument that the complaint failed to plead fraud with particularity

"because none of the policy reasons behind Rule 9(b) would be served").  Third, Puckett

explicitly objects on the ground of prematureness to the treatment of Defendants' motion

as one for summary judgment.  Based upon a combination of these three reasons, the

court declines to grant summary judgment in favor of Defendants on their argument that

the fraud claim fails to comply with Rule 9(b).[16]

---

[16] The court also declines to address *at this time* the "two additional" grounds for summary judgment which Defendants raised for the first time in their reply brief.  (Defs. Reply Br. at 20 (Doc. No. 23)); see Fisher v. Ciba Specialty Chemicals Corp., No. 03-0566-WS-B, 2007 WL 2302470, *4 (S.D. Ala. Aug. 8, 2007) ("[I]t is generally improper to raise new arguments for the first time in a reply brief" when the opposing party has "not had an opportunity to be heard on them").

## VI.  CONCLUSION

Defendants' motion for summary judgment is due to be granted on Puckett's following claims:  (1) Title VII, ADEA and ADA claims against the individual employees of the firm; (2) Title VII gender and national origin discrimination claims; (3) Title VII retaliation claim; (4) ADA claim; (5) Title VII hostile work environment gender and national origin harassment claims; and (6) state-law defamation claim.  Summary judgment is due to be denied on Puckett's age discrimination claims and state-law fraud claim.

## VII.  ORDER

Accordingly, it is CONSIDERED and ORDERED that Defendants' motion for summary judgment be and the same is hereby GRANTED in part and DENIED in part as set out herein.

DONE this 31st day of March, 2008.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE